# EXHIBIT A

## To Notice Of Removal
## In Matter of Sigal v. The General
## American Life Ins. Co., et al.

**Robert O Lampl,** Attorney at Law

960 Penn Avenue • Suite 1200 • Pittsburgh, PA 15222 • Phone 412/392-0330 • Fax 412/392-0335

| Robert O Lampl | John P. Lacher | James R. Cooney | Elsie R. Lampl | David L. Fuchs |
|---|---|---|---|---|
| rlampl@lampllaw.com | jlacher@lampllaw.com | jcooney@lampllaw.com | elampl@lampllaw.com | dfuchs@lampllaw.com |

January 8, 2013

**Via Certified Mail, Return Receipt Requested**
The Paul Revere Life Insurance Company
18 Chestnut Street,
Worcester, MA 01608-1528



     **Re: Michael B. Sigal v. The General American Life Insurance**
       **Company, et. al., Court of Common Pleas of Allegheny County,**
       **Pennsylvania – GD 13-000035**

I represent Michael B. Sigal, the Plaintiff in the above-captioned matter. I have enclosed a service copy of the Complaint in Civil Action initiating this action that was filed with the Court on January 2, 2013.

Very truly yours,

Rudy A. Fabian

c:   Michael B. Sigal

    Robert O Lampl

NOTICE OF SUIT TO SHERIFF OF ALLEGHENY CO.
You are hereby notified that on ___1/2/2013___
a COMPLAINT has been filed in this case
and you are required to serve the same on or before the
___2/1/2013___
Kate Barkman, Director
Department of Court Records

5░░░ IAN 1 1 20░░

## COMPLAINT IN CIVIL ACTION

### IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| Plaintiff(s)<br>**Sigal, Michael B.** | Case Number :<br> GD – 13 – 000035 |
| | Type of pleading:<br>**COMPLAINT** |
| | Filed on behalf of:<br>**Michael B. Sigal**<br><br>**Robert O. Lampl**<br>(Name of the filing party) |
| Vs<br>Defendant(s)<br>**Paul Revere Life Insurance Company**<br>**General American Life Insurance Company**<br>**Unum Group** | [X] Counsel of Record<br><br>[ ] Individual, If Pro Se |
| | Name, Address and Telephone Number :<br>**Robert O. Lampl**<br>**960 Penn Avenue**<br>**Suite 1200**<br>**Pittsburgh , PA 15222**<br>**412 392-0330** |
| | Attorney's State ID: **19809** |

Kate Barkman, Director, Department of Court Records

CERTIFIED FROM THE RECORD    CERTIFIED FROM ░░░░

*Kate Barkman*
DIRECTOR, DEPT. OF COURT RECORDS

CIVIL/FAMILY DIVISION
DEPARTMENT OF COURT RECORDS
ALLEGHENY COUNTY
FIRST FLOOR CITY-COUNTY BUILDING
414 GRANT STREET
PITTSBURGH, PA 15219-2469

BY _____    BY _____
      Clerk              Clerk

From: webmaster.pro@county.allegheny.pa.us [mailto:webmaster.pro@county.allegheny.pa.us]
Sent: Wednesday, January 02, 2013 10:37 AM
To: Robert Lampl
Cc: promail@county.allegheny.pa.us
Subject: Filing Confirmation CaseID :TMP234618

The following electronic filings have been received by the Allegheny County Civil/Family Division. Please
have this information available to check the status of these filings, or if you wish to submit exhibits by mail or
fax.
Case nbr:TMP234618
Description:Sigal vs The General American Life Insurance Compa
Docket Type:Complaint
Docket Number:1
Docket Date:01/02/2013
Docket Time:10:37:27
Status:Pending
Client ID:
Company ID:
Sheriff's Amount:$150.00
Civil/Family Division's Amount:$164.50
Total Amount:$314.50
Files received:
Z:\Sigal, Michael\Complaint 1-2-13.pdf
Z:\Sigal, Michael\Complaint Exhibit A 1-2-13.pdf Z:\Sigal, Michael\Complaint Exhibit B 1-2-13.pdf Z:\Sigal,
Michael\Complaint Exhibit C 1-2-13.pdf Z:\Sigal, Michael\Complaint Exhibit D 1-2-13.pdf Z:\Sigal,
Michael\Complaint Exhibit E 1-2-13.pdf Z:\Sigal, Michael\Complaint Verification 1-2-13.pdf


Your filings are being processed. Be advised this case is not officially filed until it is approved by Allegheny
County Civil/Family
Division. If approved, you will be notified via an electronic receipt
and the official date and time of filing will be the date and time listed
above At that time, your credit card will be debited. In the event
that this filing is not approved, your account will not be debited. Thank you for using the Civil/Family Division
Electronic Filing and Retrieval System.

NOTICE OF SUIT TO SHERIFF OF ALLEGHENY CO.
You are hereby notified that on ___1/2/2013___
a COMPLAINT has been filed in this case
and you are required to serve the same on or before the
___2/1/2013___
Kate Barkman, Director
Department of Court Records

OWWW IAN 1 1 2013

## COMPLAINT IN CIVIL ACTION

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| Plaintiff(s) **Sigal, Michael B.** | Case Number : GD – 13 – 000035 |
|---|---|
| | Type of pleading: **COMPLAINT** |
| | Filed on behalf of: **Michael B. Sigal** |
| | **Robert O. Lampl** (Name of the filing party) |
| Vs Defendant(s) **Paul Revere Life Insurance Company** **General American Life Insurance Company** **Unum Group** | [X] Counsel of Record [ ] Individual, If Pro Se |
| | Name, Address and Telephone Number : **Robert O. Lampl** **960 Penn Avenue** **Suite 1200** **Pittsburgh , PA 15222** **412 392-0330** |
| | Attorney's State ID: **19809** |



**Kate Barkman, Director, Department of Court Records**

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

E-FILED

JAN 0 2 2013

CIVIL/FAMILY DIVISION
DEPT. OF COURT RECORDS
ALLEGHENY COUNTY, PA

| | |
|---|---|
| MICHAEL B. SIGAL | CIVIL DIVISION |
| Plaintiff, | |
| vs. | Case No. _AD-13-35_ |
| THE GENERAL AMERICAN LIFE INSURANCE COMPANY, THE PAUL REVERE LIFE INSURANCE COMPANY and UNUM GROUP | COMPLAINT IN CIVIL ACTION |
| Defendants | Filed on behalf of Plaintiff: Michael B. Sigal |

Counsel of Record for this Party:

**Robert O. Lampl**
Pa. I.D. #19809

**James R. Cooney**
Pa. I.D. #32706

**David L. Fuchs**
Pa. I.D. # 205694

**Rudy A. Fabian**
Pa. I.D. #56703

960 Penn Avenue
Suite 1200
Pittsburgh, PA 15222
(412) 392-0330 – phone
(412) 392-0335 – fax
Email: rlampl@lampllaw.com

**JURY TRIAL DEMANDED**

## IN THE COURT OF COMMON PLEAS OF
## ALLEGHENY COUNTY, PENNSLVANIA

| | | |
|---|---|---|
| MICHAEL B. SIGAL | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | |
| THE GENERAL AMERICAN LIFE | ) | |
| INSURANCE COMPANY, THE PAUL | ) | COMPLAINT IN CIVIL ACTION |
| REVERE LIFE INSURANCE COMPANY | ) | |
| and UNUM GROUP | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |

### NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the claims set forth in the following pages, you must take action within TWENTY (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERRAL SERVICE
ALLEGHENY COUNTY BAR ASSOCIATION
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone:  (412)261-5555

2

**IN THE COURT OF COMMON PLEAS OF**
**ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL B. SIGAL | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | |
| THE GENERAL AMERICAN LIFE | ) | |
| INSURANCE COMPANY, THE PAUL | ) | COMPLAINT IN CIVIL ACTION |
| REVERE LIFE INSURANCE COMPANY | ) | |
| and UNUM GROUP | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |

## COMPLAINT IN CIVIL ACTION

AND NOW comes Michael B. Sigal ("Plaintiff" or "Sigal"), by and through his undersigned counsel, and files the following Complaint in Civil Action, stating as follows:

### Parties

1.    Plaintiff, Sigal is an adult individual residing in Allegheny County Pennsylvania.

2.    Defendant Paul Revere Life Insurance Company ("Paul Revere") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with principal place of business in Worcester, Massachusetts.

3.    Defendant UNUM Group ("UNUM") is a corporation organized and existing under the laws of the state of Delaware, with principal place of business in Chattanooga, Tennessee.

4.    Paul Revere is a wholly-owned subsidiary of UNUM.

3

5.     UNUM uses common management and processes in the administration of Paul Revere's business.

6.     UNUM adjusts claims for each of its subsidiaries, including Paul Revere, from common locations using common practices.

7.     Defendant The General American Life Insurance Company ("General American") is a corporation organized and existing under the laws of the state of Missouri, with principal place of business in St. Louis Missouri.

8.     Paul Revere acts as Administrator for General American.

9.     Paul Revere regularly conducts business in Allegheny County,

10.     UNUM regularly conducts business in Allegheny County, and in fact, has an office located in downtown Pittsburgh at 1001 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

11.     General American regularly conducts business in Allegheny County,

12.     In fact, General American has an office located in downtown Pittsburgh at 420 Fort Duquesne Boulevard, Pittsburgh, Pennsylvania, 15222.

### Factual Background

13.     Plaintiff was born in May, 1957.

14.     Plaintiff is presently a medical ophthalmologist.  At the time he purchased the disability policies at issue in this case, he was a surgical ophthalmologist

15.     In April, 1989, Plaintiff purchased an individual disability insurance policy, policy number 01-02385154, from Paul Revere. (This policy is attached hereto as Exhibit A).

4

16.     In October, 1989 Plaintiff purchased an individual disability insurance policy, policy number 01-02415363, from Paul Revere. (This policy is attached hereto as Exhibit B).

17.     In October, 1990, Plaintiff purchased an individual disability insurance policy, policy number 23-08463961, from General American. (This policy is attached hereto as Exhibit C).

18.     Plaintiff has, at all relevant times paid all premiums due under each of these policies.

19.     In 2001, Plaintiff's cardiologist, Dr. Edmundowicz ("Edmundowicz"), diagnosed Plaintiff with coronary artery disease, and told him that this condition was likely to worsen absent a change in diet, exercise and stress level.

20.     Edmundowicz immediately put Plaintiff on the appropriate medications for his condition.

21.     Subsequent annual calcium tests confirmed not only a clinically significant level of coronary artery disease, but also a significant increase in the rate at which it was progressing.

22.     In response to Plaintiff's query about steps he could take, in addition to religiously taking his medications, to slow the progression of this condition, Edmundowicz told him to eat a proper diet, get adequate, regular exercise, get enough sleep and, to avoid stress.

23.     When Edmundowicz asked Plaintiff about the most significant sources of stress in his life, he responded that there was enormous stress associated with his performing intraocular surgery.

24.    Even though Plaintiff was an eye surgeon, Edmundowicz immediately advised Plaintiff that removing the stress associated with such surgery would be significant in slowing the progression of his coronary artery disease.

25.    Plaintiff adopted all of his physician's suggestions, including weight loss, increased exercise, and stress reduction, which took the form of seeing a psychologist and suspending his performance of eye surgery as of July 1, 2004.

26.    In fall, 2004, Plaintiff submitted claims under all three of his individual disability insurance policies.

27.    The basis of Plaintiff's claims under these policies was that, as a result of his coronary artery disease, and the risk of it progressing, it had become necessary for him to discontinue performing intraocular surgery, which had resulted and continues to result in a significant loss of income.

28.    By letter written on behalf of "The General American Claims Unit" of/and "The Paul Revere Life Insurance Company," dated June 27, 2005 from Donna Terrasi, a "Disability Benefits Specialist," Plaintiff's claims under all three policies were denied.

29.    This denial letter was sent no less than seven months after Plaintiff first submitted his claim.

30.    In that letter, Ms. Terrasi claimed that this denial was based on a review of Plaintiff's medical file by an in-house physician who was board certified in internal medicine and cardiovascular disease.

31.    She also claimed in the letter that the denial was based on a telephone conversation between this in-house physician and Edmundowicz.

6

32.     She also claimed in the letter that the denial was based on a review of Plaintiff's medical file that had been conducted by a physician in Boston, Massachusetts in connection with Plaintiff's disability claim *under a different disability policy written by a different insurer.*

33.     The reason given in the letter for the denial of Plaintiff's claims was that there was no medical evidence to support the conclusion that Plaintiff was suffering from a cardiac condition that, at that time, physically limited him in performing all the occupational duties of an ophthalmologist, including surgery.

34.     The letter did not, however, address Plaintiff's actual claim, which was that he was forced to discontinue his surgical practice *in order to reduce stress*, which would, in turn, slow the progression of his coronary artery disease *so that he would not suffer actual physical harm in the future*

35.     On November 18, 2004, UNUM, Paul Revere and a number of their affiliated entities (collectively the "Companies") entered into a series of four substantially identical regulatory settlement agreements ("RSA's").  Paul Revere's RSA is attached hereto as Exhibit D and UNUM's RSA is attached hereto as Exhibit E.

36.     The RSA's were the culmination of a multistate targeted market conduct examination of the Companies initiated by the lead regulators of the states of Maine, Massachusetts and Tennessee.

37.     In addition to the three lead states, the RSA's were also executed by the United States Department of Labor and were ultimately adopted by the vast majority of the individual states.

7

38.    The purpose of the market conduct examination was to determine if the individual and group long term disability income claims handling practices of the Companies reflected unfair claim settlement practices.

39.    The RSA's represented a plan of corrective action to address "for the benefit of the Companies' current and former policyholders and insureds" the regulatory concerns raised by the examination.

40.    The RSA's embodied four main remedial measures: 1) the payment of a $15 million fine by the Companies; 2) the establishment of a process by which the Companies would reassess certain claims that they had previously denied; 3) changes to the prospective claim procedures of the Companies; and 4) the provision of oversight to insure compliance by the Companies.

41.    Specifically, the RSA's provided that the Companies were to:

    a.    utilize experienced claim processing personnel at the earliest stage of claim review;

    b.    through the mechanism of approval requirements, increase the involvement of higher level managers in claim denial decisions;

    c.    assure that there would be no interference from or attempt to influence by claims handling personnel in the appeals process;

    d.    obtain complete medical records necessary to make a denial decision;

    e.    fairly interpret and apply information from the claimants' attending physicians;

    f.    conduct an occupational review, when appropriate;

    g.    obtain an Independent Medical Evaluation ("IME");

h.     fairly interpret the IME, without any attempt to influence the impairment determinations of the professionals conducting the IME;

i.     select individuals to conduct IME's based on objective, professional criteria and not based on the results of prior IME's by that individual; and

j.     provide to the clinical, vocational and medical professionals involved in evaluating the claimant's impairment, all available medical, clinical and vocational evidence in the claim file, whether objective or subjective.

42.    In early 2010, Plaintiff began to experience arm pain while exercising.

43.    Testing revealed that Plaintiff's coronary heart disease had progressed to the point where surgery was required.

44.    On April 5, 2010 Edmundowicz determined that Plaintiff would require coronary bypass surgery.

45.    Therefore, as a result of the progression of his coronary artery disease that had been predicted by Edmundowicz, on April 7, 2010, Plaintiff underwent coronary bypass surgery.

46.    In early June, 2010, Plaintiff submitted a renewed claim for disability benefits under the three policies.

47.    In that claim, Plaintiff sought disability benefits for the period from July 1, 2004, the date on which he originally ceased his surgical practice, to April 5, 2010, the date by which his coronary artery disease had worsened to the point where Edmundowicz scheduled surgery.

48.    In that claim, Plaintiff also sought disability benefits for the period after April 5, 2010.

9

49.     By letter on UNUM letterhead dated November 18, 2010 from Cara J. Bernard, a "Lead Disability Benefits Specialist," Plaintiff's claim was denied as to both time periods.

50.     This denial letter was issued over five months after Plaintiff submitted his renewed claim.

51.     According to this letter, benefits for the earlier period were denied on the basis of the same reasoning as had previously been given in support of the denial of benefits for this period—that Plaintiff had not been physically incapable of performing intraocular surgery.

52.     According to the letter, benefits for the later period were denied because Plaintiff, who had ceased doing surgery almost six years earlier, did not become unable to perform any of his remaining occupational duties as a result of the worsening of his condition and ultimate surgery.

### Count I – Breach of Contract
### (Against Paul Revere )

53.     The allegations of Paragraphs 1 through 52 are incorporated herein by reference.

54.     Under the definitions in the two Paul Revere polices, up to July 1, 2004, "[Plaintiff's] Occupation" was ophthalmologic surgeon.

55.     Under the definitions in the two Paul Revere policies, Plaintiff's coronary artery disease was and continues to be a "Sickness," notwithstanding that, prior to July, 2004, it had caused Plaintiff no symptoms.

56.     Under the definitions in the two Paul Revere policies, Edmundowicz is a "Physician."

57.     Under "TOTAL DISABILITY IN YOUR OCCUPATION BENEFIT RIDERS" to both of the Paul Revere Policies, "Total Disability" means that because of Injury or Sickness:

10

1. [t]he insured] [is] unable to perform the important duties of [his] regular occupation; and 2. [he is] under the regular and personal care of a Physician."

58.     Under the definitions in the two Paul Revere policies, "Residual Disability," means that "due to Injury or Sickness," the insured is "unable to perform one or more of the important duties of [his] occupation…," and his "Loss of earnings is equal to at least 20% of [his] Prior Earnings while [he] was engaged in [his] Occupation or other occupation," and "[the insured] [is] under the regular and personal care of a Physician."

59.     At the time Plaintiff discontinued performing intraocular surgery, such surgery was a significant part of his occupation as an ophthalmological surgeon.

60.     As a result of the extreme stress associated with performing such surgery, Plaintiff was unable to continue performing such surgery without putting his future health at risk as a result of the worsening of his disease.

61.     Plaintiff's income after he ceased performing surgery was only about two thirds of what it had been prior to his discontinuing such surgeries.

62.     As a result of being unable to perform intraocular surgery, Plaintiff suffered a Total Disability within the meaning of the two Paul Revere Polices at the time he stopped doing surgery and that Total Disability continues to date.

63.     In the alternative, his cessation of his surgical practice was and continues to be a Residual Disability within the meaning of those two policies.

64.     Each of the Paul Revere policies provides that Paul Revere "will periodically pay a Total Disability benefit during [the insured's] Total Disability."

65.    Each of the Paul Revere policies provides that Paul Revere "will periodically pay a Residual Disability benefit during [the insured's] Residual Disability if the Residual Disability begins before [his] 65th birthday."

66.    Paul Revere has breached its two insurance contracts with Plaintiff by refusing to pay Total Disability benefits to him, notwithstanding that he has been under a Total Disability since July 1, 2004.

67.    In the alternative, Paul Revere has breached its two insurance contracts with Plaintiff by refusing to pay Residual Disability benefits to him, notwithstanding that he has been under a Residual Disability since July 1, 2004.

68.    As a direct and proximate result of the foregoing breaches of contract by Paul Revere, Plaintiff has sustained damages, including, *inter alia*, the following:

A.    Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under each of the two Paul Revere Policies, from July 1, 2004, to date;

B.    Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by Paul Revere; and

C.    Embarrassment in the medical community, as well as his personal community.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Paul Revere in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Paul Revere to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

12

## Count II – Breach of Contract
## (Against General American)

69.     The allegations of Paragraphs 1 through 68 are incorporated herein by reference.

70.     Under the definitions in the General American policy, Plaintiff's coronary artery disease was and continues to be a "Sickness."

71.     Under the definitions in the General American policy, Edmundowicz is a "Physician."

72.     Under the General American policy, "Total Disability and Totally Disabled" means that "as a result of Sickness or Injury or a combination of both, [the insured is] unable to perform all the material and substantial duties of the [insured's] regular occupation for the first 24 months.  After that [the insured] will be considered Totally Disabled if [he] is unable to perform all the material and substantial duties of any occupation for which [he] may be fitted by education, training or experience.  [The insured] must be under the regular care of a Physician, other than [the insured, himself]…"

73.     At the time Plaintiff discontinued performing intraocular surgery, such surgery was a significant part of his occupation as an ophthalmological surgeon and was, therefore, a "material and substantial duty" of his regular occupation, within the meaning of the General American Policy.

74.     As a result of the extreme stress associated with performing such surgery, Plaintiff was unable to continue performing such surgery without risking his future health as a result of the worsening of his disease.

75.     Immediately upon being unable to perform intraocular surgery, Plaintiff suffered a Total Disability within the meaning of the General American Policy.

76.    Plaintiff is, by education, training and experience, qualified to be an ophthalmological surgeon.

77.    Since he stopped doing surgery as a result of his coronary artery disease and was, therefore, first Totally Disabled, he remains unable to perform all the material and substantial duties of an ophthalmological surgeon.

78.    Accordingly, Plaintiff remains Totally Disabled, within the meaning of the General American Policy.

79.    The General American policy provides that "If [the insured] become[s] Totally Disabled while this Policy is in force, [General American] will pay the Monthly Benefit for Total Disability."

80.    General American has breached its insurance contract with Plaintiff by refusing to pay Total Disability benefits to him, notwithstanding that he has been Totally Disabled since July 1, 2004.

81.    As a direct and proximate result of the foregoing breaches of contract by General American, Plaintiff has sustained damages, including, *inter alia*, the following:

    A.    Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under his American General policy, from July 1, 2004, to date;

    B.    Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by General American; and

    C.    Embarrassment in the medical community, as well as his personal community.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against American General in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Paul Revere to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

### Count III – Breach of the Duty of Good Faith and Fair Dealing
### (Against General American and Paul Revere)

82.   The allegations of Paragraphs 1 through 81 are incorporated herein by reference.

83.   Every contract imposes on each of the parties a duty of good faith and fair dealing in its performance and its enforcement.

84.   Plaintiff's insurance policies with Paul Revere and General American are contracts that give rise to this duty of good faith and fair dealing.

85.   The duty of good faith and fair dealing assures the achievement of the purpose for which the contract was made.

86.   In the present case, Plaintiff purchased these disability polices to provide replacement income in the event that he could no longer practice as an ophthalmologic surgeon.

87.   The duty of good faith and fair dealing is intended to remove the possibility that the parties will not receive the fruits of the contract.

88.   By utilizing improper claims-handling methods, as set forth above, as well as a tortured analysis of the policy language, Paul Revere and General American have sought to thwart the purpose for which these policies were purchased and to deny Plaintiff the fruits of those policies.

89.     Accordingly, Paul Revere and General American are liable for breach of the duty of good faith and fair dealing.

90.     As a direct and proximate result of the foregoing breaches of the duty of good faith and fair dealing by Paul Revere and General American, Plaintiff has sustained damages, including, *inter alia*, the following:

      A.     Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under each of his three disability policies, from July 1, 2004, to date;

      B.     Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by Defendants; and

      C.     Embarrassment in the medical community, as well as his personal community.

      D.     Costs and legal fees that he has incurred in his effort to recover from Defendants the disability benefit payments to which he is entitled under his three policies with Defendants.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Paul Revere and General American in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Paul Revere to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

### Count IV – Breach of Third-Party Beneficiary Contract
### (Against UNUM and Paul Revere)

91.     The allegations of Paragraphs 1 through 90 are incorporated herein by reference.

92.     The November 18, 2004 RSA that UNUM executed is a contract between UNUM and certain of its affiliates, on the one hand, and the various state and federal insurance regulators, on the other hand.

93.     The November 18, 2004 RSA that Paul Revere executed is a contract between Paul Revere and various state and federal insurance regulators.

94.     In their respective RSA's, UNUM and Paul Revere agreed, *inter alia,* to adhere to the requirements of the RSA's that are set forth, *supra.*

95.     The UNUM RSA and the Paul Revere RSA each provided that it represented a plan of corrective action to address the regulatory concerns raised by the multistate targeted market conduct examination "for the benefit of the Companies' current and former policyholders and insureds."

96.     Accordingly, Plaintiff, who is a policyholder and an insured, is an intended-third party beneficiary of the UNUM RSA and of the Paul Revere RSA.

97.     UNUM and Paul Revere have each breached their respective RSA's in the following regards:

      a.      they have utilized low-level, poorly trained and poorly paid individuals to process Plaintiff's claim;

      b.      they have established financial incentives for these claims processors to deny as many claims as possible, which has affected the handling of Plaintiff's claim;

      c.      they have allowed these low-level personnel to proceed in the processing of Plaintiff's claim with virtually no oversight by managers;

17

d.      they have utilized inflated titles to hide from Plaintiff the fact that such unqualified low level people were handling his claim;

e.      they have not only allowed, but actually encouraged claims personnel to pressure those handling Plaintiff's appeal;

f.      they not only failed to review, but actually failed to obtain all of Plaintiff's relevant medical records;

g.      while paying lip service to a consideration of Edmundowicz's opinion, they entirely ignored his professional recommendation;

f.      they failed to conduct a proper occupational review, which would have revealed that the basis for the denial of Plaintiff's claim is untenable; and

g.      rather than selecting a physician to conduct a review of Plaintiff's file on the basis of objective, professional criteria, they instead utilized an already-completed review of Plaintiff's condition conducted for another insurance company, under a different policy, with unknown criteria and unknown information provided to the doctor, *and which they knew ahead of time favored a denial of his claim*.

98.    Accordingly, UNUM and Paul Revere are liable to Plaintiff for breaching the third-party beneficiary contracts represented by the RSA's.

99.    As a direct and proximate result of UNUM's and Paul Revere's foregoing breaches of the third-party beneficiary contracts represented by the RSA's, Plaintiff has sustained damages, including, *inter alia*, the following:

A.      Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under each of the two Paul Revere Policies, from July 1, 2004, to date;

B.      Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by Paul Revere; and

C.      Embarrassment in the medical community, as well as his personal community.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Paul Revere in an amount in excess of the arbitration limits of this Court, along with a permanent injunction compelling UNUM and Paul Revere to comply with the requirements of the RSA's as set forth in Paragraph 97, *supra,* and directing Paul Revere and UNUM to continue making disability benefit payments to Plaintiff for the remainder of his life, in addition to whatever addition relief this Court deems appropriate.

### Count V – Violation of the Unfair Trade Practices and Consumer Protection Act, 73 P.S. §201 et. seq.
### (Against All Defendants)

100.    The allegations of Paragraphs 1 through 99 are incorporated herein by reference.

101.    Defendants' conduct, as set forth above, is misfeasance that constitutes "fraudulent or deceptive conduct", within the meaning of 73 P.S. § 201-2(4) (xxi).

102.    Such conduct, in turn, constitutes "unfair or deceptive acts or practices in the conduct of…trade or commerce," within the meaning of 73 P.S. § 201-3.

103.    Plaintiff purchased the three disability insurance policies to provide replacement income for his family and himself if he ever had to stop practicing as an ophthalmologic

surgeon, which is, therefore, "primarily for personal, family or household purposes" within the meaning of 73 P.S. § 201-9.2.

104.   Defendants' "unfair or deceptive acts or practices in the conduct of...trade or commerce," are unlawful pursuant to 73 P.S. § 201-3.

105.   For years Plaintiff diligently paid the premiums on these policies with the expectation that they would provide replacement income if he ever had to stop practicing as an ophthalmologic surgeon.

106.   When he did, in fact, stop conducting surgery, however, Defendants improperly refused to pay benefits under the policies.

107.   Plaintiff's, inability to receive the benefits to which he is entitled comprises an "ascertainable loss of money or property," within the meaning of 73 P.S. § 201-9.2. as a result of Defendants' conduct

108.   Defendants' refusal to pay benefits was the result of the unlawful conduct described above.

109.   Accordingly, Defendants are liable to Plaintiff under Section 9.2 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2 for actual damages, for treble damages and for costs and attorney fees.

110.   As a direct and proximate result of the Defendants' Violation of the Unfair Trade Practices and Consumer Protection Act, Plaintiff has sustained damages, including, *inter alia*, the following:

>   A.   Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under his American General policy, from July 1, 2004, to date;

B.    Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by General American; and

C.    Embarrassment in the medical community, as well as his personal community.

D.    Costs and legal fees that he has incurred in his effort to recover from Defendants the disability benefit payments to which he is entitled under his three policies with Defendants.

E.    Statutory treble damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against American General for compensatory damages, legal fees and costs and punitive damages, in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Defendants to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

### Count IV – Violation of 42 Pa. C.S.A. § 8371.
### (Against All Defendants)

111.   The allegations of Paragraphs 1 through 110 are incorporated herein by reference.

112.   Forty-two Pa.C.S.A. § 8371, entitled "Actions on insurance policies" provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
  (1)  Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%

21

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

113.   As set forth in detail above, because the denial of Plaintiff's claim was predetermined, Defendants conducted nothing more than a sham investigation of his claim.

114.   Not only did Defendants' fail to reasonably investigate Plaintiff's claim, but they delayed considerably in conducting their sham investigation and in notifying him of the denials.

115.   Defendants lacked a reasonable basis for denying Plaintiff benefits—both before and after April 5, 2010.

116.   Defendants have at all times known that there existed no reasonable basis to deny Plaintiff's claim.

117.   Accordingly, Defendants have acted in bad faith toward Plaintiff.

118.   Defendants are, therefore, liable to Plaintiff under 42 Pa.C.S.A. § 8371. As a direct and proximate result of the foregoing manifestations of bad faith, Defendants are liable to Plaintiff for, *inter alia*, the following:

   A.   Compensatory damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under his American General policy, from July 1, 2004, to date;

   B.   Compensatory damages for the exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by General American; and

   C.   Compensatory damages for embarrassment in the medical community, as well as his personal community.

22

D.      Costs and legal fees that he has incurred in his effort to recover from Defendants the disability benefit payments to which he is entitled under his three policies with Defendants.

E.      Punitive damages.

F.      Prejudgment and post-judgment interest.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against American General for compensatory damages, legal fees and costs, interest and punitive damages, in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Defendants to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

### Count VII – Civil Conspiracy to Violate the Unfair Trade Practices and Consumer Protection Act, 73 P.S. §201 et. seq. (Against All Defendants)

119.   The allegations of Paragraphs 1 through 118 are incorporated herein by reference.

120.   UNUM uses common management and processes in the administration of Paul Revere's business.

121.   UNUM adjusts claims for each of its subsidiaries, including Paul Revere, from common locations using common practices.

122.   Paul Revere, in turn, acts as Administrator for General American.

123.   Much of the correspondence received by Plaintiff in connection with his claims consisted of pairs of identical, simultaneous letters, one on UNUM letterhead, written on

behalf of Paul Revere and the other one on General American letterhead, written on behalf of Paul Revere as Administrator for General American.

124.   The foregoing evidences a combination among UNUM, Paul Revere and General American.

125.   The common purpose of this combination was to deny Plaintiff's claim, irrespective of its merits.

126.   Such a predetermined denial of a disability claim is unlawful, as set forth above, in Counts I through VI.

127.   Defendants pursued and ultimately accomplished this unlawful common purpose through the conduct set forth in detail, above.

128.   Plaintiff has suffered significant harm, constituting legal damage, including but not limited to his inability to receive the substantial disability benefit payments to which he is entitled under the policies, as a result of Defendants' conduct.

129.   Accordingly, Defendants are liable to Plaintiff for civil conspiracy. As a direct and proximate result of Defendants' having engaged in this conspiracy, Plaintiff has sustained damages, including, *inter alia*, the following:

   A.   Damages for the loss of the monthly Total Disability benefits or Residual Disability benefits to which he is entitled, under his American General policy, from July 1, 2004, to date;

   B.   Exacerbation of his coronary artery disease as a result of the stress associated with the denial of his disability benefit payments by General American; and

C.     Embarrassment in the medical community, as well as his personal community.

D.     Costs and legal fees that he has incurred in his effort to recover from Defendants the disability benefit payments to which he is entitled under his three policies with Defendants.

E.     Statutory treble damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against American General for compensatory damages, legal fees and costs and punitive damages, in an amount in excess of the arbitration limits of this Court, along with a permanent injunction directing Defendants to continue making disability benefit payments to Plaintiff for the remainder of his life in addition to whatever additional relief this Court deems appropriate.

<strong>Respectfully submitted,</strong>

December 31, 2012

s/*Robert O Lampl*
Robert O. Lampl, Esquire
  PA Id. No. 19809
James R. Cooney, Esquire
  PA Id. No. 32706
David L. Fuchs, Esquire
  PA Id. No. 205694
Rudy A. Fabian, Esquire
  PA Id. No. 56703
960 Penn Avenue
Suite 1200
Pittsburgh, PA 15143
(412) 392-0330
Fax: (412) 392-0335

*Counsel for Plaintiff Michael B. Sigal*

## VERIFICATION

I, Michael B. Sigal, verify that the foregoing Complaint in Civil Action is true and correct to the best of my personal knowledge, information and belief. This statement and verification is made subject to the penalties of *18 Pa. C.S. §4904* relating to unsworn falsification to authorities, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: December ___, 2012          _____



# DUPLICATE

MICHAEL B SIGAL MD

0102385154   APR 28, 1989   **Date of Issue**

*Your Coverage & Policy Benefits*



G-73493 (4-03)

**EXHIBIT A**



**DUPLICATE**

# THE PAUL REVERE
## LIFE INSURANCE COMPANY

**18 CHESTNUT STREET**
**WORCESTER, MASSACHUSETTS  01608**

---

The Paul Revere Life Insurance Company will pay the benefits provided in this Policy for loss due to Injury or Sickness.

We have issued this Policy to You in consideration of the payment of the premium and the statements made in Your application. Your application is part of this Policy.

**Insured**        MICHAEL  B  SIGAL  MD

**Policy Number**    0102385154   APR 28, 1989      **Date of Issue**

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65. NO CHANGE IN PREMIUM RATES.** As long as the premium is paid on time, We cannot change Your Policy or its premium rate until Your 65th birthday.

**RENEWAL OPTIONS AFTER YOU REACH AGE 65. SUBJECT TO CHANGE IN PREMIUM RATES.** You may continue Your Policy for a Total Disability benefit with a limited benefit period while You are actively and regularly employed full time.  There is no age limit.  This option is explained in PART 7.

When You are no longer actively and regularly employed after age 65, You may continue Your Policy for the rest of Your life. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under the Policy. This option is explained in PART 8.

**PRE-EXISTING CONDITION.** During the first two years from the Date of Issue, We will not pay benefits for a Pre-existing Condition if it was not disclosed on Your application.  Also, We will not pay benefits for any loss We have excluded by name or specific description.

**YOUR RIGHT TO CANCEL.** If You are not satisfied with Your Policy, You may cancel it. Return the Policy to Us or Our agent by midnight of the tenth day after the date You receive it. If You return the Policy by mail, it must be properly addressed, postage prepaid, and postmarked no later than midnight of that tenth day. Our mailing address is 18 Chestnut Street, Worcester, Massachusetts 01608. Within ten days after We receive the Policy, We will refund any premium You have paid. The Policy will be considered to have never been issued.

**READ YOUR POLICY CAREFULLY.** It is a legal contract between You and Us.

Signed for The Paul Revere Life Insurance Company.

_____              _____
· Secretary                                President


Countersigned by _____

CHARTERED IN MASSACHUSETTS

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Renewal Provisions | 1 |
| Pre-existing Condition | 1 |
| Policy Schedule | 3 |
| Automatic Increase Benefit | 3 |
| Part 1 — Definitions | 6 |
| Part 2 — Benefits | 8 |
|     Total Disability | |
|     Residual Disability | |
|     Recovery Benefit | |
|     Presumptive Total Disability | |
|     Cosmetic or Transplant Surgery | |
|     Rehabilitation | |
|     Survivor Benefit | |
| Part 3 — Exclusions | 11 |
| Part 4 — Premium and Reinstatement | 12 |
| Part 5 — Waiver of Premium | 13 |
| Part 6 — Recurrent and Concurrent Disability | 13 |
| Part 7 — Renewal Option After Age 65<br>    If Employed - Total Disability Benefit | 14 |
| Part 8 — Renewal Option After Age 65<br>    If Not Employed - Hospital Confinement Indemnity | 15 |
| Part 9 — Claims | 16 |
| Part 10 — General Provisions | 17 |

A copy of Your application, added benefits You have purchased, and any added provisions are attached at the back of the Policy.

DISABILITY INCOME POLICY
THE PREFERRED PROFESSIONAL

MODIFICATION OF COVERAGE, IF ANY

NONE.

POLICY SCHEDULE

INSURED MICHAEL B SIGAL MD

POLICY
NUMBER  0102385154

DATE OF
ISSUE  APR 28, 1989

TABLE OF BENEFITS

| TOTAL DISABILITY | COMMENCEMENT DATE | MAXIMUM MONTHLY INDEMNITY | MAXIMUM BENEFIT PERIOD |
|---|---|---|---|
| FROM INJURY: | 91ST DAY OF DISABILITY | $3,800.00 | TO AGE 65 |
| FROM SICKNESS: | 91ST DAY OF DISABILITY | $3,800.00 | TO AGE 65 |

BUT FOR ANY MAXIMUM BENEFIT PERIOD OTHER THAN LIFETIME, TOTAL DIS-
ABILITY BENEFITS AND RESIDUAL DISABILITY BENEFITS SHALL NOT CONTINUE
BEYOND YOUR 65TH BIRTHDAY, EXCEPT AS STATED IN YOUR POLICY.
QUALIFICATION PERIOD FOR RESIDUAL DISABILITY:    0 DAYS

---------------------------TABLE OF ADDITIONAL BENEFITS-------------------------

| ADDITIONAL BENEFITS ATTACHED | AMOUNT OF BENEFITS | MAXIMUM BENEFIT PERIOD | ANNUAL PREMIUM PRIOR TO AGE 65 |
|---|---|---|---|
| FUTURE INCOME OPTION | | | $22.40 |
| UNIT OF INCREASE | $500.00 | -- | |
| MAXIMUM NUMBER OF UNITS | 10 UNITS | | |
| EXPIRATION DATE: | APR 28, 2007 | | |
| TOTAL DISABILITY IN YOUR OCCUPATION | -- | -- | $69.16 |

| | | |
|---|---|---|
| PREMIUM SUMMARY | NONSMOKER | |
| ANNUAL PREMIUM FOR ADDITIONAL BENEFITS | $91.56 | |
| ANNUAL PREMIUM FOR TOTAL DISABILITY BENEFITS | $1,096.66 | |
| TOTAL ANNUAL PREMIUM | $1,188.22 | |
| MODE OF PREMIUM SELECTED: | $1,188.22 ANNUALLY | |

PREMIUMS AFTER YOUR 65TH BIRTHDAY, IF THIS POLICY IS RENEWED AS PROVIDED
IN THE POLICY, ARE SUBJECT TO OUR RIGHT TO CHANGE PREMIUM RATES.86-9

960

INSURED MICHAEL B SIGAL MD

POLICY
NUMBER  0102385154

POLICY SCHEDULE III

-------------------------------AUTOMATIC INCREASES-------------------------

$190 WILL BE AUTOMATICALLY ADDED TO YOUR MONTHLY TOTAL DISABILITY BENEFIT
WITHOUT EVIDENCE OF INSURABILITY.  THIS WILL BE DONE ON EACH INCREASE DATE.

THESE INCREASES ARE SUBJECT TO THE TIMELY PAYMENT OF THE PROPER PREMIUM.
THESE PREMIUMS ARE BASED UPON YOUR ATTAINED AGE ON THE INCREASE DATE.  THEY
ARE LISTED BELOW.  IF ALL INCREASES GO INTO EFFECT, YOUR ANNUAL PREMIUM
WILL INCREASE BY        $323.96.

| INCREASE DATE | ANNUAL PREMIUM INCREASE |
|---------------|-------------------------|
| APR 28, 1990  | $59.19 |
| APR 28, 1991  | $61.79 |
| APR 28, 1992  | $64.60 |
| APR 28, 1993  | $67.62 |
| APR 28, 1994  | $70.76 |

A BENEFIT INCREASE WILL APPLY ONLY TO A DISABILITY WHICH STARTS AFTER THE
INCREASE DATE.  IT WILL NOT APPLY TO A CONTINUATION OF A PRIOR DISABILITY.
SEE THE RECURRENT DISABILITY SECTION OF THIS POLICY.  IF THE PREMIUM FOR
THE POLICY IS BEING WAIVED (SEE WAIVER OF PREMIUM SECTION) ON THE INCREASE
DATE, THE PREMIUM FOR THE INCREASE WILL ALSO BE WAIVED.  WHEN YOU RESUME
PAYING PREMIUMS FOR THE POLICY, YOU MUST ALSO START PAYING THE PREMIUM
FOR THE INCREASE.

YOU MAY REFUSE AN INCREASE BY NOTIFYING US IN WRITING PRIOR TO THE
INCREASE DATE.  YOUR REFUSAL OF AN INCREASE WILL NOT AFFECT THE REMAINING
AUTOMATIC INCREASES.  HOWEVER, IF YOU REFUSE THE FIRST TWO CONSECUTIVE
INCREASES ALL FURTHER INCREASES WILL BE CANCELLED.  THEN, AT YOUR REQUEST,
YOU MAY INCREASE YOUR MONTHLY TOTAL DISABILITY BENEFIT BY $30.00 ON THE
REMAINING INCREASE DATES.

WHEN THE ABOVE AUTOMATIC INCREASES STOP AND PRIOR TO YOUR 60TH BIRTHDAY,
YOU MAY APPLY FOR ADDITIONAL AUTOMATIC INCREASES.  YOU CAN DO THIS BY
MAKING FORMAL APPLICATION WITHIN THE PERIOD OF 60 DAYS PRIOR TO AND 31 DAYS
AFTER THE LAST INCREASE DATE SHOWN ABOVE.  APPROVAL WILL BE SUBJECT TO OUR
UNDERWRITING GUIDELINES.

INSURED        Michael B Sigal MD

POLICY NUMBER   `01023851540

POLICY OWNER    The Insured



POLICY SCHEDULE (CONTINUED)

----------------------------------AUTOMATIC INCREASES-----------------------------------------

AUTOMATIC INCREASES BENEFIT AMOUNT ON EACH INCREASE DATE  $190

| INCREASE DATE | MONTHLY BENEFIT INCREASE | ANNUAL PREMIUM INCREASE |
|---|---|---|
| April 28, 1995 | $190 | $75.56 |
| April 28, 1996 | $190 | $79.32 |
| April 28, 1997 | $190 | $83.19 |
| April 28, 1998 | $190 | $86.99 |
| April 28, 1999 | $190 | $90.82 |
| TOTAL INCREASE | $950 | $415.88 |

**POLICY CHANGE RIDER**

DUPLICATE

| Insured | Policy No. | Date Of Policy Change |
|---------|-----------|----------------------|
| Michael B Sigal MD | 0102385154 | April 28, 1995 |

At the request of the Insured and in consideration of the premium change stated herein, it is agreed that the above Policy is changed as of the date shown above, as follows:

TYPE OF CHANGE :  Exercised Future Income Option

|  | MAXIMUM MONTHLY AMOUNT | |
|--|------|------|
|  | OLD | NEW |
| Total Disability Benefit for Injury and Sickness: | $6,440.00 | $6,940.00 |

In consideration of the above change, the annual premium for your benefits have changed as follows :

|  | PREMIUM | |
|--|------|------|
|  | OLD | NEW |
| Total Disability Benefits: | $1,948.01 | $2,134.86 |
| Total Disability In Your Occupation Benefit, Form H779: | $125.13 | $137.13 |
| ALL OTHER BENEFITS REMAIN THE SAME | OLD | NEW |
| Total Annual Premium for policy: | $2,095.54 | $2,294.39 |
| Modal Premium: MONTHLY | $178.57 | $195.47 |

In the event additional insurance is issued under this Policy Change, the incontestable clause of the Policy will apply to such additional insurance from the date the Policy Change becomes effective.

All provisions of the policy to which this Policy Change is attached remain the same except where changed as stated above.

This Policy Change is effective on the date shown above. It forms a part of the Policy to which it is attached.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

*John H. Budd*

Secretary

Accepted by *Michael Sigal*

Insured

Form A592z



POLICY CHANGE RIDER

| Insured | Policy No. | Date Of Policy Change |
|---|---|---|
| Michael B Sigal MD | 0102385154 | April 28, 1993 |

At the request of the Insured and in consideration of the premium change stated herein, it is agreed that the above Policy is changed as of the date shown above, as follows:

TYPE OF CHANGE : Exercised Future Income Option

|  | MAXIMUM MONTHLY AMOUNT | |
|---|---|---|
|  | OLD | NEW |
| Total Disability Benefit for Injury and Sickness: | $5,370.00 | $5,870.00 |

In consideration of the above change, the annual premium for your benefits have changed as follows :

|  | PREMIUM | |
|---|---|---|
|  | OLD | NEW |
| Total Disability Benefits: | $1,578.22 | $1,747.22 |
| Total Disability In Your Occupation Benefit, Form H779: | $100.88 | $111.98 |

|  | OLD | NEW |
|---|---|---|
| ALL OTHER BENEFITS REMAIN THE SAME | | |
| Total Annual Premium for policy: | $1,701.50 | $1,881.60 |
| Modal Premium: MONTHLY | $145.08 | $160.39 |

In the event additional insurance is issued under this Policy Change, the incontestable clause of the Policy will apply to such additional insurance from the date the Policy Change becomes effective.

All provisions of the policy to which this Policy Change is attached remain the same except where changed as stated above.

This Policy Change is effective on the date shown above. It forms a part of the Policy to which it is attached.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

*John H. Budd*

Secretary

Accepted by

*Michael Sigal*

Insured

Form A592a

## POLICY CHANGE RIDER



| Insured | Policy No. | Date Of Policy Change |
|---|---|---|
| Michael B Sigal MD | 01023851540 | April 28, 1991 |

At the request of the Insured and in consideration of the premium change stated herein, it is agreed that the above Policy is changed as of the date shown above, as follows:

TYPE OF CHANGE : Exercised Future Income Option

| | MAXIMUM MONTHLY AMOUNT | |
|---|---|---|
| | OLD | NEW |
| Total Disability Benefit for Injury and Sickness: | $3,990.00 | $4,990.00 |

In consideration of the above change, the annual premium for your benefits have changed as follows :

| | PREMIUM | |
|---|---|---|
| | OLD | NEW |
| Total Disability Benefits: | $1,152.20 | $1,459.70 |
| Total Disability In Your Occupation Benefit, Form H779 : | $72.81 | $93.01 |
| ALL OTHER BENEFITS REMAIN THE SAME | OLD | NEW |
| Total Annual Premium for policy: | $1,247.41 | $1,575.11 |
| Modal Premium: MONTHLY | $106.48 | $134.33 |

In the event additional insurance is issued under this Policy Change, the incontestable clause of the Policy will apply to such additional insurance for a period of two years from the date the Policy Change becomes effective.

All provisions of the policy to which this Policy Change is attached remain the same except where changed as stated above.

This Policy Change is effective on the date shown above. It forms a part of the Policy to which it is attached.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

*John H. Budd*

Secretary

Accepted by

_____
Insured

Form A&S 592s82

## PART 1
## DEFINITIONS

THE FOLLOWING WORDS HAVE SPECIAL MEANINGS. THEY ARE IMPOR-
TANT IN DESCRIBING YOUR RIGHTS AND OUR RIGHTS UNDER THE POLICY.
REFER BACK TO THESE MEANINGS AS YOU READ YOUR POLICY.

1.1 **"Policy"** means the legal contract between You and Us. The policy,
the application, the Policy Schedule, and any attached papers that
We call riders, amendments, or endorsements make up the entire
contract between You and Us.

1.2 **"You"** and **"Your"** refer to the Insured named in the Policy Schedule.

1.3 **"We"**, **"Us"** and **"Our"** refer to The Paul Revere Life Insurance Com-
pany. Our Home Office is 18 Chestnut Street, Worcester,
Massachusetts, 01608.

1.4 **"Date of Issue"** means the date that the Policy becomes effective. It
is shown on the Policy Schedule.

1.5 **"Injury"** means accidental bodily injury sustained after the Date of Is-
sue and while Your Policy is in force.

1.6 **"Sickness"** means sickness or disease other than a Pre-existing
Condition which causes loss commencing while Your Policy is in
force. Complications of pregnancy or complications of childbirth are
treated as any other Sickness under the Policy. Sickness includes
Disability due to normal pregnancy or normal childbirth after You
have been Disabled for 90 days.

1.7 **"Physician"** means any licensed practitioner of the healing arts prac-
ticing within the scope of his or her license. A Physician must be a
person other than You.

1.8 **"Your Occupation"** means the occupation in which You are regularly
engaged at the time You become Disabled.

1.9 **"Total Disability"** means that because of Injury or Sickness:

   a. You are unable to perform the important duties of Your Occu-
   pation; and
   b. You are not engaged in any other gainful occupation; and
   c. You are under the regular and personal care of a Physician.

1.10 **"Pre-existing Condition"** means a Sickness or physical condition for
which medical advice or treatment was recommended by or received
from a Physician within a five-year period preceding the Date of Issue.

1.11   **"Residual Disability"**, prior to the Commencement Date, means that due to Injury or Sickness:

    a. (1) You are unable to perform one or more of the important duties of Your Occupation; or
       (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
    b. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and
    c. You are under the regular and personal care of a Physician.

As of the Commencement Date, Residual Disability means that due to the continuation of that Injury or Sickness:

    a. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and
    b. You are under the regular and personal care of a Physician.

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any.

1.12   **"Disability" or "Disabled"** refers to a continuing period of Total and/or Residual Disability.  Successive periods will be deemed to be continuing if:

    a.   Due to the same or related causes; and
    b.   Separated by no more than 6 months;

Otherwise such periods will be deemed to be new and separate Disabilities.

1.13   **"Commencement Date"** is the day shown on the Policy Schedule when benefits begin during a Disability.

1.14   **"Qualification Period"** is the number of days shown on the Policy Schedule that Total Disability must continue before Residual Disability benefits can be payable.

1.15   **"Maximum Benefit Period"** is the longest period of time We will pay benefits during any Disability. It is shown on the Policy Schedule.

For any Maximum Benefit Period other than lifetime, We will not pay Total Disability benefits beyond the later of:

    a.   Your 65th birthday; or
    b.   The date on which 24 months of benefits have been paid.

In no event will We pay Residual Disability benefits beyond Your 65th birthday unless Residual Disability begins within 3 months of Your 65th birthday. In that case, We will pay this benefit for a period not to exceed 3 months while You remain Residually Disabled.

## PART 2
## BENEFITS

### 2.1   TOTAL DISABILITY BENEFIT

We will periodically pay a Total Disability benefit during Your Total Disability. The monthly amount We will pay is the Maximum Monthly Amount. It is shown on the Policy Schedule.

This benefit will begin on the Commencement Date. We will continue to pay it while You remain Totally Disabled. But in no event will We pay beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Disability.

### 2.2   RESIDUAL DISABILITY BENEFIT

We will periodically pay a Residual Disability benefit during Your Residual Disability if the Residual Disability begins before Your 65th birthday.

The monthly amount We will pay equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad X \quad \text{Maximum Monthly Amount}$$

During any Disability each of the first 6 monthly payments will not be less than 50% of the Maximum Monthly Amount.

The benefit will begin on either the Commencement Date or the day after Your Total Disability ends, if later. We will continue to pay this benefit while You remain Residually Disabled, but not beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Disability.

"Loss of Earnings" for any month means Your Prior Earnings minus Your Monthly Earnings for the month for which Residual Disability is claimed. This difference must be due to the Injury or Sickness causing the Residual Disability.

If the Loss of Earnings for any month is 80% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings.

"Prior Earnings" means the greater of:

    a.  Your average Monthly Earnings for the 6 calendar months just before Your Disability began; or

    b.  Your highest average Monthly Earnings for any 2 successive years during the 5 year period just before Your Disability began.

Starting as of the first Review Date, We will make an inflation adjustment to Your Prior Earnings. We will multiply Your Prior Earnings by the CPI Factor. The result will be used until the next Review Date to compute Residual Disability benefit amounts payable. However, the inflation adjustment increase will be at least 7% of Your Prior Earnings amount.

The inflation adjustment will not apply once the Disability ends. But it will apply to recurrent Disability deemed continuing under the Recurrent Disability section of Your Policy.

*What is the Total Disability benefit?*

*When is the Residual Disability benefit payable?*

*How is the Residual Disability benefit calculated?*

"**CPI**" means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If this index is discontinued or if the method for computing it is materially changed, We may choose another index. We will choose an index which in Our opinion would most accurately reflect the rate of change in the cost of living in the United States. CPI will then mean the index We chose.

"**Review Date**" means the date that occurs:

    a.   After each successive 12 months of Disability; and
    b.   While Your Disability continues.

No Review Date will occur on or after Your 65th birthday.

"**Index Month**" means the calendar month four months prior to the calendar month in which a Review Date occurs. But the first Index Month for any Disability will be the calendar month 4 months prior to the month in which Your Disability began.

"**CPI Change**" means the result of a computation We will make as of each Review Date. We will divide the CPI for the most recent Index Month by the CPI for the Index Month prior to the most recent Index Month.

"**CPI Factor**" means the result of the CPI Change as of the current Review Date multiplied by the CPI Change for each prior Review Date occurring since the Disability began. The CPI Factor as of the first Review Date will equal the CPI Change as of that Review Date. A CPI Factor is determined as of each Review Date while Disability continues.

"**Monthly Earnings**" means Your salary, wages, commissions, bonuses, fees, and income earned for services performed. If You own any portion of a business or profession, it means:

    a.   Your share of the income earned by that business or profession;
    b.   Less Your share of business expenses which are deductible for Federal income tax purposes;
    c.   Plus Your salary and any contributions to a pension or profit sharing plan made on Your behalf.

Monthly Earnings does not include:

    a.   Income from deferred compensation plans, disability income policies, or retirement plans; or
    b.   Income not derived from Your vocational activities.

We will allow either the cash or accrual accounting method. But during a Disability the same method must be used when determining Loss of Earnings.

As required by state law, the Residual Disability benefit will be reduced by the amount of any first party benefits paid under automobile insurance and by catastrophic loss benefits paid by the Catastrophic Loss Trust Fund and by any workers' compensation benefits.

There is no reduction for Total Disability benefits.

## 2.3   RECOVERY BENEFIT

This benefit will be payable when:

1. Prior to age 65, You engage in any occupation right after a Disability for which benefits are payable, and
2. You incur a Loss of Earnings equal to at least 20% of Your Prior Earnings.

The monthly amount of this benefit equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \text{ X   Maximum Monthly Amount}$$

This Benefit will continue to be payable while You continue to incur a Loss of Earnings.  This benefit will not be payable:

1. For more than 4 months for any Disability, or
2. Beyond the end of the Maximum Benefit Period;

whichever first occurs.

If this benefit is payable for a period for which any other benefit is payable under Your Policy:

1. We will pay only one benefit for that period; and
2. The benefit We pay will be the larger of the benefits payable.

The provision of Your Policy titled Waiver of Premium will apply to any period for which this benefit is payable.

## 2.4   PRESUMPTIVE TOTAL DISABILITY

If Injury or Sickness causes You to totally and irrecoverably lose:

a. Your power of speech; or
b. Your hearing in both ears; or
c. Your sight in both eyes; or
d. Use of both hands; or
e. Use of both feet; or
f. Use of one hand and one foot;

We will consider You to be Totally Disabled whether or not You are able to work or require care by a Physician. The Total Disability benefit will begin on the Commencement Date. We will pay it for the amount and Maximum Benefit Periods shown on the Policy Schedule.

## 2.5   TOTAL DISABILITY BECAUSE OF COSMETIC OR TRANSPLANT SURGERY

After 6 months from the Date of Issue, if You become Totally Disabled because You have surgery to:

a. Improve Your appearance or prevent disfigurement; or
b. Transplant part of Your body to someone else;

We will consider You to be Totally Disabled due to Sickness.

*Can benefits be paid if not Disabled?*

*Can Total Disability be automatically assumed?*

*Is cosmetic or transplant surgery covered?*

## 2.6   REHABILITATION

*What happens if a program of retraining or rehabilitation is entered?*

While receiving Total Disability benefits, You may choose to join a vocational rehabilitation program.  If We approve the program before You join, We will consider You to remain Totally Disabled while:

a.   You actively participate in the program; and
b.   You are not able to perform the important duties of Your Occupation.

If so, We will pay the Total Disability benefit for up to 36 months without requiring the care of a Physician.  If You cease to be an active participant, or if We cease to approve the program, You may still be eligible for Total Disability benefits.  But, You must meet the requirements of Total Disability.  Also, We will not pay beyond what is left of the Maximum Benefit Period.

We will also pay for the cost of services incurred in connection with a program of vocational rehabilitation if:

a.   We enter into an agreement with You on both the program and the services; and
b.   The cost of the services is not covered by another plan or program.

## 2.7   SURVIVOR BENEFIT

*Is there a benefit if You die?*

If You die prior to Your 65th birthday while receiving the Total Disability benefit, We will pay to Your beneficiary 3 times the Maximum Monthly Amount payable at the time You die.  Your beneficiary will be Your estate. But You may name someone else by writing to Us.

## 2.8   GUARANTEED INSURABILITY BENEFIT

You may elect to increase Your Monthly Total Disability Benefit by $30.00 on any Policy Anniversary that is not more than five years from the Policy Issue Date.  The premium for this benefit increase will be determined by Your attained age on that Policy Anniversary.

If a schedule of automatic increases is shown on the Policy schedule, it is in lieu of this benefit.

# PART 3
# EXCLUSIONS

## 3.1   EXCLUSIONS

*When are you not covered?*

We will not pay benefits for Disability:

a.   Due to an act or accident of war, whether declared or undeclared; or
b.   Due to normal pregnancy or childbirth except as described in the definition of Sickness

# PART 4
# PREMIUM AND REINSTATEMENT

## 4.1   PAYMENT OF PREMIUM

The first premium on Your Policy is payable on the Date of Issue. After that, premiums are payable in the amount and mode shown on the Policy Schedule. Payments may be made at Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or to Our agent.

Premiums may be paid annually or semi-annually. If Our rules permit it, You can pay the premiums quarterly or monthly. We will allow You to change this by written request. But, We will not allow a change while You are Disabled.

*When are premiums due?*

## 4.2   GRACE PERIOD

After the first premium has been paid, a grace period of 31 days is allowed for late payment of premium. Your Policy will remain in force during the grace period.

If the premium is not paid when it is due or within the grace period, the Policy will lapse.

*What happens if a premium payment is late?*

## 4.3   REINSTATEMENT

If Your Policy lapses because the premium is not paid when due or within the grace period, it will be reinstated if We or Our agent accepts payment of the premium without requiring a reinstatement application.

If We receive the premium due at Our Home Office within 57 days from the date the premium was due, We will not require evidence of Your insurability.

If We receive the premium after 57 days, We will require a reinstatement application. We will issue You a conditional receipt for the premium. If We approve Your application, the Policy will be reinstated as of the date of Our approval. If We disapprove Your application, We must do so in writing within 45 days of the date of the conditional receipt or the Policy will be reinstated on the 45th day.  The reinstated Policy will cover only loss due to:

    a.   Injury sustained after the date of reinstatement; or
    b.   Sickness that begins more than ten days after such date.

Except for this and any new provisions that are added to the reinstated Policy, Your rights and Our rights will be the same as before the Policy lapsed.

*How can a lapsed Policy be reinstated?*

## 4.4   PREMIUM REFUND AT DEATH

Upon notice of Your death, We will make a pro rata refund of any premium actually paid for a period beyond the date of Your death.

*Is there any premium refund at death?*

## PART 5
## WAIVER OF PREMIUM

### 5.1   WAIVER OF PREMIUM

*When will premiums be waived?*

After You have been Disabled for 90 days, We will waive any premium that becomes due while You remain Disabled. Your Policy and its benefits will continue as if the premium had been paid.

We will also refund any premium paid that became due during those first 90 days of Disability.

When You are no longer eligible for Waiver of Premium, You can continue Your Policy in force by paying the next premium that becomes due.

Waiver of Premium will not apply to any premiums which become due after You elect the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8.

## PART 6
## RECURRENT AND CONCURRENT DISABILITY

### 6.1   RECURRENT DISABILITY

*What if a disability reoccurs?*

If after the end of a Disability You become Disabled from the same or related causes, We will deem it a separate Disability. But if such recurrence occurs within 6 months of the end of the prior period, We will deem it a continuation of the prior Disability.

Such periods of Recurrent Disability separated by 6 months or less will be deemed to be continuing in order to determine the Commencement Date. Such periods of Recurrent Total Disability separated by 6 months or less will be deemed to be continuing in order to determine completion of the Qualification Period, if any.

### 6.2   CONCURRENT DISABILITY

*What if a disability is due to more than one cause?*

If a Disability is caused by more than one Injury or Sickness, or from both, We will pay benefits as if the Disability was caused by only one Injury or Sickness. We will not pay benefits for both Total Disability and Residual Disability for the same period.

-13-

## PART 7
## RENEWAL OPTION IF EMPLOYED. TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

### 7.1   RENEWAL OPTION

After Your 65th birthday You may continue Your Policy for the Total Disability benefit while:

    a.   You remain actively and regularly employed full time; and
    b.   The premium is paid on time.

We can require proof after Your 65th birthday that You have continued to be actively and regularly employed full time.

You cannot elect this option after the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8 becomes effective.

The Policy must be in force when You elect this option.

*Can the Policy be renewed after age 65 if You are still working?*

### 7.2   TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

If You elect this option, We will pay the Total Disability amount subject to the same provisions, exceptions, and limitations in the Policy.

For Total Disability starting:

    a.   After Your 65th birthday, but before Your 75th birthday, the Maximum Benefit Period will be 24 months or the period shown on the Policy Schedule if less; and
    b.   After Your 75th birthday, the Maximum Benefit Period will be 12 months.

*How will the benefit period be limited?*

### 7.3   PREMIUMS

The premium will be the rate then in effect for Your rating group. We can change the premium rate but only if We change the rate for everyone who has this policy form in Your rating group in Your state.

Any premium paid after Your 65th birthday for a period not covered by Your Policy under this option will be returned to You. Or at Your request, We will apply it to the premium payable under the RENEWAL OPTION IF NOT EM-PLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8.

*What will the premium be?*

## PART 8
## RENEWAL OPTION IF NOT EMPLOYED.
## HOSPITAL CONFINEMENT INDEMNITY BENEFIT

### 8.1   RENEWAL OPTION

*Can the Policy be
renewed after age 65
if not working?*

When You are no longer actively and regularly employed after Your 65th birthday You may continue Your Policy for the rest of Your life, as long as the premium is paid on time. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under Your Policy and, unless We state otherwise, any benefits under riders added to the Policy.

The Policy must be in force when You elect this option.

### 8.2   HOSPITAL CONFINEMENT INDEMNITY BENEFIT

*What will the
benefit be?*

If You elect this option, We will pay You a Hospital Confinement Indemnity of 100 dollars per day while You are confined in a legally operated hospital because of Injury or Sickness.

This benefit will begin on the date You are confined. We will continue to pay it while You are confined. But We will not pay for more than 6 months during each continuous confinement.

For the purpose of this benefit, after a period of confinement ends and You are confined again from the same or related cause within 180 days, We will consider it to be a continuation of the first confinement.

For the purpose of this benefit, "hospital" means:

    a.  an institution operated pursuant to law which is licensed or approved as a hospital by the responsible state agency;

    b.  it is primarily engaged in providing medical care and treatment of sick or injured persons on an in-patient basis for which a charge is made; and

    c.  it provides 24 hour nursing service by or under supervision of registered graduate professional nurses (R.N.'s).

For the purpose of this benefit, "hospital" will not mean:

    a.  any military or veterans hospital or soldiers home or any hospital contracted for or operated by any national government or agency thereof for the treatment of members or ex-members of the armed forces;

    b.  convalescent homes, convalescent, rest, or nursing facilities; or

    c.  facilities primarily for the aged, drug or alcoholic rehabilitation, and those primarily affording custodial or educational care.

### 8.3   EXCEPTIONS

*What other Policy
provisions will change?*

Under this option, the Waiver of Premium, the Recurrent Disability, and Benefit provisions of the Policy will not apply. However, all of the other provisions, exceptions, and limitations in the Policy will apply.

### 8.4   PREMIUMS

*What will the
premium be?*

The premium will be the rate then in effect for Your rating group. We can change the premium rate but only if We change the rate for everyone who has the policy form in Your rating group in Your state.

# PART 9
## CLAIMS

### 9.1   TIME OF LOSS

All losses must occur while Your Policy is in force. But, termination of Your Policy will not affect any claim for Total Disability that begins within 30 days of the date of an Injury causing such Disability.

*When must losses occur?*

### 9.2   WRITTEN NOTICE OF CLAIM

Written notice of claim must be given to Us within 30 days after a covered loss starts, or as soon as reasonably possible.

The notice will be sufficient if it identifies You and is sent to Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or is given to Our agent.

*When must written notice be given?*

### 9.3   CLAIM FORMS

After We receive the written notice of claim, We will send You Our proof of loss forms within 15 days. If We do not, You will meet the written proof of loss requirements if You send Us, within the time set forth below, a written statement of the nature and extent of Your loss.

*Is there a form for proof of loss?*

### 9.4   WRITTEN PROOF OF LOSS

Written proof of loss must be sent to Us within 90 days after the end of a period for which You are claiming benefits. If that is not reasonably possible, Your claim will not be affected. But, unless You are legally incapacitated, written proof must be given within one year.

We can also require reasonable proof from You of Your:

  a.   Prior Earnings; and
  b.   Monthly Earnings for the month for which Disability is claimed.

This may include personal and business tax returns, financial statements, accountant's statements or other proof acceptable to Us.  We can have an audit performed as often as is reasonably required while Your claim is continuing.  Such an audit will be at Our expense.

*What types of proof of loss might be required?*

### 9.5   PHYSICAL EXAMINATIONS

At Our expense, We can have a Physician of Our choice examine You as often as reasonably required while Your claim is continuing.

*Can there be an independent medical exam performed?*

### 9.6   TIME OF PAYMENT OF CLAIMS

After We receive satisfactory written proof of loss:

  a.   We will pay any benefits then due that are not payable periodically; and
  b.   We will pay at the end of each 30 days any benefits due that are payable periodically — subject to continuing proof of loss.

*When will benefits be paid?*

*To whom will
benefits be paid?*

### 9.7   PAYMENT OF CLAIMS

All benefits will be paid to You. But, if any benefit is payable to Your estate or if You are not competent to give a valid release, We can pay up to 1,000 dollars to one of Your relatives who We believe is entitled to it. If We do that in good faith, We will not be liable to anyone for the amount We pay.

*When must notice of
an assignment
be sent?*

### 9.8   ASSIGNMENT

We will not be bound by an assignment of Your Policy or any claim unless We receive a written assignment at Our Home Office before We pay the benefits claimed. We will not be responsible for the validity of any assignment.

*What if there is a
misstatement of age?*

### 9.9   MISSTATEMENT OF AGE

If Your age has been misstated, the benefits under the Policy will be those that the premium You paid would have purchased at Your correct age.

## PART 10
## THE CONTRACT

### 10.1   ENTIRE CONTRACT; CHANGES

*Can the Policy
be changed?*

This Policy (with the application and attached papers) is the entire contract between You and Us.  No change in this Policy will be effective until approved by a Company officer.  This approval must be noted on or attached to this Policy.  No agent may change this Policy or waive any of its provisions.

### 10.2   INCONTESTABLE

*For how long is the
Policy contestable?*

a.   After Your Policy has been in force for 2 years, excluding any time You are Disabled, We cannot contest the statements in the application.

b.   No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue.

### 10.3   CONFORMITY WITH STATE STATUTES

*What if the Policy
differs with state
requirements?*

Any provision in this Policy which, on its Date of Issue, conflicts with the laws of the state in which You reside on that date is amended to meet the minimum requirements of such laws.

### 10.4   LEGAL ACTION

*When can legal action
be brought under
this Policy?*

You cannot bring legal action within 60 days from the date written proof of loss is given. You cannot bring it after 3 years from the date written proof of loss is required.

## TOTAL DISABILITY IN YOUR OCCUPATION BENEFIT RIDER

This rider deletes the definition titled **"Total Disability"** in its entirety and substitutes the following definition in the Policy to which it is added:

"**Total Disability**" means that because of Injury or Sickness:

1. You are unable to perform the important duties of Your regular occupation; and
2. You are under the regular and personal care of a Physician.

This rider will end:

1. When the Policy ends; or
2. On Your 65th birthday;

whichever happens first.

All definitions in Your Policy apply to this rider. All provisions of Your Policy remain the same except where We change them by this rider.

The annual premium for this rider is shown on the Policy Schedule.

The Date of Issue of this rider is the same as that of Your Policy. If We issued this rider after Your Policy, the Date of Issue is shown below.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

Secretary                    President

H779R                                                                    86-11

## FUTURE INCOME OPTION BENEFIT RIDER

**DEFINITIONS.** In this rider:

**"Policy Benefit"** means the Maximum Monthly Amount payable under Your Policy to which this rider is added. That amount is shown on the Policy Schedule.

**"Option Date"** means each even-numbered anniversary of the Date of Issue that occurs on or before the Expiration Date.

**"Unit of Increase"** is an amount by which the Policy Benefit can be increased on an Option Date. That amount is shown on the Policy Schedule. The maximum number of Units of Increase is also shown on the Policy Schedule.

**"Expiration Date"** is the date this rider ends. That date is shown on the Policy Schedule.

**"Earned Income"** means the greater of Your average Monthly Earnings for:
1. The twelve months just before the date of Your request for an increase in the Policy Benefit; or
2. Any two successive years during the five-year period just before the date of Your request.

All definitions in Your Policy apply to this rider. All provisions of Your Policy stay the same except where We change them by this rider.

## FUTURE INCOME OPTION BENEFIT.

You may apply for up to one Unit of Increase as of any Option Date. You may apply for part of a Unit of Increase as of any Option Date.

If all or part of a Unit of Increase is not used as of an Option Date, You may carry it over and apply for it on the next Option Date. But You cannot carry it over beyond that Option Date.

On the first Option Date, You may also apply for up to one additional Unit of Increase if You are not disabled. But You must also exercise all of Your current Unit of Increase. This additional Unit of Increase cannot be carried over.

In no event may You exercise more than two Units of Increase as of any Option Date. To use all or part of a carried-over Unit of Increase You must also exercise all of Your current Unit of Increase. The total number of Units of Increase exercised can never exceed the maximum number of Units of Increase shown on the Policy Schedule.

If You qualify, We will increase Your Policy Benefit by the amount for which You apply.

## TO QUALIFY FOR AN INCREASE.

You will qualify for an increase if, at the time You apply:

1. Your Earned Income is sufficient for an increase. This will be determined by Our published underwriting rules and issue and participation limits in effect at the time You apply; and
2. The sum of all of Your disability income coverage, after the increase, is not more than the maximum coverage We offer to new applicants of Your class of risk. This will be determined by Our published underwriting rules and issue and participation limits in effect at the time You apply. We will figure the sum of Your disability income coverage by adding up the benefits You would receive from:
   a. Us; and
   b. Any other insurer; and
   c. Any government agency.

## APPLICATION FOR AN INCREASE.

You may apply for an increase as of any Option Date. We will send You an application form. This form must be completed and returned to Us within 60 days before the Option Date. This form will ask You for a statement of Your Earned Income and disability income coverage. This form will not ask You for proof of good health.

You may apply for no more than one Unit of Increase during any continuing disability.

## WHEN AN INCREASE IS PAYABLE.

An increase in Your Policy Benefit under this rider will be effective as of the applicable Option Date. But if the Option Date upon which an increase is elected occurs while You are disabled, We will begin to pay the increased Policy Benefit on the ninety-first day of continuous disability after that Option Date. We will pay the increased Policy Benefit while Your disability continues and while the Policy Benefit is payable.

## THE PREMIUM.

The premium for each increase will be at the rate for Your age at Your nearest birthday on the applicable Option Date. We will figure this according to either:

1. Your class of risk when We issued Your Policy; or
2. Your class of risk on the Option Date of the increase;

whichever is more favorable to You.

Also, if the premium for Your Policy is being waived on the Option Date, You will not have to pay the premium for the increase until the premium for Your Policy becomes payable again.

You must make the first payment of the premium for an increase to Our Home Office or to Our agent. This must be done no later than 31 days after the Option Date.

**TERMINATION.**

This rider will end when one of the following happens:

1. The Expiration Date for this rider; or
2. When the total of all increases in the Policy Benefit equals the value of the maximum Units of Increase shown on the Policy Schedule; or
3. A premium for the Policy or this rider is not paid on time; or
4. Upon Your written request to end this rider. In that case, You must return the Policy to Us. We will make the proper endorsement and reissue the Policy to You.

The annual premium for this rider is shown in the Policy Schedule.

The premium charge for this rider will end when the rider ends.

The Date of Issue of this rider is the same as that of Your Policy. If We issued this rider after Your Policy, the Date of Issue is shown below.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

Secretary                              President

APPLICATION FOR
DISABILITY INSURANCE TO:


THE PAUL REVERE LIFE
INSURANCE COMPANY

WORCESTER, MA 01608

No 51863

| 1a. Name (Print): SIEGAL, M.D. Michael B | b. Soc. Sec. # 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 |
| (Incl. Prof. Title)   Last      First      MI | c. Ht. 5'11"  d. Wt. 195 |

| e. Sex M ☑ F ☐ | f. Birthdate: 5-24-57 | g. Age (nearest): 32 | h. Birthplace (State) PA |

i. Residence Address: 203 Cornwall Drive   Pittsburgh PA   15238   (412)826-8671
   Street      Apt. #      City      State      Zip      Phone

j. Business Address: 303 E. 6th Ave   Tarentum, PA   15084   (412) —
   Street      Apt. #      City      State      Zip      Phone

| 2a. Occupation: Surgical Ophthalmologist | b. Employer: Allegheny Ophthalmology Assoc. |

c. Exact duties: Medical & Surgical Care of Eye Diseases

| d. Length of current employment: 1/88 | e. Nature of Employer's business: Medical/Surgical |

| f. If owner, percentage owned: N/a | Length of Ownership: — | # full time employees: — |

g. Type of Business Entity: Sole Proprietor ☐ Partnership ☐ Corporation ☑ Other ☐ describe:

3. Have you within the past **2 years** engaged in motorcycle riding, scuba diving, racing or any similar sport or avocation?
   Yes ☐ No ☑ If "yes" give details: _____

4. Have you smoked cigarettes in the past **12 months**?    Yes ☐ No ☑

5. Have you been actively at work full-time for the past **6 months**?    Yes ☑ No ☐
   If "No" give details: _____

**Questions 6 and 7 need not be answered if a Paul Revere Medical Exam is required.**

6. Have you **ever** been treated for or had any known indication of: (*Circle* all conditions that apply and give details below)

   a. Chest pain, high blood pressure, mental or emotional disorder, arthritis, diabetes, cancer, tumor,
      or fainting spells?    Yes ☑ No ☐

   b. Disease or disorder of the heart or circulatory system, lungs, kidneys, bladder, genital or reproductive organs,
      brain or nervous system, skin, eyes, ears or speech?    Yes ☐ No ☑

   c. Disease or disorder of the stomach or intestines, liver, thyroid, bones, muscles, joints, back or neck?  Yes ☑ No ☐

   d. Complications of pregnancy? Yes ☐ No ☑ Are you currently pregnant? Yes ☐ No ☑ Due date: N/A

7. In the past **5 years**, have you had any medical advice or operation, physical exam, treatment, illness, abnormality or injury
   not listed above? Yes ☑ No ☐      Are you currently receiving any medical advice or treatment? Yes ☑ No ☐

8. Have you **ever** used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physi-
   cian, or been counseled or treated for excess use of alcohol or drugs?    Yes ☐ No ☑

9. Give details to all "Yes" answers to **6, 7** or **8**. Include exact diagnoses, dates, duration, physicians and addresses.
   6 ) Diet Control for Blood Pressure — Under Control.   Dr. Ed Stehlik  Buffalo NY
   C ) Hypothyroid — Controlled By Synthroid .15mg/day ~4yrs.  Dr. Stehlik
   7 ) Allergic Reaction to Blood Pressure Medication   Dr. Stehlik  1986
   7 ) Routine Checkup Dr. Chris Allen 241 Freeport Rd Aspinwall PA 781-8566 (412) (within last couple mths)

10. In the past **5 years** have you had any insurance application rejected or modified or received or been refused any disability
    or medical benefits? Yes ☐ No ☑ If "yes" give details: _____

| 11. Fill in amounts as Reportable for Federal Tax purposes | Estimated Current Annual Rate | Actual Last year 19 88 | Actual 2 Years Ago 19 87 |
|---|---|---|---|
| a. Salary, Fees, Commissions & Bonus | $125,000 | $50,000 | $30,000+ |
| b. Pension and Profit Sharing Contributions | | | |
| c. Earnings from other occupations (describe): | | | |
| d. Total Earnings (a + b + c) | | | |
| e. Deductible Business Expenses | | | |
| f. NET EARNED INCOME (d – e) | 125,000 | 50,000 | 30,000+ |

12. List Net worth (assets minus liabilities), if more than $750,000: $ _____

13. List unearned income (interest, dividends, capital gains, rent, etc.), if more than $15,000 per year: $ _____

App 64A                                                            ML                              86-4

14. Describe all disability coverage in force, and all coverage applied for in the past 12 months. Indicate if it is:
A) Individual, B) Social Security Substitute, C) Association, D) Group, E) Salary Continuation, F) Overhead Expense, or
G) Buy-Out. If none, write "none".

| Company or Source If Paul Revere, give Pol. # If pending, check | | Type (A,B,C, etc.) | Monthly Amount | Elim. Period | Benefit Period | Will coverage be Replaced/Changed or Madeover? | Effective Date of Discontinuance |
|---|---|---|---|---|---|---|---|
| MACA #0268327 | | A | 1,000 | 30 | 65 | Yes ☐ No ☒ | n/a |
| CNL #J001915 | | A | 1,000 | 90 | 65 | Yes ☒ No ☐ | 4-11-89 |
| | | | | | | Yes ☐ No ☐ | |
| | | | | | | Yes ☐ No ☐ | |

15. Describe Coverage Being Requested (If BOE, complete supplement): n/a

| Plan Code: 960 | Monthly Amt. | Elim. Period | Benefit Period | Form # | Optional Benefits | | |
|---|---|---|---|---|---|---|---|
| | | | | | Amount | Form # | Amount |
| Base | 3800 | 90 DAY | AGE 65 | 766 | 98500 | | |
| AMI | | | | 779 | 3800 | | |
| AMI | | | | AiB | 5% | | |
| SSIB | | | | | | | |

16. a. Will requested coverage be paid for by employer? Yes ☐ No ☒ If "yes" how much? _____%
    Will employer's contribution be included in your taxable income? Yes ☐ No ☐ n/a
   b. List name and address of proposed owner if other than proposed insured _____
   c. Send notices to:        Residence ☒        Business ☐
   d. Collected with this application in exchange for Conditional Receipt: $ 120.

---

**CORRECTIONS AND AMENDMENTS (For Home Office Use Only)**

---

It is understood and agreed as follows:
(1) I have read the statements and answers recorded above. They are, to the best of my knowledge and belief, true and complete and correctly recorded. They will become part of this Application and the basis for any policy issued on it.
(2) I will permanently discontinue all policies shown to be discontinued in answer to question 14 on or before the dates indicated. If not, benefits under any policy issued on this application may be reduced by the amount payable under such existing policies.
(3) No agent or broker has authority to waive the answer to any question, to determine insurability, to waive any of the Company's rights or requirements, or to make or alter any contract or policy.
(4) The insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur while the health of the Proposed Insured remains as stated in the Application. The only exception to this is the insurance provided in the Conditional Receipt detached herefrom and issued if at least the Minimum Deposit is made with the Application.
(5) Acceptance by the Proposed Insured/Owner of any policy issued on this Application will ratify any changes listed under "Corrections and Amendments", except that no changes may be made as to Classification, Age at Issue, Form of Insurance, Amount or Benefits unless agreed to in writing by the Proposed Insured/Owner.

Signed at _Pittsburgh Pa_                    Date____2/9____ 19_89_

I certify that I have truly and accurately recorded on this application the information supplied by the Proposed Insured.          X _Michael Sigal_
                                                      Signature of Proposed Insured

Witness _Mark Riser_                    X _____
          Licensed Agent or Broker          Signature of Proposed Owner (if applicable)

Mark Riser          **Applicants will be informed whether or not their application has been accepted within 60 days or be given the reason for any further delay.**

Countersigned at _____ this____day of_____19__
_____ Licensed Resident Agent

DISABILITY INCOME POLICY
THE PREFERRED PROFESSIONAL





UNUMPROVIDENT

# DUPLICATE

MICHAEL B SIGAL MD

0102415363   OCT 27, 1989   **Date of Issue**

*Your Coverage & Policy Benefits*



**EXHIBIT B**



# THE PAUL REVERE
## LIFE INSURANCE COMPANY

**18 CHESTNUT STREET**
**WORCESTER, MASSACHUSETTS 01608**

DUPLICATE

The Paul Revere Life Insurance Company will pay the benefits provided in this Policy for loss due to Injury or Sickness.

We have issued this Policy to You in consideration of the payment of the premium and the statements made in Your application. Your application is part of this Policy.

**Insured**      MICHAEL B SIGAL MD

**Policy Number** · 0102415363   OCT 27, 1989   **Date of Issue**

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65. NO CHANGE IN PREMIUM RATES.** As long as the premium is paid on time, We cannot change Your Policy or its premium rate until Your 65th birthday.

**RENEWAL OPTIONS AFTER YOU REACH AGE 65. SUBJECT TO CHANGE IN PREMIUM RATES.** You may continue Your Policy for a Total Disability benefit with a limited benefit period while You are actively and regularly employed full time. There is no age limit. This option is explained in PART 7.

When You are no longer actively and regularly employed after age 65, You may continue Your Policy for the rest of Your life. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under the Policy. This option is explained in PART 8.

**PRE-EXISTING CONDITION.** During the first two years from the Date of Issue, We will not pay benefits for a Pre-existing Condition if it was not disclosed on Your application. Also, We will not pay benefits for any loss We have excluded by name or specific description.

**YOUR RIGHT TO CANCEL.** If You are not satisfied with Your Policy, You may cancel it. Return the Policy to Us or Our agent by midnight of the tenth day after the date You receive it. If You return the Policy by mail, it must be properly addressed, postage prepaid, and postmarked no later than midnight of that tenth day. Our mailing address is 18 Chestnut Street, Worcester, Massachusetts 01608. Within ten days after We receive the Policy, We will refund any premium You have paid. The Policy will be considered to have never been issued.

**READ YOUR POLICY CAREFULLY.** It is a legal contract between You and Us.

Signed for The Paul Revere Life Insurance Company.

_____          _____
        Secretary                          President

Countersigned by _____

CHARTERED IN MASSACHUSETTS

DISABILITY INCOME POLICY
                  THE PREFERRED PROFESSIONAL

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Renewal Provisions | 1 |
| Pre-existing Condition | 1 |
| Policy Schedule | 3 |
| Automatic Increase Benefit | 3 |
| Part 1 — Definitions | 6 |
| Part 2 — Benefits | 8 |
|     Total Disability | |
|     Residual Disability | |
|     Recovery Benefit | |
|     Presumptive Total Disability | |
|     Cosmetic or Transplant Surgery | |
|     Rehabilitation | |
|     Survivor Benefit | |
| Part 3 — Exclusions | 11 |
| Part 4 — Premium and Reinstatement | 12 |
| Part 5 — Waiver of Premium | 13 |
| Part 6 — Recurrent and Concurrent Disability | 13 |
| Part 7 — Renewal Option After Age 65 If Employed - Total Disability Benefit | 14 |
| Part 8 — Renewal Option After Age 65 If Not Employed - Hospital Confinement Indemnity | 15 |
| Part 9 — Claims | 16 |
| Part 10 — General Provisions | 17 |

A copy of Your application, added benefits You have purchased, and any added provisions are attached at the back of the Policy.

POLICY SCHEDULE

INSURED  MICHAEL B SIGAL MD

POLICY                                          DATE OF
NUMBER  0102415363                              ISSUE  OCT 27, 1989

------------------------------------PREMIUM SUMMARY---NONSMOKER -----------
            ANNUAL PREMIUM FOR ADDITIONAL BENEFITS          $18.60
        ANNUAL PREMIUM FOR TOTAL DISABILITY BENEFITS        $314.00
                        TOTAL ANNUAL PREMIUM                $332.60


            THIS IS THE PREMIUM YOU PAY MONTHLY             $29.02
                            DRAFT PLAN

    THIS PREMIUM WILL REMAIN IN EFFECT UNTIL YOUR 65TH BIRTHDAY.
    IT IS SUBJECT TO CHANGE IF YOU RENEW YOUR POLICY AFTER YOUR 65TH BIRTHDAY.


--------------------------TABLE OF TOTAL DISABILITY BENEFITS-------------------
                    COMMENCEMENT DATE          MAXIMUM            MAXIMUM
                                               MONTHLY AMOUNT     BENEFIT PERIOD*

FROM INJURY:       91ST DAY OF DISABILITY      $1,000.00          TO AGE 65

FROM SICKNESS:     91ST DAY OF DISABILITY      $1,000.00          TO AGE 65

*THE MAXIMUM BENEFIT PERIOD MAY CHANGE DUE TO YOUR AGE AT TOTAL DISABILITY.
PLEASE SEE POLICY SCHEDULE II.
------------------------------------------------------------------------------
QUALIFICATION PERIOD FOR RESIDUAL DISABILITY:   0 DAYS
------------------------------------------------------------------------------
----------------------------TABLE OF ADDITIONAL BENEFITS----------------------
ADDITIONAL                  AMOUNT OF          MAXIMUM            ANNUAL PREMIUM
BENEFITS ATTACHED           BENEFITS           BENEFIT PERIOD     PRIOR TO AGE 65

TOTAL DISABILITY IN             --                 --                $18.60
  YOUR OCCUPATION


--------------------------MODIFICATION OF COVERAGE----------------------------

NONE.

960                                                            88-9

POLICY SCHEDULE II

INSURED MICHAEL B SIGAL MD

POLICY
NUMBER   0102415363

-----------------------------MAXIMUM BENEFIT PERIODS--------------------------

FOR INJURY AND SICKNESS:

| | | |
|---|---|---|
| TOTAL DISABILITY STARTING | BEFORE AGE 61 | TO AGE 65 |
| TOTAL DISABILITY STARTING | AT AGE 61 BUT BEFORE AGE 62 | 48 MONTHS |
| TOTAL DISABILITY STARTING | AT AGE 62 BUT BEFORE AGE 63 | 42 MONTHS |
| TOTAL DISABILITY STARTING | AT AGE 63 BUT BEFORE AGE 64 | 36 MONTHS |
| TOTAL DISABILITY STARTING | AT AGE 64 BUT BEFORE AGE 65 | 30 MONTHS |
| TOTAL DISABILITY STARTING | AT AGE 65 BUT BEFORE AGE 75 | 24 MONTHS |
| TOTAL DISABILITY STARTING | AT OR AFTER AGE 75 | 12 MONTHS |

----------------------------------------------------------------------------

INSURED  MICHAEL  B  SIGAL  MD

POLICY
NUMBER   0102415363

POLICY SCHEDULE III

--------------------------------AUTOMATIC INCREASES----------------------------

$50 WILL BE AUTOMATICALLY ADDED TO YOUR MONTHLY TOTAL DISABILITY BENEFIT
WITHOUT EVIDENCE OF INSURABILITY.  THIS WILL BE DONE ON EACH INCREASE DATE.

THESE INCREASES ARE SUBJECT TO THE TIMELY PAYMENT OF THE PROPER PREMIUM.
THESE PREMIUMS ARE BASED UPON YOUR ATTAINED AGE ON THE INCREASE DATE.  THEY
ARE LISTED BELOW.  IF ALL INCREASES GO INTO EFFECT, YOUR ANNUAL PREMIUM
WILL INCREASE BY        $86.25.

| INCREASE DATE | ANNUAL PREMIUM INCREASE |
|---|---|
| OCT 27, 1990 | $15.74 |
| OCT 27, 1991 | $16.41 |
| OCT 27, 1992 | $17.16 |
| OCT 27, 1993 | $18.01 |
| OCT 27, 1994 | $18.93 |

A BENEFIT INCREASE WILL APPLY ONLY TO A DISABILITY WHICH STARTS AFTER THE
INCREASE DATE.  IT WILL NOT APPLY TO A CONTINUATION OF A PRIOR DISABILITY.
SEE THE RECURRENT DISABILITY SECTION OF THIS POLICY.  IF THE PREMIUM FOR
THE POLICY IS BEING WAIVED (SEE WAIVER OF PREMIUM SECTION) ON THE INCREASE
DATE, THE PREMIUM FOR THE INCREASE WILL ALSO BE WAIVED.  WHEN YOU RESUME
PAYING PREMIUMS FOR THE POLICY, YOU MUST ALSO START PAYING THE PREMIUM
FOR THE INCREASE.

YOU MAY REFUSE AN INCREASE BY NOTIFYING US IN WRITING PRIOR TO THE
INCREASE DATE.  YOUR REFUSAL OF AN INCREASE WILL NOT AFFECT THE REMAINING
AUTOMATIC INCREASES.  HOWEVER, IF YOU REFUSE THE FIRST TWO CONSECUTIVE
INCREASES ALL FURTHER INCREASES WILL BE CANCELLED.  THEN, AT YOUR REQUEST,
YOU MAY INCREASE YOUR MONTHLY TOTAL DISABILITY BENEFIT BY $30.00 ON THE
REMAINING INCREASE DATES.

WHEN THE ABOVE AUTOMATIC INCREASES STOP AND PRIOR TO YOUR 60TH BIRTHDAY,
YOU MAY APPLY FOR ADDITIONAL AUTOMATIC INCREASES.  YOU CAN DO THIS BY
MAKING FORMAL APPLICATION WITHIN THE PERIOD OF 60 DAYS PRIOR TO AND 31 DAYS
AFTER THE LAST INCREASE DATE SHOWN ABOVE.  APPROVAL WILL BE SUBJECT TO OUR
UNDERWRITING GUIDELINES.

INSURED     Michael B Sigal MD

POLICY NUMBER     01024153630

POLICY OWNER     The Insured

DUPLICATE

POLICY SCHEDULE (CONTINUED)

----------------------------------AUTOMATIC INCREASES----------------------------------------

AUTOMATIC INCREASES BENEFIT AMOUNT ON EACH INCREASE DATE  $40

| INCREASE DATE | MONTHLY BENEFIT INCREASE | ANNUAL PREMIUM INCREASE |
|---|---|---|
| October 27, 1995 | $40 | $15.91 |
| October 27, 1996 | $40 | $16.70 |
| October 27, 1997 | $40 | $17.51 |
| October 27, 1998 | $40 | $18.31 |
| October 27, 1999 | $40 | $19.12 |
| TOTAL INCREASE | $200 | $87.55 |

# PART 1
## DEFINITIONS

THE FOLLOWING WORDS HAVE SPECIAL MEANINGS. THEY ARE IMPORTANT IN DESCRIBING YOUR RIGHTS AND OUR RIGHTS UNDER THE POLICY. REFER BACK TO THESE MEANINGS AS YOU READ YOUR POLICY.

1.1  "Policy" means the legal contract between You and Us. The policy, the application, the Policy Schedule, and any attached papers that We call riders, amendments, or endorsements make up the entire contract between You and Us.

1.2  "You" and "Your" refer to the Insured named in the Policy Schedule.

1.3  "We", "Us" and "Our" refer to The Paul Revere Life Insurance Company. Our Home Office is 18 Chestnut Street, Worcester, Massachusetts, 01608.

1.4  "Date of Issue" means the date that the Policy becomes effective. It is shown on the Policy Schedule.

1.5  "Injury" means accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.

1.6  "Sickness" means sickness or disease other than a Pre-existing Condition which causes loss commencing while Your Policy is in force. Complications of pregnancy or complications of childbirth are treated as any other Sickness under the Policy. Sickness includes Disability due to normal pregnancy or normal childbirth after You have been Disabled for 90 days.

1.7  "Physician" means any licensed practitioner of the healing arts practicing within the scope of his or her license. A Physician must be a person other than You.

1.8  "Your Occupation" means the occupation in which You are regularly engaged at the time You become Disabled.

1.9  "Total Disability" means that because of Injury or Sickness:

    a.   You are unable to perform the important duties of Your Occupation; and

    b.   You are not engaged in any other gainful occupation; and

    c.   You are under the regular and personal care of a Physician.

1.10  "Pre-existing Condition" means a Sickness or physical condition for which medical advice or treatment was recommended by or received from a Physician within a five-year period preceding the Date of Issue.

1.11   **"Residual Disability"**, prior to the Commencement Date, means that due to Injury or Sickness:

    a. (1) You are unable to perform one or more of the important duties of Your Occupation; or

       (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

    b. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and

    c. You are under the regular and personal care of a Physician.

As of the Commencement Date, Residual Disability means that due to the continuation of that Injury or Sickness:

    a. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and

    b. You are under the regular and personal care of a Physician.

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any.

1.12   **"Disability"** or **"Disabled"** refers to a continuing period of Total and/or Residual Disability.  Successive periods will be deemed to be continuing if:

    a. Due to the same or related causes; and

    b. Separated by no more than 6 months;

Otherwise such periods will be deemed to be new and separate Disabilities.

1.13   **"Commencement Date"** is the day shown on the Policy Schedule when benefits begin during a Disability.

1.14   **"Qualification Period"** is the number of days shown on the Policy Schedule that Total Disability must continue before Residual Disability benefits can be payable.

1.15   **"Maximum Benefit Period"** is the longest period of time We will pay benefits during any Disability. It is shown on the Policy Schedule.

For any Maximum Benefit Period other than lifetime, We will not pay Total Disability benefits beyond the later of:

    a. Your 65th birthday; or

    b. The date on which 24 months of benefits have been paid.

In no event will We pay Residual Disability benefits beyond Your 65th birthday unless Residual Disability begins within 3 months of Your 65th birthday. In that case, We will pay this benefit for a period not to exceed 3 months while You remain Residually Disabled.

# PART 2
# BENEFITS

## 2.1   TOTAL DISABILITY BENEFIT

We will periodically pay a Total Disability benefit during Your Total Disability. The monthly amount We will pay is the Maximum Monthly Amount.   It is shown on the Policy Schedule.

This benefit will begin on the Commencement Date. We will continue to pay it while You remain Totally Disabled. But in no event will We pay beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Disability.

## 2.2   RESIDUAL DISABILITY BENEFIT

We will periodically pay a Residual Disability benefit during Your Residual Disability if the Residual Disability begins before Your 65th birthday.

The monthly amount We will pay equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad X \quad \text{Maximum Monthly Amount}$$

During any Disability each of the first 6 monthly payments will not be less than 50% of the Maximum Monthly Amount.

The benefit will begin on either the Commencement Date or the day after Your Total Disability ends, if later. We will continue to pay this benefit while You remain Residually Disabled, but not beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Disability.

"Loss of Earnings" for any month means Your Prior Earnings minus Your Monthly Earnings for the month for which Residual Disability is claimed. This difference must be due to the Injury or Sickness causing the Residual Disability.

If the Loss of Earnings for any month is 80% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings.

"Prior Earnings" means the greater of:

    a.  Your average Monthly Earnings for the 6 calendar months just before Your Disability began; or
    b.  Your highest average Monthly Earnings for any 2 successive years during the 5 year period just before Your Disability began.

Starting as of the first Review Date, We will make an inflation adjustment to Your Prior Earnings.  We will multiply Your Prior Earnings by the CPI Factor. The result will be used until the next Review Date to compute Residual Disability benefit amounts payable.  However, the inflation adjustment increase will be at least 7% of Your Prior Earnings amount.

The inflation adjustment will not apply once the Disability ends.  But it will apply to recurrent Disability deemed continuing under the Recurrent Disability section of Your Policy.

*What is the Total Disability benefit?*

*When is the Residual Disability benefit payable?*

*How is the Residual Disability benefit calculated?*

"CPI" means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If this index is discontinued or if the method for computing it is materially changed, We may choose another index. We will choose an index which in Our opinion would most accurately reflect the rate of change in the cost of living in the United States. CPI will then mean the index We chose.

"Review Date" means the date that occurs:

    a.  After each successive 12 months of Disability; and
    b.  While Your Disability continues.

No Review Date will occur on or after Your 65th birthday.

"Index Month" means the calendar month four months prior to the calendar month in which a Review Date occurs. But the first Index Month for any Disability will be the calendar month 4 months prior to the month in which Your Disability began.

"CPI Change" means the result of a computation We will make as of each Review Date. We will divide the CPI for the most recent Index Month by the CPI for the Index Month prior to the most recent Index Month.

"CPI Factor" means the result of the CPI Change as of the current Review Date multiplied by the CPI Change for each prior Review Date occurring since the Disability began. The CPI Factor as of the first Review Date will equal the CPI Change as of that Review Date. A CPI Factor is determined as of each Review Date while Disability continues.

"Monthly Earnings" means Your salary, wages, commissions, bonuses, fees, and income earned for services performed. If You own any portion of a business or profession, it means:

    a.  Your share of the income earned by that business or profession;
    b.  Less Your share of business expenses which are deductible for Federal income tax purposes;
    c.  Plus Your salary and any contributions to a pension or profit sharing plan made on Your behalf.

Monthly Earnings does not include:

    a.  Income from deferred compensation plans, disability income policies, or retirement plans; or
    b.  Income not derived from Your vocational activities.

We will allow either the cash or accrual accounting method. But during a Disability the same method must be used when determining Loss of Earnings.

As required by state law, the Residual Disability benefit will be reduced by the amount of any first party benefits paid under automobile insurance and by catastrophic loss benefits paid by the Catastrophic Loss Trust Fund and by any workers' compensation benefits.

There is no reduction for Total Disability benefits.

**2.3   RECOVERY BENEFIT**

This benefit will be payable when:

1.   Prior to age 65, You engage in any occupation right after a Disability for which benefits are payable, and
2.   You incur a Loss of Earnings equal to at least 20% of Your Prior Earnings.

The monthly amount of this benefit equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad X \quad \text{Maximum Monthly Amount}$$

This Benefit will continue to be payable while You continue to incur a Loss of Earnings.  This benefit will not be payable:

1.   For more than 4 months for any Disability, or
2.   Beyond the end of the Maximum Benefit Period;

whichever first occurs.

If this benefit is payable for a period for which any other benefit is payable under Your Policy:

1.   We will pay only one benefit for that period; and
2.   The benefit We pay will be the larger of the benefits payable.

The provision of Your Policy titled Waiver of Premium will apply to any period for which this benefit is payable.

**2.4   PRESUMPTIVE TOTAL DISABILITY**

If Injury or Sickness causes You to totally and irrecoverably lose:

a.   Your power of speech; or
b.   Your hearing in both ears; or
c.   Your sight in both eyes; or
d.   Use of both hands; or
e.   Use of both feet; or
f.   Use of one hand and one foot;

We will consider You to be Totally Disabled whether or not You are able to work or require care by a Physician. The Total Disability benefit will begin on the Commencement Date. We will pay it for the amount and Maximum Benefit Periods shown on the Policy Schedule.

**2.5   TOTAL DISABILITY BECAUSE OF COSMETIC OR TRANSPLANT SURGERY**

After 6 months from the Date of Issue, if You become Totally Disabled because You have surgery to:

a.   Improve Your appearance or prevent disfigurement; or
b.   Transplant part of Your body to someone else;

We will consider You to be Totally Disabled due to Sickness.

*Can benefits be paid if not Disabled?*

*Can Total Disability be automatically assumed?*

*Is cosmetic or transplant surgery covered?*

### 2.6   REHABILITATION

While receiving Total Disability benefits, You may choose to join a vocational rehabilitation program.  If We approve the program before You join, We will consider You to remain Totally Disabled while:

    a.   You actively participate in the program; and
    b.   You are not able to perform the important duties of Your Occupation.

If so, We will pay the Total Disability benefit for up to 36 months without requiring the care of a Physician.  If You cease to be an active participant, or if We cease to approve the program, You may still be eligible for Total Disability benefits.  But, You must meet the requirements of Total Disability.  Also, We will not pay beyond what is left of the Maximum Benefit Period.

We will also pay for the cost of services incurred in connection with a program of vocational rehabilitation if:

    a.   We enter into an agreement with You on both the program and the services; and
    b.   The cost of the services is not covered by another plan or program.

### 2.7   SURVIVOR BENEFIT

If You die prior to Your 65th birthday while receiving the Total Disability benefit, We will pay to Your beneficiary 3 times the Maximum Monthly Amount payable at the time You die.  Your beneficiary will be Your estate. But You may name someone else by writing to Us.

### 2.8   GUARANTEED INSURABILITY BENEFIT

You may elect to increase Your Monthly Total Disability Benefit by $30.00 on any Policy Anniversary that is not more than five years from the Policy Issue Date.  The premium for this benefit increase will be determined by Your attained age on that Policy Anniversary.

If a schedule of automatic increases is shown on the Policy schedule, it is in lieu of this benefit.

## PART 3
## EXCLUSIONS

### 3.1   EXCLUSIONS

We will not pay benefits for Disability:

    a.   Due to an act or accident of war, whether declared or undeclared; or
    b.   Due to normal pregnancy or childbirth except as described in the definition of Sickness

*What happens if a program of retraining or rehabilitation is entered?*

*Is there a benefit if You die?*

*When are you not covered?*

# PART 4
# PREMIUM AND REINSTATEMENT

## 4.1   PAYMENT OF PREMIUM

The first premium on Your Policy is payable on the Date of Issue. After that, premiums are payable in the amount and mode shown on the Policy Schedule. Payments may be made at Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or to Our agent.

Premiums may be paid annually or semi-annually. If Our rules permit it, You can pay the premiums quarterly or monthly. We will allow You to change this by written request. But, We will not allow a change while You are Disabled.

*When are premiums due?*

## 4.2   GRACE PERIOD

After the first premium has been paid, a grace period of 31 days is allowed for late payment of premium. Your Policy will remain in force during the grace period.

If the premium is not paid when it is due or within the grace period, the Policy will lapse.

*What happens if a premium payment is late?*

## 4.3   REINSTATEMENT

If Your Policy lapses because the premium is not paid when due or within the grace period, it will be reinstated if We or Our agent accepts payment of the premium without requiring a reinstatement application.

If We receive the premium due at Our Home Office within 57 days from the date the premium was due, We will not require evidence of Your insurability.

If We receive the premium after 57 days, We will require a reinstatement application. We will issue You a conditional receipt for the premium. If We approve Your application, the Policy will be reinstated as of the date of Our approval. If We disapprove Your application, We must do so in writing within 45 days of the date of the conditional receipt or the Policy will be reinstated on the 45th day.  The reinstated Policy will cover only loss due to:

   a.   Injury sustained after the date of reinstatement; or
   b.   Sickness that begins more than ten days after such date.

Except for this and any new provisions that are added to the reinstated Policy, Your rights and Our rights will be the same as before the Policy lapsed.

*How can a lapsed Policy be reinstated?*

## 4.4   PREMIUM REFUND AT DEATH

Upon notice of Your death, We will make a pro rata refund of any premium actually paid for a period beyond the date of Your death.

*Is there any premium refund at death?*

## PART 5
## WAIVER OF PREMIUM

### 5.1   WAIVER OF PREMIUM

*When will premiums be waived?*

After You have been Disabled for 90 days, We will waive any premium that becomes due while You remain Disabled. Your Policy and its benefits will continue as if the premium had been paid.

We will also refund any premium paid that became due during those first 90 days of Disability.

When You are no longer eligible for Waiver of Premium, You can continue Your Policy in force by paying the next premium that becomes due.

Waiver of Premium will not apply to any premiums which become due after You elect the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINE-MENT INDEMNITY BENEFIT in PART 8.

## PART 6
## RECURRENT AND CONCURRENT DISABILITY

### 6.1   RECURRENT DISABILITY

*What if a disability reoccurs?*

If after the end of a Disability You become Disabled from the same or related causes, We will deem it a separate Disability. But if such recurrence occurs within 6 months of the end of the prior period, We will deem it a continuation of the prior Disability.

Such periods of Recurrent Disability separated by 6 months or less will be deemed to be continuing in order to determine the Commencement Date. Such periods of Recurrent Total Disability separated by 6 months or less will be deemed to be continuing in order to determine completion of the Quali-fication Period, if any.

### 6.2   CONCURRENT DISABILITY

*What if a disability is due to more than one cause?*

If a Disability is caused by more than one Injury or Sickness, or from both, We will pay benefits as if the Disability was caused by only one Injury or Sickness. We will not pay benefits for both Total Disability and Residual Dis-ability for the same period.

-13-

## PART 7
## RENEWAL OPTION IF EMPLOYED. TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

### 7.1   RENEWAL OPTION

After Your 65th birthday You may continue Your Policy for the Total Disability benefit while:

   a.   You remain actively and regularly employed full time; and
   b.   The premium is paid on time.

We can require proof after Your 65th birthday that You have continued to be actively and regularly employed full time.

You cannot elect this option after the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8 becomes effective.

The Policy must be in force when You elect this option.

### 7.2   TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

If You elect this option, We will pay the Total Disability amount subject to the same provisions, exceptions, and limitations in the Policy.

For Total Disability starting:

   a.   After Your 65th birthday, but before Your 75th birthday, the Maximum Benefit Period will be 24 months or the period shown on the Policy Schedule if less; and
   b.   After Your 75th birthday, the Maximum Benefit Period will be 12 months.

### 7.3   PREMIUMS

The premium will be the rate then in effect for Your rating group.  We can change the premium rate but only if We change the rate for everyone who has this policy form in Your rating group in Your state.

Any premium paid after Your 65th birthday for a period not covered by Your Policy under this option will be returned to You. Or at Your request, We will apply it to the premium payable under the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8.

*Can the Policy be renewed after age 65 if You are still working?*

*How will the benefit period be limited?*

*What will the premium be?*

## PART 8
## RENEWAL OPTION IF NOT EMPLOYED.
## HOSPITAL CONFINEMENT INDEMNITY BENEFIT

### 8.1   RENEWAL OPTION

*Can the Policy be renewed after age 65 if not working?*

When You are no longer actively and regularly employed after Your 65th birthday You may continue Your Policy for the rest of Your life, as long as the premium is paid on time. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under Your Policy and, unless We state otherwise, any benefits under riders added to the Policy.

The Policy must be in force when You elect this option.

### 8.2   HOSPITAL CONFINEMENT INDEMNITY BENEFIT

If You elect this option, We will pay You a Hospital Confinement Indemnity of 100 dollars per day while You are confined in a legally operated hospital because of Injury or Sickness.

*What will the benefit be?*

This benefit will begin on the date You are confined. We will continue to pay it while You are confined. But We will not pay for more than 6 months during each continuous confinement.

For the purpose of this benefit, after a period of confinement ends and You are confined again from the same or related cause within 180 days, We will consider it to be a continuation of the first confinement.

For the purpose of this benefit, "hospital" means:

    a.  an institution operated pursuant to law which is licensed or approved as a hospital by the responsible state agency;

    b.  it is primarily engaged in providing medical care and treatment of sick or injured persons on an in-patient basis for which a charge is made; and

    c.  it provides 24 hour nursing service by or under supervision of registered graduate professional nurses (R.N.'s).

For the purpose of this benefit, "hospital" will not mean:

    a.  any military or veterans hospital or soldiers home or any hospital contracted for or operated by any national government or agency thereof for the treatment of members or ex-members of the armed forces;

    b.  convalescent homes, convalescent, rest, or nursing facilities; or

    c.  facilities primarily for the aged, drug or alcoholic rehabilitation, and those primarily affording custodial or educational care.

### 8.3   EXCEPTIONS

*What other Policy provisions will change?*

Under this option, the Waiver of Premium, the Recurrent Disability, and Benefit provisions of the Policy will not apply. However, all of the other provisions, exceptions, and limitations in the Policy will apply.

### 8.4   PREMIUMS

*What will the premium be?*

The premium will be the rate then in effect for Your rating group. We can change the premium rate but only if We change the rate for everyone who has the policy form in Your rating group in Your state.

# PART 9
# CLAIMS

### 9.1   TIME OF LOSS

All losses must occur while Your Policy is in force. But, termination of Your Policy will not affect any claim for Total Disability that begins within 30 days of the date of an Injury causing such Disability.

*When must losses occur?*

### 9.2   WRITTEN NOTICE OF CLAIM

Written notice of claim must be given to Us within 30 days after a covered loss starts, or as soon as reasonably possible.

The notice will be sufficient if it identifies You and is sent to Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or is given to Our agent.

*When must written notice be given?*

### 9.3   CLAIM FORMS

After We receive the written notice of claim, We will send You Our proof of loss forms within 15 days. If We do not, You will meet the written proof of loss requirements if You send Us, within the time set forth below, a written statement of the nature and extent of Your loss.

*Is there a form for proof of loss?*

### 9.4   WRITTEN PROOF OF LOSS

Written proof of loss must be sent to Us within 90 days after the end of a period for which You are claiming benefits. If that is not reasonably possible, Your claim will not be affected. But, unless You are legally incapacitated, written proof must be given within one year.

We can also require reasonable proof from You of Your:

    a.   Prior Earnings; and
    b.   Monthly Earnings for the month for which Disability is claimed.

This may include personal and business tax returns, financial statements, accountant's statements or other proof acceptable to Us. We can have an audit performed as often as is reasonably required while Your claim is continuing. Such an audit will be at Our expense.

*What types of proof of loss might be required?*

### 9.5   PHYSICAL EXAMINATIONS

At Our expense, We can have a Physician of Our choice examine You as often as reasonably required while Your claim is continuing.

*Can there be an independent medical exam performed?*

### 9.6   TIME OF PAYMENT OF CLAIMS

After We receive satisfactory written proof of loss:

    a.   We will pay any benefits then due that are not payable periodically; and
    b.   We will pay at the end of each 30 days any benefits due that are payable periodically — subject to continuing proof of loss.

*When will benefits be paid?*

### 9.7   PAYMENT OF CLAIMS

*To whom will benefits be paid?*

All benefits will be paid to You. But, if any benefit is payable to Your estate or if You are not competent to give a valid release, We can pay up to 1,000 dollars to one of Your relatives who We believe is entitled to it. If We do that in good faith, We will not be liable to anyone for the amount We pay.

### 9.8   ASSIGNMENT

*When must notice of an assignment be sent?*

We will not be bound by an assignment of Your Policy or any claim unless We receive a written assignment at Our Home Office before We pay the benefits claimed. We will not be responsible for the validity of any assignment.

### 9.9   MISSTATEMENT OF AGE

*What if there is a misstatement of age?*

If Your age has been misstated, the benefits under the Policy will be those that the premium You paid would have purchased at Your correct age.

## PART 10
## THE CONTRACT

### 10.1   ENTIRE CONTRACT; CHANGES

*Can the Policy be changed?*

This Policy (with the application and attached papers) is the entire contract between You and Us. No change in this Policy will be effective until approved by a Company officer. This approval must be noted on or attached to this Policy. No agent may change this Policy or waive any of its provisions.

### 10.2   INCONTESTABLE

*For how long is the Policy contestable?*

a.   After Your Policy has been in force for 2 years, excluding any time You are Disabled, We cannot contest the statements in the application.

b.   No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue.

### 10.3   CONFORMITY WITH STATE STATUTES

*What if the Policy differs with state requirements?*

Any provision in this Policy which, on its Date of Issue, conflicts with the laws of the state in which You reside on that date is amended to meet the minimum requirements of such laws.

### 10.4   LEGAL ACTION

*When can legal action be brought under this Policy?*

You cannot bring legal action within 60 days from the date written proof of loss is given. You cannot bring it after 3 years from the date written proof of loss is required.

## TOTAL DISABILITY IN YOUR OCCUPATION BENEFIT RIDER

This rider deletes the definition titled **"Total Disability"** in its entirety and substitutes the following definition in the Policy to which it is added:

**"Total Disability"** means that because of Injury or Sickness:

1. You are unable to perform the important duties of Your regular occupation; and
2. You are under the regular and personal care of a Physician.

This rider will end:

1. When the Policy ends; or
2. On Your 65th birthday;

whichever happens first.

All definitions in Your Policy apply to this rider. All provisions of Your Policy remain the same except where We change them by this rider.

The annual premium for this rider is shown on the Policy Schedule.

The Date of Issue of this rider is the same as that of Your Policy. If We issued this rider after Your Policy, the Date of Issue is shown below.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

Secretary                              President

## AMENDMENT TO POLICY

This amendment changes the policy to which it is attached.

The definition of "Maximum Benefit Period" is deleted. The following is substituted:

"**Maximum Benefit Period**"is the longest period of time We will pay benefits during any Disability.

For Total Disability this period is listed on the Policy Schedule.

For Residual Disability We will not pay benefits beyond Your 65th birthday unless Residual Disability begins within 3 months of Your 65th birthday.   In that case, We will pay this benefit for a period not to exceed 3 months while You remain Residually Disabled.

## GENERAL

All provisions of Your Policy remain the same except where changed by this amendment.

The Date of Issue of this amendment is the same as that of Your Policy.  If We issued this Amendment after Your Policy, the Date of Issue is shown below.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

Secretary                    President

**THE PAUL REVERE LIFE INSURANCE COMPANY**

WORCESTER, MA 01608

**APPLICATION FOR DISABILITY INSURANCE TO:**

№ 110590

| 1a. Name (Print): SIGAL, MD (Last) MICHAEL (First) B (MI) (Incl. Prof. Title) | b. Soc. Sec. # 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 |
| | c. Ht. 5'11"   d. Wt. 195 |

e. Sex M ☒ F ☐   f. Birthdate: 6·29·57   g. Age (nearest): 32   h. Birthplace (State) PA

i. Residence Address: 402 WICKSFORD DR (Street) PITTSBURGH FOX CHAPEL (City) PA (State) 15238 (Zip) (412) 963-1711 (Phone)

j. Business Address: 303 E. 6th AVE (Street) (Apt. #) TARENTUM (City) PA (State) 15084 (Zip) (412) 224-1333 (Phone)

2a. Occupation: SURGICAL OPHTHALMOLOGIST   b. Employer: ALLEGHENY OPHTHALMOLOGY ASSOC

c. Exact duties: MEDICAL & SURGICAL CARE OF EYE DISEASES

d. Length of current employment: 7/88   e. Nature of Employer's business: MEDICAL/SURGICAL

f. If owner, percentage owned: n/a   Length of Ownership: ____   # full time employees: ____

g. Type of Business Entity: Sole Proprietor ☐ Partnership ☐ Corporation ☒ Other ☐ describe:

3. Have you within the past **2 years** engaged in motorcycle riding, scuba diving, racing or any similar sport or avocation? Yes ☐ No ☒ If "yes" give details: ____

4. Have you smoked cigarettes in the past **12 months**?   Yes ☐ No ☒

5. Have you been actively at work full-time for the past **6 months**?   Yes ☒ No ☐ If "No" give details: ____

**Questions 6 and 7 need not be answered if a Paul Revere Medical Exam is required.**

6. Have you **ever** been treated for or had any known indication of: (*Circle* all conditions that apply and give details below)
   a. Chest pain, high blood pressure, mental or emotional disorder, arthritis, diabetes, cancer, tumor, or fainting spells?   Yes ☒ No ☐
   b. Disease or disorder of the heart or circulatory system, lungs, kidneys, bladder, genital or reproductive organs, brain or nervous system, skin, eyes, ears or speech?   Yes ☐ No ☒
   c. Disease or disorder of the stomach or intestines, liver, thyroid, bones, muscles, joints, back or neck?   Yes ☒ No ☐
   d. Complications of pregnancy? Yes ☐ No ☒ Are you currently pregnant? Yes ☐ No ☐ Due date: NA

7. In the past **5 years**, have you had any medical advice or operation, physical exam, treatment, illness, abnormality or injury not listed above? Yes ☒ No ☐   Are you currently receiving any medical advice or treatment? Yes ☒ No ☐

8. Have you **ever** used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physician, or been counseled or treated for excess use of alcohol or drugs?   Yes ☐ No ☒

9. Give details to all "Yes" answers to 6, 7 or 8. Include exact diagnoses, dates, duration, physicians and addresses.
   6a  Diet Control for blood pressure - under control
   c  hypo thyroid - controlled by synthroid .15 mg/day - 4yrs
   7  Allergic reaction to blood pressure medication Dr. Stepnik 1986
   7  Routine Checkup Dr. Chris Allen 241 Freeport Rd. Aspinwall, PA
      412-781-8566  1989

10. In the past **5 years** have you had any insurance application rejected or modified or received or been refused any disability or medical benefits? Yes ☐ No ☒ If "yes" give details: ____

| 11. Fill in amounts as Reportable for Federal Tax purposes | Estimated Current Annual Rate | Actual Last year 19 88 | Actual 2 Years Ago 19 87 |
|---|---|---|---|
| a. Salary, Fees, Commissions & Bonus | $ 195,000 | $ 50,000 | $ 30,000+ |
| b. Pension and Profit Sharing Contributions | | | |
| c. Earnings from other occupations (describe): | | | |
| d. Total Earnings (a + b + c) | | | |
| e. Deductible Business Expenses | | | |
| f. NET EARNED INCOME (d – e) | 195,000 | 50,000 | 30,000+ |

12. List Net worth (assets minus liabilities), if more than $750,000: $____

13. List unearned income (interest, dividends, capital gains, rent, etc.), if more than $15,000 per year: $____

App 64A

86-4

14. Describe all disability coverage in force, and all coverage applied for in the past 12 months. Indicate if it is:
A) Individual, B) Social Security Substitute, C) Association, D) Group, E) Salary Continuation, F) Overhead Expense, or
G) Buy-Out. If none, write "none".

| Company or Source If Paul Revere, give Pol. # If pending, check | Type (A,B,C, etc.) | Monthly Amount | Elim. Period | Benefit Period | Will coverage be Replaced/Changed or Madeover? | Effective Date of Discontinuance |
|---|---|---|---|---|---|---|
| MACA # 0268327 | A | 1000 | 30 | 65 | Yes ☐ No ☒ | |
| Paul Revere # 2385154 | A | 3800 | 90 | 65 | Yes ☐ No ☒ | |
| | | | | | Yes ☐ No ☐ | |
| | | | | | Yes ☐ No ☐ | |

15. Describe Coverage Being Requested (If BOE, complete supplement):

| Plan Code: 960 | Monthly Amt. | Elim. Period | Benefit Period | Form # | Optional Benefits Amount | Form # | Amount |
|---|---|---|---|---|---|---|---|
| Base | 1000 | 90 | 65 | 779 | 1000 | | |
| AMI | | | | AIB | 5a70 | | |
| AMI | | | | | | | |
| SSIB | | | | | | | |

16. a. Will requested coverage be paid for by employer? Yes ☐ No ☒ If "yes" how much? _____ %
    Will employer's contribution be included in your taxable income? Yes ☐ No ☒
    b. List name and address of proposed owner if other than proposed insured _____

    c. Send notices to:    Residence ☒    Business ☐
    d. Collected with this application in exchange for Conditional Receipt:  $ 0 _____

---

**CORRECTIONS AND AMENDMENTS (For Home Office Use Only)**

It is understood and agreed as follows:
(1) I have read the statements and answers recorded above. They are, to the best of my knowledge and belief, true and complete and correctly recorded. They will become part of this Application and the basis for any policy issued on it.
(2) I will permanently discontinue all policies shown to be discontinued in answer to question 14 on or before the dates indicated. If not, benefits under any policy issued on this application may be reduced by the amount payable under such existing policies.
(3) No agent or broker has authority to waive the answer to any question, to determine insurability, to waive any of the Company's rights or requirements, or to make or alter any contract or policy.
(4) The insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur while the health of the Proposed Insured remains as stated in the Application. The only exception to this is the insurance provided in the Conditional Receipt detached herefrom and issued if at least the Minimum Deposit is made with the Application.
(5) Acceptance by the Proposed Insured/Owner of any policy issued on this Application will ratify any changes listed under "Corrections and Amendments", except that no changes may be made as to Classification, Age at Issue, Form of Insurance, Amount or Benefits unless agreed to in writing by the Proposed Insured/Owner.

Signed at _____    Date _____ 8-24 _____ 19 89

I certify that I have truly and accurately recorded on this application the information supplied by the Proposed Insured.

X _____
Signature of Proposed Insured

Witness _____
Licensed Agent or Broker

X _____
Signature of Proposed Owner (if applicable)

Mark Rosen

**Applicants will be informed whether or not their application has been accepted within 60 days or be given the reason for any further delay.**

PAGE 2

MEDICAL APPLICATION

WORCESTER, MA 01608

**PART 2** THE PAUL REVERE LIFE
INSURANCE COMPANY

THE PAUL REVERE PROTECTIVE
LIFE INSURANCE COMPANY

THE PAUL REVERE VARIABLE
ANNUITY INSURANCE COMPANY

| 1. N A M E | Last | Sirigail | 2. Birthdate 5 29 57 Mo Day Yr | 3. Birthplace Pa (State) |
|---|---|---|---|---|
| | First / Middle | Miichiaiel B | | |

4. Residence: Street _402 Wicksford Dr_ Apt # _____ 5. Occupation _Ophthalmologist_
City _Pittsburgh_ State _Pa_ Zip _15238_ Duties _Medical + Surgical eye care_

6. Name(s) and address(es) of personal physician(s) or health care facility(ies). If none, write "none".
_Chris Allen     241-251 Freeport Rd, Pittsburgh Pa 15215_

7. Date and reason for last consultation. _____

8. Is Proposed Insured presently under observation or treatment or taking medication? Yes ☒ No ☐ If "Yes", give details.
_Synthroid — hypothyroidism_

| 9. Family History | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|
| Father | 57 | | |
| Mother | 56 | | |
| Brothers & Sisters 2 | 33 39 | | |

10. Has any family member ever had a stroke or diabetes, cancer, high blood pressure, heart or kidney disease, mental illness, or committed suicide? Yes ☒ No ☐ If "Yes", give details.
_Father— hypertension_

| | Yes | No | Details of "Yes" answers. Identify question number. Circle applicable items. Include diagnosis, dates, duration and current status. List names and addresses of all attending physicians and medical facilities. |
|---|---|---|---|
| 11. Have you, *within the past 5 years*: | | | |
| a. Been examined by or consulted a physician or other practitioner? | ☒ | ☐ | _Ed, Stehlik_ |
| b. Been under observation or treatment in any hospital, sanitarium, or institution? | ☐ | ☒ | _1783 Colvin Blvd, Buffalo, N.Y. 14223 716-874-2150_ |
| c. Had an X-ray, EKG, blood or urine test, or other lab tests? | ☒ | ☐ | |
| 12. Have you *ever*: | | | |
| a. Except as legally prescribed by a physician, used: cocaine, barbiturates, heroin, or any narcotic drug? | ☐ | ☒ | _11-c Routine Blood work Chris Allen_ |
| b. Sought or received advice for, or treatment of, or been arrested for the use of alcohol, marijuana or drugs? | ☐ | ☒ | |
| c. Been rejected for or given medical discharge from military, naval, or air service? | ☐ | ☒ | |
| 13. Are you pregnant? If "Yes", what is due date? | ☐ | ☐ | |
| 14. Has your weight changed *within the past year*? | ☐ | ☒ | |

SAMPLE

| 15. Have you *ever* had any known indication of or been treated for: | Yes | No | Details of "Yes" answers. Identify question number. Circle applicable items. Include diagnosis, dates, duration and current status. List names and addresses of all attending physicians and medical facilities. |
|---|---|---|---|
| a. Any disease or impairment of eyes, ears, nose or speech? | ☐ | ☒ | |
| b. Any type of back or spinal trouble, including sprain or strain? | ☐ | ☒ | 15 c PMHx hypertension took Capoten Allergic reaction – Dc'd No Longer takes med. hospitalized – 6 yrs ago Erie Co. Med Ctr. Buffalo, NY 14215 |
| c. Chest pain, heart murmur, high blood pressure, or any disease of the heart, blood vessels, or blood? | ☒ | ☐ | |
| d. Peptic ulcer, indigestion, or any disease of the stomach, intestines, gall bladder, or liver? | ☐ | ☒ | |
| e. Tuberculosis, asthma, pleurisy, or any disease of the chest or lungs? | ☐ | ☒ | |
| f. Kidney stone, albumin, pus, blood or sugar in urine, or any disease of the kidneys, bladder, or genital organs? | ☐ | ☒ | |
| g. Headaches, fainting spells, epilepsy, paralysis, nervousness, mental disorder, or any disease of the brain or nervous system? | ☐ | ☒ | |
| h. Rheumatic fever, syphilis, gout, arthritis, thyroid disease, diabetes, cancer, or tumor? | ☐ | ☒ | |
| i. Allergies or any disease of the skin? | ☐ | ☒ | |
| j. Any disease of the reproductive organs or breast? | ☐ | ☒ | |
| k. Any amputation or deformity, hernia or rupture, hemorrhoids or varicose veins? | ☐ | ☒ | |
| 16. Have you had any surgical operation, treatment, special diet, or any illness, ailment, abnormality, or injury, not mentioned above, *within the past five years?* | ☐ | ☒ | |

MEDITEST - 3
CONESTOGA BLDG. STE 300
7 WOOD STREET
PITTSBURGH, PA 15222
(412) 391-4006
ID No. 48-0773965

I have read the statements and answers made above. They are, to the best of my knowledge and belief, true and complete and correctly recorded. I understand that they will become a part of my application for insurance and any policy issued on it.

Signed at _Tarentum Pa_       Date _Sept 15_       19 _89_

Witness _Patricia Temple_       X _OM Sig_
Person Examined

### COMPLETE IN ALL CASES — AUTHORIZATION FOR INFORMATION

I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically-related facility, insurance company, MIB, Inc. or other organization, institution or person, that has any records or knowledge of me or my health, to give to The Paul Revere Life Insurance Co., The Paul Revere Protective Life Insurance Co., The Paul Revere Variable Annuity Insurance Co., and/or their reinsurers any such information. To facilitate rapid submission of such information, I authorize all said sources, except MIB, Inc., to give such records or knowledge to Equifax Services, The Hooper-Holmes Bureau, or American Service Bureau. A photostat of this authorization shall be as valid as the original.

_9/15/89_ Date       X _OM Sig_       Signature of Proposed Insured

Countersigned at _____ this_____day of_____19___

_____ Licensed Resident Agent

DISABILITY INCOME POLICY
THE PREFERRED PROFESSIONAL

**\* \* DATA PAGE \* \***

POLICY NUMBER:
8,463,961

INSURED:
MICHAEL B SIGAL

Your Policy Schedule tells you what amounts we will pay and when we will pay.

This policy is effective as of 12:01 a.m. on:
1. the Policy Date; or
2. the date it is delivered to you, accepted by you and the full first premium paid to us,
whichever is later.

Payment of the first premium will maintain this Policy in force until 12:01 a.m. on the next premium due date. All times are Standard Time at the place where you then reside.

## RENEWAL CONDITIONS

### Non-Cancellable and Guaranteed Renewable To Age 65

You may continue this Policy until age 65. Until that time and unless you consent, we cannot cancel this Policy, increase your premiums, reduce the coverage, nor add any restrictions.

### Conditionally Renewable After Age 65

After your age 65 and while you continue to be Actively and Regularly Employed on a Full-Time Basis, this Policy is conditionally renewable for life at premium rates being used for your attained age.

### RIGHT TO EXAMINE POLICY

You may return this Policy within 20 days after receiving it. You may deliver it to us or the agent through whom it was purchased. It then will be deemed void from the start. We will return any premium paid.

### PROFESSIONAL/ EXECUTIVE DISABILITY INCOME POLICY

This Policy is noncancellable and guaranteed renewable to your age 65. This Policy is subject to non-renewal at age 65.

ISSUED BY:   GENERAL AMERICAN LIFE INSURANCE CO.
A MUTUAL COMPANY
P.O. BOX 396
ST. LOUIS, MISSOURI 63166

DUPLICATE

1801037
(1/89)

0.01

8,463,961

**EXHIBIT C**

# ALPHABETIC GUIDE TO YOUR CONTRACT

| Page | |
|---|---|
| 3.02 | Assignment |
| 5.02 | Claim Information |
| 6.01 | Conformity with State Statutes |
| 4.01 | Cosmetic or Transplant Surgery Benefit |
| 3.01 | Definitions |
| 6.01 | Dividend Participation |
| 0.01 | Effective Date |
| 6.01 | Incontestable |
| 4.02 | Limitations |
| 3.02 | Loss Payee |
| 5.01 | Military Service |

| Page | |
|---|---|
| 6.01 | Misstatement of Age |
| 3.02 | Owner |
| 5.01 | Premiums/Grace Period |
| 4.01 | Presumptive Total Disability Benefit |
| 4.01 | Rehabilitation Benefit |
| 5.02 | Reinstatement |
| 0.01 | Renewal Conditions |
| 4.02 | Survivor's Benefit |
| 4.01 | Total Disability Benefit |
| 4.02 | Waiver of Premium Benefit |

Additional Benefit Riders, Endorsements and Amendments, if any, and a copy of the Application are found following the final section.



POLICY SCHEDULE
PROFESSIONAL/EXECUTIVE DISABILITY INCOME

Policy Number:          8,463,961    Insured:                Michael B Sigal
Policy Date:    October 16, 1990    Issue Age:                      33

BASIC COVERAGE:

Waiting Period: 180 days

Maximum Monthly Benefit for Total Disability
    Injury or Sickness -   $3000 starting on the 181st day of a period of
    total disability and continuing until the end of the maximum benefit
    period.

Maximum Benefit Periods for Total Disability
    Injury    - Total disability starting before age 65...for life

    Sickness  - Total disability starting before age 55...for life
              - Total disability starting after age 55....to age 65, but not
                                          less than 24 months

Annual Premium for Total Disability Benefit:   $817.50

PRESUMPTIVE TOTAL DISABILITY BENEFIT:

    Injury    - Presumptive Disability starting before age 65...for life

    Sickness  - Presumptive Disability starting before age 60...for life
              - Presumptive Disability starting after age 60...to age 65
                but not less than 24 months


PREMIUM SUMMARY

| FORM NO. | DESCRIPTION | BENEFIT AMOUNT | ANNUAL PREMIUM | AGE PREMIUMS CEASE |
|----------|-------------|----------------|----------------|---------------------|
| BASE BENEFITS: | | | | |
| 18010 | Basic | $3000 | $   817.50 | 65 |
| 1801037 | | | | |
| 18010A | | | | |
| 1830837 | | | | |
| 1840837 | | | | |
| 1850937 | | | | |
| 18606 | | | | |
| OPTIONAL RIDERS: | | | | |
| 1882237 | Proportionate Income Replacement | | $   136.50 | 65 |
| 1882937 | Own Occupation | | $    69.30 | 65 |
| 1882437 | Cost of Living Adjustment | | $   440.40 | 65 |
| 1883037 | Future Benefit Increase | $5000 | $    95.50 | 55 |

( CONTINUED ON NEXT PAGE )

DUPLICATE

18010A                                                        8,463,961

```
Annual Premium Before Discounts                          $1559.20
Annual Non-Smoker Discount                          -     $155.92
Annual Volume Discount                              -      $70.17
Annual Administrative Discount                      -      $66.66
Annual Policy Fee                                         $30.00
                                                   _____

Total Annual Premium to Age 54                           $1296.45
Total Annual Premium Age 55 to Age 65                    $1218.88

Term Premium Payable Each 12 Months                      $1296.45
```

This policy is a legal contract between the policy owner and General
American Life Insurance Company.  PLEASE READ YOUR CONTRACT CAREFULLY.



8010A                                                    8,463,961

## 1.   DEFINITIONS IN THIS POLICY.

**You and Your**  mean the Insured person.

**We, Our and Us**  mean the General American Life Insurance Company.

**Policy Date**  means the date used to determine premium due dates, Policy anniversaries, and Policy years.

**Age**  means your age nearest birthday.

**Total Disability and Totally Disabled**  mean that, as a result of Sickness or Injury or a combination of both, you are unable to perform all the material and substantial duties of your regular occupation for the first 24 months.

After that, you will be considered Totally Disabled if you are unable to perform all the material and substantial duties of any occupation for which you may be fitted by education, training or experience. You must be under the regular care of a Physician, other than yourself, unless you furnish proof satisfactory to us that future or continued care would be of no benefit.

**Sickness**  means Sickness or disease of an insured person which is diagnosed or treated after the effective date of insurance and while the insurance is in force.

**Injury**  means accidental bodily Injury that occurs while this Policy is in force.

**Waiting Period**  means the total number of days at the beginning of a Period of Disability for which no benefit is payable.

**Physician**  means a licensed practitioner of the healing arts practicing within the scope of his or her license.

**Period of Total Disability**  means the number of days you are continuously Totally Disabled at any one time. A Period of Total Disability includes a later Period(s) of Total Disability and will be considered continuous and part of the same claim, if the later period(s):

1.   is due, in whole or in part, to the same or related cause or causes as the previous period, and

2.   starts less than six months after the end of the prior Period of Disability.

In all other cases, the later Period of Total Disability will be a new disability and a new claim. It will require a new Waiting Period and a new Benefit Period.

**Monthly Benefit for Total Disability**  means the amount payable for Total Disability.

**Actively and Regularly Employed on a Full-Time Basis**  means you are working at least 30 hours a week at full pay and for at least 10 months per year.



3.01

## 2.  OWNER, LOSS PAYEE, ASSIGNMENT.

**Owner**

You own this Policy unless someone else has been named as Owner. The Owner, while living, has all the rights and privileges granted by this Policy, except that benefits will be paid as stated in the Claim Information section. If you are not the Owner, and the Owner dies before you, you become the Owner unless a successor Owner has been named.

**Loss Payee**

All benefits payable under this Policy, except the Survivor's Benefit, are payable to the Loss Payee. If no Loss Payee is named in the application, you are the Loss Payee. If accepted by us, any change of Loss Payee will take effect on the date the original change was signed. The change of Loss Payee shall not affect any payment made by us before receiving written notice of the change at our home office.

**Assignment**

You may assign any or all ownership rights to someone else. If you assign any rights, the assignment must specify the rights that are assigned and the term of the assignment. The right to receive benefits will remain with the Loss Payee, unless that right is expressly assigned.

When an assignment is in effect, "You" and "Your" refer to the assignee only in those provisions that describe ownership rights, not in those provisions that describe benefit payments.

An assignment will not be binding on us until we receive and acknowledge the original or an acceptable copy of it at our home office. We are not responsible for the validity or for the effects of an assignment. Our obligations will be fully discharged to the extent of any payment we make or any action we take in good faith relying on an assignment.



## 3.   BENEFITS.

**Total Disability Benefit**

If you become Totally Disabled while this Policy is in force, we will pay the Monthly Benefit for Total Disability. The first monthly payment is payable at the end of the first month of Total Disability following the Waiting Period. We will stop paying this benefit when:

1.   you are no longer Totally Disabled; or

2.   it has been paid for the Maximum Benefit Period,

whichever occurs first.

**Presumptive Total Disability Benefit**

You will be deemed to be Totally Disabled and we will pay the Monthly Benefit for Total Disability if, because of Sickness or Injury, you lose:

1.   the sight of both eyes (that means vision correctable to 20/400 or less in each eye); or

2.   the use of both hands, or both feet, or one hand and one foot; or

3.   the ability to speak; or

4.   the hearing in both ears.

Benefits as a result of Presumptive Total Disability are payable even if you are working and even if you are not under the regular care of a Physician.

The Waiting Period will be waived in the case of Presumptive Total Disability.

We will stop paying this benefit when:

1.   the specific loss is recovered; or

2.   it has been paid for the Maximum Benefit Period,

whichever occurs first.

**Cosmetic or Transplant Surgery Benefit**

You may become disabled from cosmetic surgery or from the transplant of a part of your body to another person. If the surgery occurs while this Policy is in force, the disability will be considered a Sickness and benefits will be paid accordingly. For purposes of this benefit, cosmetic surgery means any surgery to change your appearance or to restore prior appearance.

**Rehabilitation Benefit**

To help you participate in an occupational or vocational rehabilitation program, we will consider paying benefits in addition to any other benefits available under this Policy. We need to approve the program. Any additional benefits will be determined by mutual agreement between you and us.

**Waiver of Premium Benefit**

If, before your age 65, you become Totally Disabled while this Policy is in force, we will waive premiums as they become due:

1.   after Total Disability has continued for 90 days, or the Waiting Period, whichever is shorter; and

2.   while you remain Totally Disabled.



DUPLICATE

1840837
(1/89)

We will refund any premium due and paid during the Waiting Period or the first 90 days of Total Disability, whichever is applicable. We will stop waiving premiums when you are no longer Totally Disabled. Then this Policy will stay in force to the next premium due date. After that, you may continue this Policy in force by paying the premiums as they are due, subject to the Renewal provisions.

**Survivor's Benefit**    We will continue to pay the Monthly Benefit for Total Disability for up to 3 months following your death if:

1. you die prior to your age 65 and as a result of Total Disability, you are receiving monthly benefit payments under this Policy; and

2. the Monthly Benefit for Total Disability has been payable for at least the 12 months immediately prior to your death.

However, no payments will be made under this benefit if such payments together with other benefit payments already made would extend beyond the Maximum Benefit Period.

Any amount payable under this benefit will be:

1. paid to your surviving spouse, if any, or if none, to your estate; and

2. paid each month in an amount equal to the Monthly Benefit for Total Disability. The first such payment shall be due one month after the date of your death.

For purposes of this benefit, "spouse" means the person to whom you are legally married at the time of your death. Evidence of legal marriage shall consist of a certified copy of the official marriage record for you and your spouse.

## 4.   LIMITATIONS.

**Pre-existing Condition**    This Policy does not cover loss caused by a Pre-existing Condition that is not disclosed in the application if the loss occurs during the first 2 years after the Policy Date.

A Pre-existing Condition is one that exists before the Policy Date and, during the past two years caused you to get professional advice or treatment by a physician.

**Concurrent Disability**    In no event will more than one benefit be payable at a time, even if you suffer from more than one disabling condition. This also means that we will not pay benefits under the Total Disability and the Presumptive Total Disability Benefits at the same time. A period of disability will not be considered to end and a new period begin just because the cause or causes changed.

**Pregnancy**    This Policy does not cover disability or other loss resulting from childbirth or pregnancy except if such disability or other loss is due to:

1. complications of pregnancy; or

2. normal pregnancy or childbirth after the 90th day of disability or the end of the Waiting Period, whichever is longer.



"Complications of Pregnancy" means:

1. conditions requiring medical treatment prior or subsequent to the termination of pregnancy whose diagnoses are distinct from pregnancy but which are adversely affected by pregnancy or caused by pregnancy, such as acute nephritis, nephrosis, cardiac decompensation, missed abortion, disease of the vascular, hemopoietic, nervous, or endocrine systems, and similar medical and surgical conditions of comparable severity; but will not include false labor, occasional spotting, physician prescribed rest during the period of pregnancy, morning sickness and similar conditions associated with the management of a difficult pregnancy not constituting a classifiably distinct complication of pregnancy; and

2. hyperemesis gravidarum and pre-eclampsia requiring hospital confinement, ectopic pregnancy which is terminated, and spontaneous termination of pregnancy which occurs during a period of gestation in which a viable birth is not possible.

3. conditions requiring medical treatment after the termination of pregnancy whose diagnoses are distinct from pregnancy but which are adversely affected by pregnancy or caused by pregnancy.



## 5.   PREMIUMS, RENEWAL AND REINSTATEMENT.

**Premiums**

You may pay premiums annually, semi-annually or quarterly using our premium rates in effect on the Policy Date. If we agree, you may pay premiums on a monthly premium plan. You may not change a premium payment mode to a less frequent mode of premium payment during any period you are disabled.

Premiums are payable in advance at our home office. Each premium after the first is due at the end of the term for which the prior premium was paid. However, after the first premium we will allow a 31 day Grace Period for the payment of any future premiums. We will furnish a premium receipt upon request.

We will not keep this Policy in force after the last day of the term for which the premium is paid except as stated in the Grace Period provision.

If you terminate this Policy, we will refund any premium amount paid for a period beyond the date of termination.

We will refund any premium paid for a period beyond the date of your death.

**Grace Period**

If you do not pay a premium on or before its due date, we will keep this Policy in force and continue coverage for a Grace Period of 31 days beyond that date. If you fail to pay the premium during the Grace Period, this Policy and all coverage will terminate.

**Renewal After Age 65**

If you are Actively and Regularly Employed on a Full-Time Basis after your age 65, you may continue to renew this Policy for one year at a time, on each anniversary. You must pay premiums based on our table of rates then in effect for your age. We may change those rates at any time. However, the change will apply only to premiums due on or after the date of change. Any change of premiums applies to all insureds of the same age and rate class who are covered under policies of this form.

To receive benefits you must furnish proof satisfactory to us that you were Actively and Regularly Employed on a Full-Time Basis at the time of claim. We reserve the right to require this proof from time to time.

The Maximum Benefit Period for Total Disability or Presumptive Total Disability starting while this Policy is so continued will be 24 months.

If you cease to be Actively and Regularly Employed on a Full-Time Basis, the Policy will automatically terminate. We will refund any premiums paid for any period after you are no longer employed.

**Military Service**

If you enter full-time active duty in the armed forces of any country or international authority, other than active duty for training lasting 3 months or less, this Policy will be suspended. Coverage will stop on the date active service begins. We will refund any premium paid beyond that date.

If you end full-time active duty before this Policy has been suspended for 5 years, we will reinstate it without evidence of insurability based on your health. However, our financial and other underwriting requirements that pertain to new applicants for this type of coverage must be met. We also need to receive:

1. your written request to reinstate; and

2. the premium for the period from the date you end full-time active duty to the next premium due date. (Premiums will be at the same rate they would have been had this Policy not been suspended.)

If we don't receive both the request and the premium within 90 days after you end full-time active duty, you still may apply for reinstatement. In this case, we will require complete evidence of insurability satisfactory to us.



1850937
(1/89)

5.01

**Reinstatement**

If this Policy terminates for nonpayment of premiums, you may apply to reinstate it. In no event, however, will we reinstate it if the unpaid premium is 6 or more months overdue. To apply for reinstatement, you must:

1. complete a written request for consideration of reinstatement;
2. pay all back premiums; and
3. when requested, furnish evidence of current insurability, satisfactory to us.

If, during the first 6 months a premium is overdue, we (or an agent specifically authorized to do so by us) accept the overdue premium without requiring a written request for consideration of reinstatement, the Policy will be reinstated automatically on the date of payment.

If the request is approved, the Policy will be reinstated as of the approval date. If we neither approve nor disapprove the request by the 45th day after the request is received, the Policy will be reinstated on that date. If we disapprove the request, we will promptly refund the premium payment.

The reinstated Policy will cover only loss that results from:

1. an Injury as may be sustained after the date of reinstatement;
2. a Sickness as may begin more than 10 days after the date of reinstatement; or
3. Total Disability unless the disease or condition causing the Total Disability is excluded by name or description.

A copy of any application for reinstatement will be sent to you for attachment to the Policy.

## 6.   CLAIM INFORMATION.

**Notice of Claim**

We must receive written Notice of Claim within 30 days after a covered loss starts or as soon after that as is reasonably possible. We will send a claim form within 10 working days after receipt of this notice. If you do not receive the claim form within 15 days after you sent us the notice, send us a letter about the claim describing the cause and the extent of the loss in detail. You also should tell us the name, address and telephone number of your attending physician. We should receive this letter within the time set for filing Proof of Loss.

**Proof of Loss**

Completion and return of the claim form or, if needed, the letter described above will serve as proper filing of Proof of Loss. This filing must be received in our home office no later than 90 days after the end of a period for which we are liable. For any other loss, we must be given written Proof of Loss within 90 days after such loss. Benefits will not be reduced due to a delay in filing Proof of Loss if it was filed as soon as reasonably possible. In no event, however, will we accept a filing of Proof of Loss more than a year after it is due. An exception will be made only if we receive proof satisfactory to us that you were not competent to make claim.

**Payment of Claims**

Monthly benefits are paid at the end of each month a payment is due, subject to continuing Proof of Loss. Any balance not yet paid when our liability ends will be paid immediately. Benefits will be paid to the Loss Payee except as provided in the Survivor's Benefit provision. If benefits are payable to an estate, a minor, or a person not competent to give a release, we may make a payment up to $1,000. This payment may be made to any relative by blood or marriage of the Loss Payee we believe entitled to it. If we do that in good faith, we will not be liable to anyone else for such amount.



**Partial Months**      We will pay 1/30th of the appropriate monthly benefit for each day of any period less than a full month for which benefits are payable.

**Physical Exams**      While a claim is pending or benefits are being paid, we have the right to require you to be examined from time to time by a Physician of our choice. This will be at our expense and as often as we reasonably may require.

**Legal Action**      Legal action may not be started against us to recover on this Policy until 60 days after you have filed Proof of Loss nor more than 3 years after filing Proof of Loss is required by this Policy.



## 7.   THE CONTRACT.

**Consideration,
Entire Contract,
Changes**

The consideration for this insurance is the application, a copy of which is attached to and made a part of this Policy, and the payment of the required premiums. Any application for reinstatement will become a part of the reinstatement contract and of this Policy.

This Policy, with the application and attached papers, is the entire contract. No change in this Policy will be effective until approved by one of our officers in writing. This approval must be noted on or attached to this Policy. No agent or sales representative may change this Policy or waive any of its provisions.

**Incontestable**

After this Policy has been in force for a period of 2 years during your lifetime, excluding any period you are disabled, we cannot contest the Policy because of the statements in the application.

We cannot contest any reinstatement of this Policy, except for nonpayment of premiums, after it has been in force during your lifetime for a period of 2 years from the date we approve the reinstatement, excluding any period you are disabled.

No claim starting or loss occurring after 2 years from the Policy Date will be reduced or denied because of a Pre-existing Condition unless the condition is excluded by name or description.

## 8.   GENERAL PROVISIONS.

**Misstatement
of Age**

If your age has been misstated in the application, the benefits will be those that the premium paid would have bought for the correct age.

If your age has been misstated in the application and we accept a premium for coverage that we would not have issued or that would have ceased according to your correct age, our only liability is to refund the premium for the period not covered.

If your age was not misstated in the application and we accept a premium for coverage that should not have been issued or that should have ceased according to your age, the coverage will continue in force subject to any right of cancellation until the end of the period for which the premium has been accepted.

**Conformity with
State Statutes**

If any provision of this Policy conflicts with the statutes of the state where you live on the Policy Date, it is amended to conform with the minimum requirements of those statutes.

**Dividend
Participation**

While in force, this Policy may participate in our divisible surplus, as determined by our Board of Directors. Any share of divisible surplus for this Policy may be applied under one of the following options:

1.   reduction of premium; or

2.   cash.

Any dividend not applied under option 1 will be paid in cash.



8.463.961

# PROPORTIONATE INCOME REPLACEMENT RIDER FOR RESIDUAL DISABILITY (NO QUALIFICATION PERIOD)

This rider is part of the Policy and subject to all its conditions. The Policy remains the same except where changed by this rider.

## 1. DEFINITIONS.

**Residual Disability and Residually Disabled**

mean that while you are Disabled from Sickness or Injury, or a combination of both, either in your Regular Occupation or another occupation:

1. you are working, but, solely as a result of such Disability, you are unable to earn at a rate of at least 80% of your Prior Earned Income; or

2. during the Waiting Period and during the first 6 months benefits are payable, you are working, but, solely as a result of such Disability:

   a) you are unable to perform one or more of the substantial and material duties which accounted for at least 20% of the time you spent in your Regular Occupation prior to your Disability; or

   b) you are able to perform all of the substantial and material duties of your Regular Occupation, but for 80%, or less, of the time you formerly spent prior to your Disability; and

3. you are under the regular care of a Physician, other than yourself, unless you furnish proof satisfactory, to us that future or continued care would be of no benefit to you.

**Disability and Disabled**

mean Total Disability, Totally Disabled, Residual Disability, Residually Disabled, or Presumptive Total Disability as defined in the Policy and this rider.

**Regular Occupation**

means your usual occupation when Disability begins.

**Period of Disability**

means the number of days you are continuously Disabled at any one time. A Period of Disability includes a later Period(s) of Disability and will be considered continuous and part of the same claim, if the later period(s):

1. is due, in whole or in part, to the same or related cause or causes as the previous period, and

2. starts less than six months after the end of the prior Period of Disability.

During the time between Periods of Disability, you must:

1. be able to do the material and substantial duties of an occupation; and

2. either continuously work on a full-time basis; or

3. earn at least 80% of your Prior Earned Income.

In all other cases, the later Period of Disability will be a new Disability and a new claim. It will require a new Waiting Period and a new Benefit Period.



1882237
(1/89)

1

| | |
|---|---|
| **Earned Income** | means all income you receive in one month, except for income received for work done prior to your Disability. This includes salary, wages, bonuses, fees, draw, commissions, and any other compensation from any vocational activity or business and that is reportable for Federal Income Tax purposes. Earned Income also includes contributions to any tax qualified retirement plans, annuity, salary reduction agreement, deferred compensation plan, or to any non-qualified deferred compensation plan if the contributions are: |

1.  made either by you or on your behalf; and

2.  not waived by contract during your Disability.

Earned Income does not include:

1.  income received from any tax qualified retirement plan, annuity, salary reduction agreement, deferred compensation plan, non-qualified deferred compensation plan, or disability income policy; nor

2.  income not derived from the duties of your job; nor

3.  your business expenses when paid by you and that you are allowed to deduct for Federal Income Tax purposes.

We have the right to require reasonable proof of your income both before and during any Period of Disability. This proof may include, but is not limited to, federal and state income tax returns, income statements, balance sheets, audit reports and other financial data.

| | |
|---|---|
| **Prior Earned Income** | means the greater of: |

1.  your average monthly Earned Income for the 12 calendar months just before the start of your Disability; or

2.  your highest average monthly Earned Income for any 2 consecutive years in the 5 year period just before the start of your Disability.

| | |
|---|---|
| **Current Earned Income** | means your monthly Earned Income during each month benefits are claimed under this rider. |
| **Loss of Earned Income** | means the difference of Prior Earned Income less Current Earned Income. Any Loss of Earned Income must result directly from Disability. The difference must equal at least 20% of Prior Earned Income to be considered Loss of Earned Income under this rider. If Loss of Earned Income is 75% or more of Prior Earned Income, we will consider it to be 100%. |
| **Proportionate Income Replacement Benefit** | means the benefit payable under this rider. It is determined monthly as follows: |

$$\frac{\text{Loss of Earned Income}}{\text{Prior Earned Income}} \times \begin{array}{c}\text{Monthly Benefit for}\\\text{Total Disability}\end{array} = \begin{array}{c}\text{Proportionate Income}\\\text{Replacement Benefit}\end{array}$$

| | |
|---|---|
| **Indexed Income** | means Prior Earned Income as adjusted by the Indexing of Prior Earned Income provision of this rider. The Indexed Income will never be less than the Prior Earned Income. |
| **Indexed** | means adjusted for changes in the CPI. Any adjustment will be made by multiplying your Prior Earned Income by the Index Factor. |



CPI      means the Consumer Price Index for the United States, All Items, All Urban Consumers. It is published by the Bureau of Labor Statistics of the U.S. Department of Labor. If this index is discontinued or if the method of computing it is materially changed, we may use another nationally published index approved by the Insurance Commissioner. We will choose an index that, in our opinion, most accurately reflects the rate of change in the cost of living in the United States. CPI will then mean the chosen index.

Review Date      means each anniversary date of the start of a Period of Disability.

Index Month      means the calendar month 3 months before the Review Date.

First Index Month      means the calendar month 3 months before the start of a Period of Disability. All changes in the CPI will be measured from this month.

Index Factor      means the figure we use that measures the change in the CPI from one Review Date to the next. On a Review Date the Index Factor equals the CPI for the latest Index Month divided by the CPI for the First Index Month, rounded to the 3rd decimal. As a minimum, the Index Factor cannot be less than a value of 1 accumulated at a 5% simple annual rate.

## 2.   BENEFIT PROVISIONS.

Proportionate Income Replacement Benefit

We will pay this benefit while you are Residually Disabled, after you have satisfied the Waiting Period. However, after this benefit has been payable for 6 months, further benefit payments will be based only on your Loss of Earned Income and Physician's care as described in 1. and 3. of the definition of Residual Disability.

In any event, for each of the first 6 months benefits are payable while you are Residually Disabled, we will pay the greater of:

1.   the Proportionate Income Replacement Benefit; or

2.   50% of the Monthly Benefit for Total Disability which would be paid if you were Totally Disabled.

After the first 6 months, any amount payable under this rider will be the Proportionate Income Replacement Benefit.

Any amount payable under this benefit will be rounded up to the nearest $10.

Extended Benefit Following Full Recovery

After a period of compensable Disability has ended and if solely because of that Disability your Earned Income remains at 80% or less of your Prior Earned Income, we will pay the Proportionate Income Replacement Benefit. This benefit will continue for up to 24 months or until your Earned Income is more than 80% of your Prior Earned Income, whichever occurs first. In no event will payments under this Extended Benefit be made beyond the Maximum Benefit Period or your age 65, whichever is first.

Indexing of Prior Earned Income

Beginning on the first Review Date we will index your Prior Earned Income. Indexing will continue each year after that as long as you are continuously Disabled. The Indexed Income will be used to calculate the Proportionate Income Replacement Benefit. The Indexed Income amount will be determined each year in advance for the next year by applying the Index Factor to your Prior Earned Income. However, the Indexed Income amount for any year will never be less than the Indexed Income for the previous year during any one Period of Disability.



1882237
(1/89)

3

8-463-961

If benefits are payable for successive Periods of Disability, the following will apply:

1. if a new Waiting Period is required, a new Prior Earned Income will be determined and used in calculations for the new benefit. There also will be a new Review Date.

2. if a new Waiting Period is not required, and Prior Earned Income had been indexed, the Indexed Income as last determined shall be used until the next Review Date. The next Review Date will be the anniversary of the previous Review Date. Prior Earned Income also will be indexed if the last Review Date fell during the time between the successive Periods of Disability.

**Waiver of Premium**

If, before your age 65, you become Disabled while the Policy is in force, we will waive premiums as they become due:

1. after your Disability has continued for 90 days or the Waiting period, whichever is shorter; and

2. while you remain Disabled; or

3. after a period of compensable Disability has ended, while we continue to pay benefits in accordance with the terms of the Extended Benefit Following Full Recovery.

We will refund any premium due and paid during the first 90 days of Disability or the Waiting Period, whichever is shorter. We will stop waiving premiums when you are no longer Disabled or no further payments of monthly benefits are due. Then the Policy will stay in force to the next premium due date. After that, you may continue the Policy in force by paying the premiums as they are due, subject to the Renewal provisions.

## 3.  LIMITATIONS.

No amount will be paid under this rider unless Disability begins while the Policy and this rider are in force.'

No benefit will be paid under this rider beyond the end of the Maximum Benefit Period or your attaining age 65, whichever occurs first.

Also, the combined benefit periods for Total Disability under the Policy and Residual Disability under this rider cannot exceed the Maximum Benefit Period shown on the Policy Schedule for which the Monthly Benefit for Total Disability is payable.

Any amount paid under this rider will be reduced by any benefits paid for income loss under:

1. the Pennsylvania Motor Vehicle Financial Responsibility Law; and/or

2. any worker's compensation or occupational disease, employer''s liability or similar law in the state of Pennsylvania (including insurance which provided benefits under such law).



## 4.   GENERAL PROVISIONS.

**Premium**       The premium for this rider is shown on the Policy Schedule and is payable at the same time as the premium for the Policy.

**Termination**       This rider and the premium for it will cease at your age 65.

**Effective Date**       The effective date of this rider is the later of:

1.   the Policy Date; or

2.   the rider date, if any, shown here: _____

James D. Gaughan
Secretary
V.P., General Counsel,
AND SECRETARY

C. Robert Henrikson
President
CHAIRMAN AND CEO



**General American**
LIFE INSURANCE COMPANY
ST. LOUIS, MISSOURI 63166



DUPLICATE

1882237
(1/89)

5

# OWN OCCUPATION RIDER
## (FOR THE FULL BENEFIT PERIOD)

This rider is part of the Policy and subject to all its conditions. This rider changes the definition of Total Disability and Totally Disabled as found in the Policy. In all other respects, the Policy remains the same.

**Total Disability and Totally Disabled**   mean that, as a result of Sickness or Injury or a combination of both, you are unable to perform the material and substantial duties of your Regular Occupation.

You must be under the regular care of a Physician, other than yourself, unless you furnish proof satisfactory to us that future or continued care would be of no benefit.

**Regular Occupation**   means your usual occupation when Total Disability begins.

**Premium**   The premium for this rider is shown on the Policy Schedule and is payable at the same time as the premium for the Policy.

**Effective Date**   The effective date of this rider is the later of:

1.   the Policy Date; or

2.   the rider date, if any, shown here: _____



James D. Gaughan
Secretary

C. Robert Henrikson
President

General American
LIFE INSURANCE COMPANY
ST. LOUIS, MISSOURI 63166



1882937
(1/89)

# COST OF LIVING ADJUSTMENT RIDER
## (Guaranteed 5% Simple, Maximum 10% Simple)

This rider is part of the Policy and subject to all its conditions. The Policy remains the same except where changed by this rider.

## 1.    DEFINITIONS.

**Adjusted Monthly Benefit**     means the Monthly Benefit for Total Disability or the Proportionate Income Replacement Benefit, if any, multiplied by the Index Factor for a Review Period. The Adjusted Monthly Benefit never will be less than the amount that would have been payable in the absence of this rider. Also, the Adjusted Monthly Benefit never will be less than the Adjusted Monthly Benefit for the previous year during any one Period of Disability.

**Index Factor**     means the figure we use to measure the change in the CPI from one Review Date to the next. On a Review Date the Index Factor equals the CPI for the latest Index Month divided by the CPI factor for the First Index Month, rounded to the 3rd decimal. But, the Index Factor cannot:

1. be more than a percentage factor determined by the following formula: 1 + (the completed number of Review Periods X 10%); nor

2. be less than a percentage factor determined by the following formula: 1 + (the completed number of Review Periods X 5%).

**Review Date**     means each anniversary date of the start of a Period of Disability.

**Review Period**     means a 12 month period ending on a Review Date.

**Index Month**     means the calendar month 3 months before the Review Date.

**First Index Month**     means the calendar month 3 months before the start of a Period of Disability. All changes in the CPI will be measured from the First Index Month.

**CPI**     means the Consumer Price Index for the United States, All Items, All Urban Consumers. It is published by the Bureau of Labor Statistics of the U.S. Department of Labor. If this index is discontinued or if the method of computing it is materially changed, we may use another nationally published index approved by the Insurance Commissioner. We will choose an index which, in our opinion, most accurately reflects the rate of change in the cost of living index in the United States. CPI will then mean the chosen index.

**Monthly Benefit for Total Disability**     means the monthly amount payable for Total Disability. This amount may be increased by a Social Insurance Replacement Benefit, if it is included in the Policy and when it is applicable.

## 2.    BENEFIT PROVISIONS.

**Cost of Living Adjustment Benefit**     Beginning on the first Review Date, and continuing on each Review Date while you are disabled, we will calculate and pay the Adjusted Monthly Benefit during each Review Period.



If benefits are payable for a successive Period of Disability, we will pay as follows:

1. if a new Waiting Period is required, a new Review Date must be established for any Adjusted Monthly Benefit to be payable. Any previous benefit adjustments will not apply.

2. if a new Waiting Period is not required, benefits will be payable in the same amount as resulted from the last adjustment, if any, until the next Review Date. The next Review Date will be the anniversary of the previous Review Date. An adjustment also will be made if the last Review Date fell during the time between the successive Periods of Disability.

If you continue to qualify for benefits after your age 65 because of a disability which began prior to your age 64, benefits will be paid at the same amount as just prior to your age 65. No adjustments will be made after your age 65.

If a claim begins between your age 64 and age 65, we will compute an adjustment on your first Review Date. This amount will continue to apply to any benefits paid during that Period of Disability.

Any amount payable under this benefit will be rounded up to the nearest $10.

## 3.   LIMITATIONS.

No adjustment will be made under this rider unless disability begins while the Policy and this rider are in force.

Cost of living adjustments will end on the earliest of:

1. the end of a Period of Disability;

2. the end of the Benefit Period shown on the Policy Schedule; or

3. your age 65.

## 4.   CONVERSION PRIVILEGE.

When you are Actively and Regularly Employed on a Full-Time Basis after the end of a Period of Disability during which you were paid an Adjusted Monthly Benefit, you may elect to increase the amount of the Monthly Benefit for Total Disability shown on the Policy Schedule. You may increase it to the amount of the Adjusted Monthly Benefit for Total Disability which was used to determine the last monthly claim payment.

To take advantage of this Conversion Privilege you must apply:

1. before your age 60;

2. within 90 days after the Period of Disability ends; and

3. in writing, on a form which will be furnished by us at your request. On this form, you must confirm that you are Actively and Regularly Employed on a Full-Time Basis. No other evidence of insurability will be required.

The effective date of the increase will be the later of:

1. the date we approve your application for the increase; or

2. the date the additional premium is paid.

The required additional premium must be paid within 31 days after the date we approve the application for the increase. Later premiums for the increase must be paid as part of the renewal premiums for the Policy.

The premium for the increase will be based on:

1. our rates in effect on the date of conversion; and

2. your attained age.



At the time you request the increase, the Policy and this rider must be in force. The increase in benefit will cover only those losses which start after the effective date of the increase. It also will be subject to the same limitations and exclusions as other coverage provided by the Policy, including any applicable riders as permitted by our underwriting rules. The increase will not be effective nor payable for successive Periods of Disability resulting from the disability from which the increase originated. The increase will be effective only for a new Period of Disability and a new claim.

## 5. GENERAL PROVISIONS.

**Premium**  The premium for this rider is shown on the Policy Schedule and is payable at the same time as premiums for the Policy.

**Termination**  This rider and the premium for it will cease at your age 65.

**Effective Date**  The effective date of coverage under this rider is the later of:

1. the Policy Date; or
2. the rider date, if any, shown here: _____

James D. Gaughan
Secretary

C. Robert Henrikson
President





LIFE INSURANCE COMPANY
ST. LOUIS, MISSOURI 63166

# FUTURE BENEFIT INCREASE RIDER
## (DISABILITY INCOME POLICY)

This rider is part of the Policy and subject to all its conditions. The Policy remains the same except where changed by this rider.

**Benefit**

Prior to your age 55, you have the right to purchase additional amounts of the Monthly Benefit For Total Disability, up to the Future Benefit Increase Amount. You may do so without submitting any evidence of your insurability based on your health. Our financial and other underwriting requirements for new applicants for this type of policy will apply.

Any increase purchased in accordance with this benefit will be issued as a separate policy. It will be on a form we determine to be most like this Policy and that is being issued by us at that time in the state where you live.

You may exercise your right to purchase additional amounts as follows:

1. on or after the first anniversary date of the Policy, up to and including the fifth anniversary date, the increase may equal any amount up to the total Future Benefit Increase Amount; and

2. after that time, the increase, if any remaining, shall not exceed an amount equal to one-third of the Future Benefit Increase Amount.

You are limited to two such increases in any one policy year. In any one policy year only one such increase may be exercised on a date other than the anniversary of the Policy Date; the other increase must be exercised as of the anniversary of the Policy Date. In any event, the total of all increases shall not exceed the Future Benefit Increase Amount shown on the Policy Schedule.

You must make a formal written application for the increase. The increased amount will then be effective on the later of:

1. the Policy Date of the new policy; or

2. the date the new policy is delivered to you, accepted by you, and the full first premium paid to us.

If you are disabled when an increase is applied for, eligibility for the increase will be based on your average monthly earnings for the 12 month period immediately prior to disability. The increased benefits will apply only to a new disability which begins after the effective date of the increase.

**Issue Limits**

The increased benefit, when combined with all other disability income insurance you have in force at that time, cannot exceed our published issue and participation limits for such insurance. Those limits will be our published limits on the Policy Date of this Policy, unless more liberal limits are then in effect.

**Premium**

The premium for this rider is shown on the Policy Schedule and is payable at the same time as premiums for the Policy.

The premium for each increase will be based on our premium rates then in effect for:

1. your attained age; and

2. your occupation at that time.

If on the effective date of an increase, the premium for this Policy is being waived, the additional premium for the new policy also will be waived until premiums for this Policy again become payable.



DUPLICATE

1883037
(1/89)

1

**Termination**        This rider will end and no further premiums will be due on the earlier of:

1.    your age 55; or

2.    the date the total amount of increased benefits purchased equals the Future Benefit Increase Amount.


James D. Gaughan
Secretary

C. Robert Henrikson
President





LIFE INSURANCE COMPANY
ST. LOUIS, MISSOURI 63166

1883037
(1/89)

2

018599        PP721TT

**DISABILITY INCOME**
**APPLICATION PART I**

**GENERAL AMERICAN**
**LIFE INSURANCE CO.**
**ST. LOUIS, MISSOURI**

1. Amount if any paid in cash in exchange for the Conditional Receipt with the same number as this application. $ 0

| 2. (a) Name of Proposed Insured (Print Last, First, Middle) | (b) ☒ Male ☐ Female | (c) Social Security Number 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 |
|---|---|---|

Michael B Segal

| (d) Date of Birth | Mo. 5 | Day 29 | Yr. 57 | (e) Age Nearest Birthday 33 | (f) If Special Date Desired: (Date) | (g) Birthplace PA |
|---|---|---|---|---|---|---|

| (h) Residence Address: Number and Street, or RFD | City | State | Zip | Area | Home Phone No. |
|---|---|---|---|---|---|
| 402 WICKFORD DR | PITTSBURGH | PA | 15238 | 412 | 963-1711 |

| 3. (a) Name of Employer | (b) Occupation |
|---|---|
| ALLEGHENY OPHTHALMOLOGY ASSOCIATES | SURGEON |

| (c) Business Address: Number and Street, or RFD | City | State | Zip | Area | Bus. Phone No. |
|---|---|---|---|---|---|
| 303 EAST SIXTH AVE | TARENTUM | PA | 15084 | 412 | 224-4240 |

4. (a) Send Premium Notices to:  ☐ Residence  ☒ Business    (b) Premium Payor:  Name ___ Address ___

5. I apply for  ☒ a new policy or  ☐ a FBI policy from policy # _____ as indicated below.

| Policy | ☒ Prof/Exec (4200 Series) | ☐ ARDI | ☐ GR-65 | ☐ BOE | ☐ Key Person | ☐ Other |
|---|---|---|---|---|---|---|
| Monthly Benefit: | $ 3000 | $ | $ | $ | $ | $ |
| Waiting Period: | 180 days | ___ days | ___ days | ___ days | ___ days | ___ days |
| Benefit Period: | ☐ 2 Yr ☐ 5 Yr | ☐ to 65 ☐ L/65 | ☐ 2 Yr ☐ 5 Yr | ☐ 12 ☐ 24 | | |
| | ☐ to 65 ☐ L/65 | ☐ L/L55 ☐ L/L60 | | | | (Benefit Period) |
| | ☐ L/L50 (A-2 only) | ☐ ___ ___ | | | | ☐ |
| | ☒ L/L55 ☐ L/L60 | ☐ ___ ___ | | | | ☐ |
| | ☐ ___ ___ | | | | | ☐ |

| Riders & Other Options: | ☐ Base 365 | ☐ Base 365 | ☐ Partial | ☐ PIR | | ☐ |
|---|---|---|---|---|---|---|
| | $ ___ WP ___ days | $ ___ WP ___ days | $ ___ Soc. Ins. | ☐ BPR $ ___ | | ☐ |
| | ☒ Own. Occ. | ☐ Own Occ. | $ ___ WP ___ days | ☐ 6 ☐ 12 | | ☐ |
| | ☐ 2 Yr | ☐ 2 Yr | | ☐ FBI $ ___ | | |
| | ☐ 5 Yr | ☐ 5 Yr | | | | |
| | ☒ LT/Full Ben | ☐ LT/Full Ben | | | | |
| | ☐ LT/Mod. Full Ben (P only) | ☐ LT/Mod. Full Ben (P only) | | | | |
| | ☒ PIR | ☐ PIR | | | | |
| | ☒ FBI $ 5000 | ☐ FBI $ ___ | | | | |
| | ☒ Soc. Ins. | ☐ Soc. Ins. | | | | |
| | $ ___ WP ___ days | $ ___ WP ___ days | | | | |
| | ☒ COLA | ☐ COLA | | | | |
| | ☐ 8% ☒ 5/10% Simple | ☐ 8% ☐ 5/10% | | | | |

DUPLICATE

| 6. Premiums Payable: | ☐ ANN | ☐ SA | ☐ QR | ☐ Payroll Deduction | ☒ Pre-Auth Check |
|---|---|---|---|---|---|
| List Billing: | ☐ ANN | ☐ SA | ☐ QR | ☐ MO | |

List Billing Number (if adding to an existing List Billing) ___

7. Dividend Option (if eligible):  ☐ Redn. of Premium  ☐ Cash

8. Loss Payee (If other than Proposed Insured) (Print full name, address, telephone number, and relationship to Proposed Insured.)

| 9. Original Owner (If other than Proposed Insured) (Print full name, address, telephone number, and relationship to Proposed Insured.) | Soc. Sec. or Tax No. of Proposed Owner (Required by law) 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 |
|---|---|
| | ☒ Individual |
| | ☐ Corporation |
| | ☐ Partnership |
| | ☐ Other |

10. Will your employer pay the premium for the Insurance now applied for with no portion of the premium included in your taxable income?  ☐ Yes  ☒ No

11. Is this an employer-sponsored plan (two or more lives)?  ☐ Yes  ☒ No

12. Is Disability Income Insurance contemplated or applied for with any other company on Proposed Insured? (If "Yes", give details in #26.)  ☐ Yes  ☒ No

018599

13. (a) In the following spaces, list and describe all existing and pending disability income coverage. Include the following: disability income insurance, group ability insurance, association disability plans, salary continuation plans, any other coverage providing disability benefits, also include any coverage for w the Proposed Insured will become eligible after a qualifying period of employment has been met, private and government pension or retirement plans, c insurance plans, overhead expense insurance, General American disability income insurance. (If none, write "None":

| Company or Source | Issue Date | Monthly Benefit | | | Waiting Period | Benefit Period | To Be Continued | Date to be Discontinued | Paid to Date |
|---|---|---|---|---|---|---|---|---|---|
| | | DI | BOE | Other | | | | | |
| MACA | 1/21/84 | 1,000 | | | 30 DAY | 65 | ☒ Yes ☐ No | | |
| P. REVERE | 4/24/89 | 3850 | | | 90 DAY | 65 | ☐ Yes ☐ No | | |
| P. REVERE | 10/27/89 | 1000 | | | 90 DAY | 65 | ☐ Yes ☐ No | | |
| | | | | | | | ☐ Yes ☐ No | | |

(b) Show the total amount of any Soc. Ins. benefit in force. $ ___NONE___

(c) Is the Proposed Insured eligible for:     State Cash Sickness? _____ (If none, write "None": _____)     ☐ Yes ☒ N

Workers' Compensation? ☐ Yes ☒ N

(d) Is policy applied for to replace or change any existing insurance? (If "Yes", give details in #26 and forward appropriate replace-     ☐ Yes ☒ N ment forms, if required.)

General American will rely on the fact that the coverage indicated will be discontinued on the stated date. If that coverage is not discontinued on that dat any policy issued will be rescinded and all premiums will be returned with interest. Any action taken by General American will be subject to the incontestat provision in the policy. General American may contact any listed insurer after the stated discontinuance date to confirm that the coverage has been discontinue

(e) Is policy applied for to replace any General American disability income insurance?     ☐ Yes ☒ N (If "Yes", give full details): _____

14. Have you ever been declined, postponed, rated or offered a policy different than that applied for? (If "Yes", give details in #26.)     ☐ Yes ☒ N

15. Do you contemplate travel or residence outside the U.S.A.? (If "Yes", give details in #26.)     ☐ Yes ☒ N

16. In the past five years have you been in a motor vehicle accident or charged with a moving violation of any motor vehicle law     ☐ Yes ☒ N or had your license restricted or revoked? (If "Yes", please give your automobile driver's license number, date, and details in #26.)

17. Have you engaged in or contemplated engaging in parachuting, racing, underwater diving or any similar sport or hobby?     ☐ Yes ☒ N (If "Yes", complete Avocation Section.)

18. Have you flown during the past two years in any aircraft other than as a passenger? (If "Yes", complete Aviation Section.)     ☐ Yes ☒ N

19. (a) Proposed Insured's Occupation (include specialty, if any):
OPHTHALMOLOGY SURGEON _____ % Administrative _____ % Sales _____ % Manual _____ % Travel

(b) Describe exact duties: SURGEON (EYE)

(c) Employer: Name: ALLEGHENY OPHTHALMOLOGY     Address: 303 E. SIXTH AVE TARENTUM PA 15084
Phone Number: 412-324-4240

(d) Nature of business: EYE SURGERY

(e) How long has Proposed Insured been employed in present occupation? 2 YRS _____ If less than two years, state prior occupation an employer: _____

(f) If self-employed, show number of full-time employees: _____ Part-time employees: _____

(g) Is Proposed Insured actively at work on a full-time basis (at least 30 hrs per week) without medical restrictions?     ☒ Yes ☐ No If "No", explain: _____

(h) Does Proposed Insured have any other part-time or full-time jobs, or additional duties?     ☐ Yes ☒ No If "Yes", explain with complete details: _____

(i) Does Proposed Insured intend to change occupation(s) or employer(s) within the next six months?     ☐ Yes ☒ No If "Yes", explain: _____

(j) Percentage of job duties performed inside _____

018599

20. Annual Earned Income from your Occupation for Federal Tax Purposes (after business expense, if any - Net Profit or Net Occupational Income unincorporated Business Owner(s), independent contractor, commissioned salesperson, or employee who itemizes business deductions before taxes). self-employed less than one year, provide complete details of projected estimated annual income.

|  | | Current Year | Last Year | Two Years Ago |
|---|---|---|---|---|
| a. | Annual Salary | $ 200,000 | $ 100,000 | $ 75,000 |
| b. | Commissions | $ | $ | $ |
| c. | Bonuses | $ 250,000 | $ 120,000 | $ |
| d. | Pension and Profit-sharing Contributions and other Deferred Compensation | $ | $ | $ |
| e. | Earnings from other occupations | $ | $ | $ |
|  | TOTALS | $ 450,000 | $ 220,000 | $ 75,000 |

Other Income:

|  | | | | |
|---|---|---|---|---|
| f. | Dividends and Interest | $ | $ | $ |
| g. | Net Real Estate Income Before Depreciation | $ | $ | $ |
| h. | Other (Identify Source:) _____ | $ | $ | $ |

Current Net Worth $ _BUSINESS + HOME (MORTGAGED)_ Itemize below if net worth exceeds $2,000,000.

| Cash, Savings, Stocks, Bonds $ _____ | Business Interest (Fair Market Value) $ 500,000 |
|---|---|
| Personal Residence $ _____ | Personal Property (Jewelry, Cars, etc.) $ _____ |
| Other Real Estate $ _____ | Other (describe): $ _____ |
| (Fair Market Value less mortgages, loans) | |

## Business Overhead Expense Information

21. a. How is your business organized?  ☐ Sole Owner   ☐ Corporation   ☐ Partnership

   ☐ Other _____

   b. Number of employees, excluding members of your profession _____

   c. If expenses are shared, include only the portion of expenses for which you are personally responsible and give your portion _____ %
   Exclude payments or salaries paid to you, members of your profession or employees capable of performing your duties.

| Rent | $ _____ | Salaries | $ _____ | Liability Ins. | $ _____ |
|---|---|---|---|---|---|
| Utilities | $ _____ | Depreciation | $ _____ | Property Taxes | $ _____ |
| Building Maint. | $ _____ | Telephone | $ _____ | Mortgage Int. | $ _____ |

   Other normal and customary fixed office expenses $ _____ (Give full details in #26 if over 10% of total.)

   d. If business expenses listed above are reimbursed in any manner, give complete details: _____

## Key-Person Insurance Only

22. What monthly salary does Employer-Purchaser pay the Proposed Insured?     $ _____

23. Is Employer-Purchaser a  ☐ Corporation or  ☐ Partnership?

24. If Employer-Purchaser is a Corporation:

   (a) What is the approximate number of stockholders? _____

   (b) What is the approximate number of company employees? _____

   (c) What percentage of stock, if any, does Proposed Insured own or control? _____

25. If Employer-Purchaser is a partnership, what is Proposed Insured's share of the partnership?

DUPLICATE

26. Explanations or additional instructions.

---

The undersigned agree(s) that

(1) All Parts of this application will be a part of any policy issued.

(2) Knowledge of the agent or medical examiner shall not be imputed to us unless stated in Part I, or any of its supplements, Part II, or medical reports rec in the Home Office. No printed provision of this application shall be modified or waived except by an endorsement signed by an officer at the Home Office.

(3) The "date of issue" as shown in your policy will be the "anniversary date." The due date of future premiums will be determined from that date. The num of policy years and months for deciding policy values will be determined from that date.

(4) Statements and answers in Application Part I or any of its supplements, and Part II are complete and true to the best of your knowledge and belief.

(5) If a premium is paid and so indicated, Interim Insurance is provided, BUT ONLY as described in the Interim Insurance Agreement which bears the same num as this application.

(6) Policy Delivery Requirements: If an advance premium payment of at least 1/12 of an annual premium is not made; (a) no insurance will be in force until policy is delivered to the Proposed Owner(s); (b) no insurance will be in force until full premium is paid to us in cash; and (c) no insurance will be in force un the Proposed Insured is alive and in sound health at the time of delivery.

Dated at _____Pittsburgh Pa._____

_____ X _Michael Siegel_ _____
Signature of Proposed Insured

this _____23_____ day of _____August_____, 19 90

_____
Signature of Applicant-Purchaser if not Proposed Insured.
If a Corporation or other Firm, show full name of Firm.

I certify that I have truly and accurately recorded on all parts of this Application the information supplied by the Applicant.

_____Mark Rosen_____
(Signature of Licensed Agent)
If not yet appointed, do not sign.

_____
Signature and Title of Firm Officer
(other than Proposed Insured)

9730-37 (10/89)

018599

SOLICITING AGENT'S CERTIFICATE

1. If in present occupation less than 1 year, give former occupation and name and address of former employer.

_Nc_

2. Are you related to Proposed Insured?     If yes, explain     3. Net Worth: $

_NO_

4. What risk class was quoted to the applicant?

_Std Select_

5. ☐ To the best of my knowledge, this is a replacement. (Complete and submit required papers.)

☑ To the best of my knowledge, this is not a replacement.

6. Did you deliver "Notice of Information Practices" and the explanation of Medical Information Bureau to the Proposed Insured?   ☑ Yes   ☐

_____
Signature of Soliciting Agent

7. Names and Codes of Agents to be credited with production. If not yet appointed-do not sign.

Agent _____

Agent _____

Agent _____

Agent _____

Annualize commission requested   ☑ Yes   ☐ No

_____
Signature of General Agent

ATTACH AGENT LABEL ONLY FOR AGENT TO BE CREDITED WITH PRODUCTION - Do not attach additional agent or General Agent labels unless it is your intention to split commission.

```
0693-1011-077575-01      GREEN
MARK O ROSEN, CLU
LIFE BROKERAGE CORP
412-281-0600
EFF DATE: 90-01-15  C CLASS U2
```

# General
# American
LIFE INSURANCE COMPANY
St. Louis, Missouri

DUPLICATE

APPLICATION PART II

(To be completed by the Agent when Non-Medical basis)

**GENERAL AMERICAN LIFE INSURANCE CO.**
ST. LOUIS, MISSOURI

018599

1. (a) Name _MICHAEL B. SIGAL_  (b) Date of Birth _5-27-57_

2. Height ____ ft. ____ in; Weight ____ lbs. Any change in weight in past year? (If yes, give details below, including lbs.)  ☐ Yes  ☐ No

3. (a) Name and address of your personal physician. If none, check ☐  Name _DR CHRIS ALLEN_
Street # _241 FREEPORT RD_  City, State & Zip Code _AYONWORE PA_  Phone # _781-6566_
(b) Date and reason last consulted?  Date _COUPLE MONTHS AGO_  Reason _ROUTINE_
(c) What treatment was given or medication prescribed?

4. Have you **ever** been medically treated for or medically diagnosed as having:

| | YES | NO |
|---|---|---|
| (a) Disorder of eyes, ears, nose, or throat? | ☐ | ☒ |
| (b) Dizziness, fainting, convulsions, headaches, speech defect, paralysis or stroke, mental or nervous disorder? | ☐ | ☒ |
| (c) Shortness of breath, persistent hoarseness or cough, blood spitting, bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ |
| (d) Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☒ | ☐ |
| (e) Jaundice, intestinal or rectal bleeding, ulcer, hernia, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| (f) Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| (g) Diabetes, thyroid or other endocrine disorders? | ☒ | ☐ |
| (h) Neuritis, sciatica, rheumatism, arthritis, gout, or disorder of the muscles or bones, including the spine, back or joints, deformity, lameness or amputation? | ☐ | ☒ |
| (i) Acquired Immune Deficiency Syndrome (AIDS) or "AIDS" Related Complex (ARC)? | ☐ | ☒ |
| (j) Disorder of skin, lymph glands, cyst, tumor or cancer? | ☐ | ☒ |
| (k) Allergies, anemia or other disorder of the blood? | ☐ | ☒ |
| 5. Are you now under observation or taking medication or treatment? | ☐ | ☒ |
| 6. Do you have any doctor's visit or medical care scheduled? | ☐ | ☒ |

7. Other than above, have you within the past 5 years:

| | YES | NO |
|---|---|---|
| (a) Had any psychiatric or psychological consultation not listed above? | ☐ | ☒ |
| (b) Had a checkup, consultation, illness, injury, surgery? | ☒ | ☐ |
| (c) Been a patient in a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☒ |
| (d) Had electrocardiogram, X-ray, other diagnostic test? | ☒ | ☐ |
| (e) Been advised to have any diagnostic test, hospitalization, treatment, or surgery which was not completed? | ☐ | ☒ |

8. Have you ever requested or received a pension, benefits, or payment because of an injury, sickness or disability from any state or federal plan, any employer, or the military?  ☐  ☒

9. In the past 5 years have you used any of the following once or more: Narcotics, LSD, marijuana, amphetamines, barbiturates, cocaine, heroin, or any drugs except as legally prescribed by a physician?  ☐  ☒

10. Have you ever received treatment for or advice for or joined an organization because of alcoholism or drug addiction?  ☐  ☒

11. Have you ever attempted suicide or a suicidal gesture?  ☐  ☒

12. Do you currently use tobacco in any form?  ☐  ☒
Have you used tobacco in any form in the last 5 years?  ☐  ☒
If yes, in what form _____
how often _____
If discontinued, why _____
when _____

13. Do you exercise regularly, i.e. calisthenics, jogging, etc.?  ☒  ☐
If "Yes", how often?  ☒ Daily  ☐ Weekly  ☐ Other _BIKE 45MIN/DAY_

14. If you are a female, are you now pregnant? _n/a_  ☐  ☐
If "Yes", what is the expected date of delivery? _____

15. Do you have any family history of tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide?  ☐  ☒

**DETAILS of answers. (IDENTIFY QUESTION NUMBER, CIRCLE APPLICABLE ITEMS: include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.)**

Synthroid - hypothyroidism

Routine yearly blood etc
Dr Chris Allen

Hypertension — no longer
medicated

| 16. | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | 57 | | |
| Mother | 58 | | |
| Brothers and Sisters | 3, 14 | | |
| No. Living | ✓ | | |
| No. Dead | | | |

Dated at _Pgh Pa_

this _23_ day of _August_ 19 _90_

Witnessed by _Mark Rosen_
(Signature of Licensed Agent)

X _Michael Sigal_
Signature of Proposed Insured

DUPLICATE

Signature of Parent (Guardian) if Proposed Insured is under 14 years and 6 months old.

10730-37 (10/89)

018599

## AVOCATION SECTION

**1. RACING, AUTO, MOTORCYCLE, SNOWMOBILE, MOTORBOAT**

A. Type: ☐ midget, ☐ stock, ☐ hotrod, ☐ go-kart,
☐ drag, ☐ sportscar, ☐ snowmobile, ☐ cycle, ☐ boat,
☐

B. Vehicle or boat: make & model _____
displacement _____ horsepower _____
class & category _____

C. Maximum speed attained _____ m.p.h.

D. Timing: ☐ Vehicle vs vehicle  ☐ Vehicle vs clock

E. Location: (oval track, closed circuit, drag strip, hill climb, etc., indicate all) _____

F. Have you ever had a racing accident?  ☐ Yes  ☐ No
(If yes, explain full details) _____

G. Racing organizations affiliated with: _____

H. Races supervised by: _____

| I. Frequency (Number of Days) | Last 12 Months | 1 to 2 Years Ago | Estimate Next 12 Months |
|---|---|---|---|
|  |  |  |  |

**2. UNDERWATER DIVING**

A. Type: ☐ scuba, ☐ skin, or snorkel

B. Purpose: ☐ recreation  ☐ rescue  ☐ salvage  ☐ _____ specify

C. Locations: ☐ oceans  ☐ lakes  ☐ rivers  ☐ pools  specify
☐ quarries  ☐ caves _____

D. Have you received formal diving training?  specify
☐ Yes  ☐ No (If yes, explain) _____

E. Do you use the "buddy system"?  ☐ Yes  ☐ No

| Depth | Avg. Time (Mins.) | Last 12 Mos. | 1 to 2 Years Ago | Est. Next 12 Mos. |
|---|---|---|---|---|
| 0-50 ft. |  |  |  |  |
| 50-75 ft. |  |  |  |  |
| 75-100 ft. |  |  |  |  |
| 100-150 ft. |  |  |  |  |
| OVER 150 ft. |  |  |  |  |

**3. PARACHUTING OR SKYDIVING**

A. Do you participate in skydiving or delayed chute opening competition?  ☐ Yes  ☐ No

B. Are you a member of the United States Parachute Association?  ☐ Yes  ☐ No

C. Do you parachute over or near water?  ☐ Yes  ☐ No
(If yes, explain)

| D. Frequency (Number of Jumps) | Last 12 Months | 1 to 2 Years Ago | Estimate Next 12 Months |
|---|---|---|---|
|  |  |  |  |

**4. MOUNTAIN OR ROCK CLIMBING**

A. Locations (ranges, caves, rock formations, trails, include usual heights including geographical area) _____

B. Type:  ☐ rock  ☐ ice  ☐ _____ specify

C. Do you use direct-aid climbing?  ☐ Yes  ☐ No

D. Do you participate as a guide or engage in rescue duties?  ☐ Yes  ☐ No

E. Have you had a climbing accident?  ☐ Yes  ☐ No
(If yes, explain)

| F. Frequency (Number of Days) | Last 12 Months | 1 to 2 Years Ago | Estimate Next 12 Months |
|---|---|---|---|
|  |  |  |  |

**5. REMARKS OR OTHER AVOCATIONS (Include details regarding nature, location, frequency, and degree of participation.)**

## AVIATION SECTION -- FOR STUDENTS, PILOTS AND CREW MEMBERS

1. _____ TOTAL OF ALL HOURS FLOWN AS PILOT OR CREW MEMBER  _____ TOTAL HOURS FLOWN IN PAST 12 MONTHS?  _____ ESTIMATED HOURS FLYING IN NEXT 12 MONTHS?

2. PILOT CERTIFICATE currently held:  ☐ Student  ☐ Private  ☐ Commercial
☐ Airline Transport Rating (ATR)  ☐ Flight Instructor  ☐ Instrument Flight Rating (IFR)
Have you ever been grounded or had your license revoked?  ☐ Yes  ☐ No  (If "Yes", give full details under REMARKS)

3. MEDICAL CERTIFICATE currently held:  ☐ III  ☐ II  ☐ I  Date of last renewal _____
Was it denied by the Aviation Medical Examiner but eventually issued?  ☐ Yes  ☐ No
Was it necessary to appeal before Certificate was eventually issued?  ☐ Yes  ☐ No
Was Medical Certificate granted subject to limitation(s) or physical waiver(s)?  ☐ Yes  ☐ No
(If any of the above questions is answered "Yes", please give full details and explain) _____

4. Are you currently, have you within the past 12 months or do you contemplate future flying in the Civil Air Patrol?  ☐ Yes  ☐ No

5. Do you contemplate a change from your present flying to commercial or military flying?  ☐ Yes  ☐ No
If "Yes", give full details under REMARKS)

6. REMARKS _____

7. Should you not qualify for full coverage at standard rates, do you desire:  ☐ (a) Full coverage with extra premium if available?  ☐ Yes  ☐ No
☐ (b) Restricted aviation coverage without extra premium if available?  ☐ Yes  ☐ No

I HEREBY DECLARE that all the statements and answers to the above questions are complete and true to the best of my knowledge and belief, and I agree that they shall form a part of my application for insurance dated _____ this _____ day of _____ 19___

X

018599

DUPLICATE

**GENERAL AMERICAN**
**LIFE INSURANCE COMPANY**
**ST. LOUIS, MISSOURI**

## AUTHORIZATION TO OBTAIN AND DISCLOSE INFORMATION

I authorize General American, its agents, employees, reinsurers, insurance support organizations and their representatives to obtain information about me to evaluate this application. This information may be about: (a) age; (b) medical history, condition and care; (c) physical and mental health; (d) occupation; (e) income; (f) avocations; (g) driving record; (h) other personal characteristics; and (i) other insurance. It includes the use of alcohol, drugs and tobacco.

I authorize any physician, health care professional, hospital, clinic, medical facility, the Veterans Administration, the MIB, Inc., employer, consumer reporting agency or other insurance company, to release information about me to General American on receipt of this Authorization. I also authorize all said sources, except MIB, Inc., to give such records or knowledge to any agency or representative employed by General American to collect and transmit such information. General American or its representative(s) may also release this information about me to its reinsurer, to the MIB, Inc., or to another insurance company to whom I have applied or to whom a claim has been made. No other release may be made except as allowed by law or as I further authorize.

This form is valid for 30 months from the date it is signed. I have received the Notice of Information Practices, which includes the Medical Information Bureau and Fair Credit Reporting Act notices. I authorize General American to obtain an investigative consumer report on me.

A photographic copy of this is as valid as the original. I have the right to receive a copy of this if I ask for it.

Date _8-23-90_

Witness _Mark Rosen_

_MICHAEL SIGAL_
Print Name of Proposed Insured

X _Michael Sigal_
Signature of Proposed Insured, Parent or Guardian of Minor

NAME OF INSURED:

The undersigned hereby certifies that the Disclosure Statement required by the Life Insurance Solicitation Regulation of Pennsylvania was given to the applicant no later than the time the application for insurance was signed by the applicant.

Date  8-23-90

_____
Soliciting Agent

This certification must be removed and sent to the Home Office with the application.

GENERAL AMERICAN P.O. BOX 14490, ST. LOUIS, MO. 63178

To: General American Life Insurance Company

I, ___MICHAEL B. SIGAL_____, hereby declare and warrant that my
                    (Proposed Insured)

occupation is _____, and that since the application for

insurance on my life dated ___AUGUST 23, 1990___, together with any supplement

or amendment thereto (including a Part II, if any), I have not been declined or postponed

for insurance, or been offered a policy different from that applied for by any other in-

surance company, and that I have sustained no personal injury, have not been afflicted

with any disease whatsoever, except as stated in the above described application, nor

have I consulted any physician or received any medical or surgical advice or attention,

except as follows:

_____

_____

_____

_____

(If there are no exceptions, so state)

This statement is made for the purpose of inducing said General American Life Insurance

Company to deliver Policy(ies) No._____8,463,961_____

on my life and it is agreed that if any of the statements contained herein are untrue, said

policy(ies) shall be void. I also renew all the representations, covenants and agree-

ments expressed in the aforesaid application and any supplement or amendment thereto

(including a Part II, if any).

Date ___11-31-90___

X _Michael Sigal_
      Proposed Insured

DATE  DEC 04 1990
INITIAL  MARNIA C.A. YOUNG
          PREM. ADM. DEPT.

DUPLICATE

Form 1405 (Rev. 1985)

White - Original • Yellow - File Copy

## POLICY RECEIPT

I certify that I have reviewed the copy of the application attached to this policy #  8,463,961

and that the information is accurately recorded and is correct and true, to the best of my knowledge

and belief. I further certify that the information contained in the application(s) for this insurance

remains true and correct as of the date I sign this statement. There has been no change in the

circumstance and/or health of the insured(s) since the date of the application and/or examination

for insurance.

I have received the said policy on this date and accept it as issued.

I also affirm that the coverage provided by this policy was explained to me and that I understand the

insurance protection provided.

Also, I understand that I may return this policy within twenty days and any premium paid will be

returned.

If policyowner other than insured, the insured is certifying only to the information in the application

and the circumstance of his/her health.

Dated at _____ , this ___ day of _____ , 19___

_____
(Agent)

_____
(Policyowner)

X _____
(Insured)

**DUPLICATE**

**General American**
LIFE INSURANCE COMPANY
ST. LOUIS, MISSOURI 63166

DATE DEC 0 4 1990
INITIALS   MARNIACIA YOUNG
PREM. ADM. DEPT.

Maine.gov

Agencies | Online Services | Help   Page Tools [ ∨ ] GO                     State Search: [        ] GO

BUREAU OF
INSURANCE

Home

About us

Licensee
search

Licensing &
registration

Consumer
information

Company
services

Adjuster,
Producer &
Business
Entity services

Employer
information

Laws, rules &
bulletins

Administrative
and
Enforcement
actions

Frequently
Asked
Questions
(FAQs)

Department of
Professional &
Financial
Regulation

OTHER PFR
AGENCIES

Professional
Licensing

Consumer
Credit
Protection

Financial &
Banking
Regulation

Securities &
Investment
Regulation

CONSUMER
TOOLS

Consumer information

Home Inventory Tool

Compare Individual and
Small Group Health
Insurance Policies

Brochures

File a complaint

Glossary of terms

Cancellation/Nonrenewal
Notices

Helpful links

PPACA Filings/Rate
increases

Long Term Care
Partnership

INDUSTRY
TOOLS

Physician Tiering
Program Reporting

Online Data Reporting
System

Company forms and
information

Producer and Business
Entity forms and
information

Address change forms

Fees

Cancellation/Nonrenewal
Notices

Request for proposal

Domestic Insurance
Company Annual
Statements

EMPLOYER
TOOLS

Workers compensation
insurance

Health insurance
information

Rural Medical Access
Program

HEALTH CARE
PROVIDER
TOOLS

Any Willing Pharmacy
Requirements

IN THE MATTER OF

**THE PAUL REVERE LIFE INSURANCE COMPANY**
Worcester, Massachusetts

**REGULATORY SETTLEMENT AGREEMENT**

**TARGETED MULTISTATE DISABILITY
INCOME MARKET CONDUCT EXAMINATION**

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ___ day of November, 2004, by and between The Paul Revere Life Insurance Company (the "Company"), the Commissioner of the Massachusetts Division of Insurance (the "Lead Regulator"), the Commissioner of the Tennessee Department of Commerce and Insurance and the Superintendent of the State of Maine Bureau of Insurance, (collectively with the Lead Regulator, the "Lead Regulators"), the insurance regulators of each of the remaining States, the District of Columbia and American Samoa that adopt, agree to and approve this Agreement (the "Participating Regulators") and the United States Department of Labor (the "DOL").

**A. Recitals**

1. The Company maintains its home office at Worcester, Massachusetts. At all relevant times, the Company has been a licensed insurance company domiciled in the Commonwealth of Massachusetts. The Company and its affiliates Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company (collectively, "Provident") and Unum Life Insurance Company of America ("Unum") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Provident is and has been a licensed insurance company domiciled in the State of Tennessee, and Unum is and has been a licensed insurance company domiciled in the State of Maine. The Company, Provident, and Unum, are collectively referred to as the "Companies."

2. On September 2, 2003, the Lead Regulators of the domiciliary states of the Companies, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of the Provident Life and Accident Insurance Company and Unum (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3. The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously with the Multistate Examination, the DOL was conducting an investigation of the Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4. As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the Companies to address those concerns for the benefit of the Companies' current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical regulatory settlement agreements between each of Provident and Unum and their respective domiciliary states and to the payment of a $15,000,000 fine. In addition, the insurer subsidiary of the Parent Company that is domiciled in New York, First Unum Life Insurance Company (the "New York subsidiary"), will enter into a substantially identical regulatory settlement agreement with the New York Superintendent of Insurance and the Lead Regulators. As the result of the ongoing Multistate Examination and the DOL Investigation, the Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement and/or the entry of consent orders where necessary under the law or practice of a particular Participating Regulator's state.

5. The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

**EXHIBIT D**

a. provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b. provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by (i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

c. provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Companies hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

6. This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Company's compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

7. Location of Definitions. Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

a. "Agreement" is defined in the preamble paragraph.

b. "AP" is defined in paragraph B.3.c.(i)

c. "Applicable Consent Order" is defined in paragraph C.5.c.

d. "Board of Directors" is defined in paragraph B.1.a.

e. "Claim Reassessment Process" is set forth in paragraph B.2.

f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

g. "Company" is defined in the preamble paragraph.

h. "Companies" is defined in paragraph A.1.

i. "DOL" is defined in the preamble paragraph.

j. "DOL Investigation" is defined in paragraph A.3.

k. "ERISA" is defined in paragraph A.3.

l. "FCE" is defined in paragraph B.3.c.(i)

m. "Governance Implementation Date" is defined in paragraph B.1.a.

n. "Group" is defined in paragraph B.3.j.

o. "Handbook" is defined in paragraph A.2.

p. "IME" is defined in paragraph B.3.c.(i)

q. "Implementation Date" is defined in paragraph B.2.a.

r. "Lead Regulator(s)" is defined in the preamble paragraph.

s. "Model Act" is defined in paragraph A.2.

t. "Multistate Examination" is defined in paragraph A.2.

u. "New York subsidiary" is defined in paragraph A.4.

v. "NAIC" is defined in paragraph A.2.

w. "Parent Company" is defined in paragraph A.1.

x. "Participating Regulators" is defined in the preamble paragraph.

y. "Plan" is defined in the heading to paragraph B.

z. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

aa. "Requesting Claimant" is defined in paragraph B.2.b.

bb. "Specified Claimant" is defined in paragraph B.2.b.

## B. Plan of Corrective Action (the "Plan")

1. Changes in Corporate Governance

a. Expansion of Board of Directors. The Lead Regulators, and the Board of Directors of the Parent Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors. (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.) The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange. In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The Company shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004. If the two proposed new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004. However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified candidates, as appropriate, to propose as members of the Board of Directors. Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting. The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004. In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience. In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005. If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval. If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

b. Audit Committee. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

c. Creation of Regulatory Compliance Committee. No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee". The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA, and the Companies' compliance with the Plan, along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d. Creation of Regulatory Compliance Unit. No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below. The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct

matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i) monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters. Employees of the Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit. Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance of which will be monitored by the Regulatory Compliance Unit. A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

e. Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL. During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the Company shall each meet separately with the Lead Regulators to evaluate compliance with the Plan. The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate. The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

2. Claim Reassessment Process

a. Formation of Claim Reassessment Unit. Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators, the DOL and no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the Companies (and assuming approval of substantially identical regulatory settlement agreements between each of Provident and Unum and their respective domiciliary regulators, and the execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators) (the "Implementation Date"), the Company shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

b. Implementation of Claim Reassessment Process. Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the Companies shall mail a notice (in the form of Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit established for that purpose. "Specified Claimant" means any claimant of one of the Companies or any claimant of the New York subsidiary, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the Company challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

1. Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

2. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000

date; and

3. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests to participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the Company his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election to participate, (iii) that the Claim Reassessment Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the Claim Reassessment, (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d. The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision. In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy. The Company shall maintain its records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4. The Company commits to use its best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

c. Monitoring of Claim Reassessment Process. The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly. The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate. The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate. The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process. The DOL shall receive notice of these meetings and may attend as it deems appropriate.

d. Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the Company, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the Company may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating

benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the Company's obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

3. Changes in Claim Organization and Procedures

a. Changes in Claim Organization. The Company's claim organization shall include the following ongoing objectives:

(i) Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

(ii) Increased emphasis upon claim staff accountability for compliance with the terms of insurance           policies and applicable law;

(iii) Increased involvement of higher levels of management in claim denial and benefit termination           decisions through approval requirements;

(iv) Creation of a separate compliance-accountability function at the claim denial and benefit termination level focusing on compliance, documentation, accountability for compliance, whether           the claimant has been treated fairly under the circumstances, and any action that may be construed           as an instance of an improper claim practice.

No later than the Implementation Date, the Company shall implement changes to its claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

b. Communications with Appeals Personnel. Company personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other Company personnel involved with the separate appeal process following denial of benefits or termination of any claim.

c. Changes in Claim Procedures. The Company's claim procedures shall include the following ongoing objectives:

(i) Increased focus on policies and procedures relating to medical and related evidence, including           but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;
- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;
- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation ("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii) Clear and express notice to claimants of the information to be provided by the claimants and the information to be collected by the Company. If a file is determined to lack specific information,           Company personnel will work with claimant to obtain such information in accordance with           appropriate procedures established for such purposes.

No later than the Implementation Date, the Company shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

d. Selection of Evaluation Personnel. The Company shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

e. Professional Certification. Each clinical, vocational and medical professional employed by the Company must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which

includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by Company personnel bearing on the impairment for which such professional is trained prior to making a determination as to such impairments.

f. Providing Medical, Clinical and/or Vocational Evidence. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the Company or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

g. Claims involving co-morbid conditions. (i) When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the Implementation Date, the Companies will implement improved procedures for evaluating claims which involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

h. Training. No later than March 1, 2005, substantially all employees in the Company's claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) Company personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a claimant, and (ii) Company personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The Company hereby confirms that it shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

i. Monitoring of Compliance with Revised Claim Procedures. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;
- Obtain complete medical records;
- Fairly interpret or apply information from the claimant's AP;
- Use appropriate in-house medical resources;
- Fairly interpret or apply in-house medical opinions;
- Contact AP where circumstances warrant;
- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;
- Fairly interpret or apply IME or FCE results;
- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow Company claim procedures or other Company procedures.

. Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;

- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j. Standard for Compliance. The Company shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard. Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term *group* and *individual* disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k. Opportunity for Review and Comment. The Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l. Claim Files. A claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), which shall be maintained in the claim file either in a paper file, or in electronic form in the case of the Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

## C. Other Provisions

1. This Agreement shall be governed by and interpreted according to laws of the Commonwealth of Massachusetts, excluding its conflict of laws provisions, and any applicable federal laws.

2. It is expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will monitor the Company's compliance with this Agreement and any Consent Order to which it is attached. The DOL may also monitor the Company's compliance with this Agreement and any consent Order to which it is attached. It is further expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will conduct a full re-examination of the issues addressed by the Multistate Examination within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3. The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by the Agreement, shall be paid by the Company.

4. This Agreement is being made in conjunction with the entry of related Consent Orders arising from the Multistate Examination, and it shall be implemented and administered harmoniously with those Consent Orders.

5. a. The Lead Regulator shall deliver this Agreement to each of the Participating States within five (5) days following its execution by the Company, the DOL and the Lead Regulator.

b. Each person signing on behalf of a Participating State gives his/her express assurance that under applicable state laws, regulations and judicial rulings, that the person has the authority to enter into this Agreement on behalf of the Participating State.

c. Each Participating Regulator shall execute and deliver this Agreement to the Lead Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. If a Participating Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Participating Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. The Lead Regulators may waive the thirty (30) day period for Participating Regulators to execute this Agreement.

d. For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to the Company if it: (i) incorporates by reference and attaches via exhibit a copy of this Agreement, (ii)

expressly adopts and agrees to the provisions of this Agreement, and (iii) includes only those other terms that may be legally required in the state of the applicable Participating Regulator. However, nothing in this Agreement shall be construed to require any state to execute and deliver an Applicable Consent Order if such state elects instead to sign this Agreement.

6. Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which any of the Companies provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

7. Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

8. A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all three of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

9. This Agreement shall remain in effect until the later of (i) January 1, 2007; (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2. Except as set forth in paragraph C.10 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.9.

10. Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.9 above:

(i) This Agreement shall survive as to the following provisions, which also individually survive: paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.l (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.8), two-thirds of the Participating Regulators and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.9 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

11. Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator, the DOL or the Participating Regulators as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the Companies or the Parent Company, or as a waiver by the Company, the Companies or the Parent Company of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

12. The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

13. Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy. Neither this Agreement nor any relief to be offered under this Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 13 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

14. The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of the Agreement by appropriate documentation of no less than two-thirds of the Participating States unless a lesser number is agreed by the Company, (iii) approval and execution of substantially identical regulatory settlement agreements between each of Provident and Unum and their respective domiciliary regulators, and (iv) the approval and execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators.

15. During the pendency of this Agreement, each of the Participating Regulators agrees that such Participating Regulator and his or her insurance department (i) will not conduct a market conduct examination of the Companies relating to the Model Act, and (ii) will not impose a fine, injunction or any other remedy on any of the Companies for any of the matters that are the subject matter of this Agreement and may only participate on terms set forth in this Agreement in any fine or remedy that may be imposed under this Agreement . Notwithstanding the foregoing, upon notice from any Participating Regulator to the Lead Regulators, the Participating Regulator and the Lead Regulators shall proceed to investigate an assertion of the Company's non-compliance herewith regarding residents of said Participating Regulator's state.

16. This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company without the consent of any Participating Regulator, provided that any such amendment does not materially alter this Agreement. Any amendment to the terms of the Agreement (or to its Exhibits and their Attachments) which would affect the regulatory authority of any Participating Regulators(s) shall not become effective without the consent of such Participating Regulator(s). All such amendments to this Agreement shall be in writing.

17. The DOL may enter into arrangements or agreements with any of the Lead Regulators or Participating Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators or Participating Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

18. For the duration of this Agreement, if any Lead Regulator or Participating Regulator finds any information which it believes constitutes a violation of ERISA with respect to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

## D. Remedies

1. In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

2. In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

3. In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

4. In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

5. In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

6. Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance

standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

      7. Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

      8. The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

      9. Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to this Agreement (unless the Company consents to a lower number) and the other conditions of effectiveness set forth in paragraph C.14 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

      10. In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulators and Participating Regulators retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

      11. The obligation, as among the individual Company members of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each Company to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such Company.

      12. All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the Company's premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

      13. The Lead Regulators, the DOL and the Participating Regulators reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

      14. The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

THE PAUL REVERE LIFE INSURANCE COMPANY

BY:_____

ITS:_____

November ___, 2004

MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
    Julianne M. Bowler, Commissioner

November ___, 2004

TENNESSEE DEPARTMENT OF COMMERCE    MAINE BUREAU OF INSURANCE
AND INSURANCE

BY:_____     BY:_____
    Paula A. Flowers, Commissioner        Alessandro A. Iuppa

November __, 2004                              Superintendent

                                              November __, 2004


ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COOMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY ADMINISTRATION

BY:_____
    James M. Benages
    Regional Director
    Employee Benefits Security Administration

    November __, 2004


Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203
TEL:(617)565-9600
FAX:(617)565-9666


**PARTICIPATING REGULATOR ADOPTION**

    On behalf of [Insert the State and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

BY:_____
    [Title of Regulator]

    November __, 2004


Last Updated: **August 22, 2012**

Copyright © 2006 All rights reserved.

**Maine.gov**   Agencies | Online Services | Help   [Page Tools ▼] [GO]   State Search: [_____] [GO]

BUREAU OF INSURANCE

| Home |
| About us |
| Licensee search |
| Licensing & registration |
| Consumer information |
| Company services |
| Adjuster, Producer & Business Entity services |
| Employer information |
| Laws, rules & bulletins |
| Administrative and Enforcement actions |
| Frequently Asked Questions (FAQs) |

| Department of Professional & Financial Regulation |

OTHER PFR AGENCIES

| Professional Licensing |
| Consumer Credit Protection |
| Financial & Banking Regulation |
| Securities & Investment Regulation |

CONSUMER TOOLS

Consumer information
Home Inventory Tool
Compare Individual and Small Group Health Insurance Policies
Brochures
File a complaint
Glossary of terms
Cancellation/Nonrenewal Notices
Helpful links
PPACA Filings/Rate increases
Long Term Care Partnership

INDUSTRY TOOLS

Physician Tiering Program Reporting
Online Data Reporting System
Company forms and information
Producer and Business Entity forms and information
Address change forms
Fees
Cancellation/Nonrenewal Notices
Request for proposal
Domestic Insurance Company Annual Statements

EMPLOYER TOOLS

Workers compensation insurance
Health insurance information
Rural Medical Access Program

HEALTH CARE PROVIDER TOOLS

Any Willing Pharmacy Requirements

**IN THE MATTER OF**

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY Chattanooga, Tennessee**

**REGULATORY SETTLEMENT AGREEMENT**

**TARGETED MULTISTATE DISABILITY INCOME MARKET CONDUCT EXAMINATION**

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ____ day of November, 2004, by and between Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company (collectively, the "Company"), the Commissioner of the Tennessee Department of Commerce (the "Lead Regulator"), the Superintendent of the State of Maine Bureau of Insurance and the Commissioner of the Massachusetts Division of Insurance (collectively with the Lead Regulator, the "Lead Regulators"), the insurance regulators of each of the remaining States, the District of Columbia and American Samoa that adopt, agree to and approve this Agreement (the "Participating Regulators") and the United States Department of Labor (the "DOL").

**A. Recitals**

1. The Company maintains its home office at Chattanooga, Tennessee. At all relevant times, the Company has been a licensed insurance company domiciled in the State of Tennessee. The Company and its affiliates Unum Life Insurance Company of America ("Unum") and The Paul Revere Life Insurance Company ("Revere") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Unum is and has been a licensed insurance company domiciled in the State of Maine, and Revere is and has been a licensed insurance company domiciled in the Commonwealth of Massachusetts. The Company, Unum, and Revere, are collectively referred to as the "Companies."

2. On September 2, 2003, the Lead Regulators of the domiciliary states of the Companies, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of Provident Life and Accident Insurance Company, Unum and Revere (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the

**EXHIBIT E**

National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972)* or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3. The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously with the Multistate Examination, the DOL was conducting an investigation of the Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4. As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the Companies to address those concerns for the benefit of the Companies' current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical regulatory settlement agreements between Unum and Revere and their respective domiciliary regulators and to the payment of a $15,000,000 fine. In addition, the insurance subsidiary of the Parent Company that is domiciled in New York, First Unum Life Insurance Company (the "New York subsidiary"), will enter into a substantially identical regulatory settlement agreement with the New York Superintendent of Insurance and the Lead Regulators. As the result of the ongoing Multistate Examination and the DOL Investigation, the Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement and/or the entry of consent orders where necessary under the law or practice of a particular Participating Regulator's state.

5. The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

a. provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision

and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b. provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by (i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

c. provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Companies hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

6. This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Company's compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

7. Location of Definitions. Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

a. "Agreement" is defined in the preamble paragraph.

b. "AP" is defined in paragraph B.3.c.(i)

c. "Applicable Consent Order" is defined in paragraph C.5.c.

d. "Board of Directors" is defined in paragraph B.1.a.

e. "Claim Reassessment Process" is set forth in paragraph B.2.

f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

g. "Company" is defined in the preamble paragraph.

h. "Companies" is defined in paragraph A.1.

i. "DOL" is defined in the preamble paragraph.

j. "DOL Investigation" is defined in paragraph A.3.

k. "ERISA" is defined in paragraph A.3.

l. "FCE" is defined in paragraph B.3.c.(i)

m. "Governance Implementation Date" is defined in paragraph B.1.a.

n. "Group" is defined in paragraph B.3.j.

o. "Handbook" is defined in paragraph A.2.

p. "IME" is defined in paragraph B.3.c.(i)

q. "Implementation Date" is defined in paragraph B.2.a.

r. "Lead Regulator(s)" is defined in the preamble paragraph.

s. "Model Act" is defined in paragraph A.2.

t. "Multistate Examination" is defined in paragraph A.2.

u. "New York subsidiary" is defined in paragraph A.4.

v. "NAIC" is defined in paragraph A.2.

w. "Parent Company" is defined in paragraph A.1.

x. "Participating Regulators" is defined in the preamble paragraph.

y. "Plan" is defined in the heading to paragraph B.

z. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

aa. "Requesting Claimant" is defined in paragraph B.2.b.

bb. "Specified Claimant" is defined in paragraph B.2.b.

**B. Plan of Corrective Action (the "Plan")**

1. Changes in Corporate Governance

a. Expansion of Board of Directors. The Lead Regulators, and the Board of Directors of the Parent

Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors. (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.) The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange. In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The Company shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004. If the two proposed new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004. However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified candidates, as appropriate, to propose as members of the Board of Directors. Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting. The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004. In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience. In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005. If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval. If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the

Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

b. Audit Committee. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

c. Creation of Regulatory Compliance Committee. No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee". The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA, and the Companies' compliance with the Plan, along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d. Creation of Regulatory Compliance Unit. No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below. The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i) monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters. Employees of the Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit. Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance

of which will be monitored by the Regulatory Compliance Unit. A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

e. Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL. During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the Company shall each meet separately with the Lead Regulators to evaluate compliance with the Plan. The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate. The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

2. Claim Reassessment Process

a. Formation of Claim Reassessment Unit. Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators, the DOL and no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the Companies (and assuming approval of substantially identical regulatory settlement agreements between Unum and Revere and their respective domiciliary regulators, and the execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators) (the "Implementation Date"), the Company shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

b. Implementation of Claim Reassessment Process. Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the Companies shall mail a notice (in the form of Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit

established for that purpose. "Specified Claimant" means any claimant of one of the Companies or any claimant of the New York subsidiary, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the Company challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

1. Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

2. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000 date; and

3. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests to participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the Company his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election to participate, (iii) that the Claim Reassessment

Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the Claim Reassessment, and (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d. The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision. In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy. The Company shall maintain its records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4. The Company commits to use its best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

c. Monitoring of Claim Reassessment Process. The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly. The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate. The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate. The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by

the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process. The DOL shall receive notice of these meetings and may attend as it deems appropriate.

d. Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the Company, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the Company may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the Company's obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

3. Changes in Claim Organization and

Procedures

    a. Changes in Claim Organization. The Company's claim organization shall include the following ongoing objectives:

    (i) Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

    (ii) Increased emphasis upon claim staff accountability for compliance with the terms of insurance policies and applicable law;

    (iii) Increased involvement of higher levels of management in claim denial and benefit termination decisions through approval requirements;

    (iv) Creation of a separate compliance-accountability function at the claim denial and benefit termination level focusing on compliance, documentation, accountability for compliance, whether the claimant has been treated fairly under the circumstances, and any action that may be construed as an instance of an improper claim practice.

No later than the Implementation Date, the Company shall implement changes to its claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

    b. Communications with Appeals Personnel. Company personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other Company personnel involved with the separate appeal process following denial of benefits or termination of any claim.

    c. Changes in Claim Procedures. The Company's claim procedures shall include the following ongoing objectives:

    (i) Increased focus on policies and procedures relating to medical and related evidence, including but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;
- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;
- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation

("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii) Clear and express notice to claimants of the information to be provided by the claimants and the information to be collected by the Company. If a file is determined to lack specific information, Company personnel will work with claimant to obtain such information in accordance with appropriate procedures established for such purposes.

No later than the Implementation Date, the Company shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

d. Selection of Evaluation Personnel. The Company shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

e. Professional Certification. Each clinical, vocational and medical professional employed by the Company must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by Company personnel bearing on the impairment for which such professional is trained prior to making a determination as to such impairments.

f. Providing Medical, Clinical and/or Vocational Evidence. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the Company or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

g. Claims involving co-morbid conditions. (i) When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the

Implementation Date, the Companies will implement improved procedures for evaluating claims which involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

h. Training. No later than March 1, 2005, substantially all employees in the Company's claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) Company personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a claimant, and (ii) Company personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The Company hereby confirms that it shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

i. Monitoring of Compliance with Revised Claim Procedures. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;

- Obtain complete medical records;

- Fairly interpret or apply information from the claimant's AP;

- Use appropriate in-house medical resources;

- Fairly interpret or apply in-house medical opinions;

- Contact AP where circumstances warrant;

- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;
- Fairly interpret or apply IME or FCE results;
- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow Company claim procedures or other Company procedures.

Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;
- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j. Standard for Compliance. The Company shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard. Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term group and individual disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k. Opportunity for Review and Comment. The Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l. Claim Files. A claim file shall include all documents relating to a claim history and/or decision,

including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), which shall be maintained in the claim file either in a paper file, or in electronic form in the case of the Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

## C. Other Provisions

1. This Agreement shall be governed by and interpreted according to laws of the State of Tennessee, excluding its conflict of laws provisions, and any applicable federal laws.

2. It is expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will monitor the Company's compliance with this Agreement and any Consent Order to which it is attached. The DOL may also monitor the Company's compliance with this Agreement and any consent Order to which it is attached. It is further expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will conduct a full re-examination of the issues addressed by the Multistate Examination within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3. The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by the Agreement, shall be paid by the Company.

4. This Agreement is being made in conjunction with the entry of related Consent Orders arising from the Multistate Examination, and it shall be implemented and administered harmoniously with those Consent Orders.

5. a. The Lead Regulator shall deliver this Agreement to each of the Participating States within five (5) days following its execution by the Company, the DOL and the Lead Regulator.

b. Each person signing on behalf of a Participating State gives his/her express assurance that under applicable state laws, regulations and judicial rulings, that the person has the authority to enter into this Agreement on behalf of the Participating State.

c. Each Participating Regulator shall execute and deliver this Agreement to the Lead Regulator within thirty (30) days following the receipt of this Agreement

from the Lead Regulator. If a Participating Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Participating Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. The Lead Regulators may waive the thirty (30) day period for Participating Regulators to execute this Agreement.

d. For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to the Company if it: (i) incorporates by reference and attaches via exhibit a copy of this Agreement, (ii) expressly adopts and agrees to the provisions of this Agreement, and (iii) includes only those other terms that may be legally required in the state of the applicable Participating Regulator. However, nothing in this Agreement shall be construed to require any state to execute and deliver an Applicable Consent Order if such state elects instead to sign this Agreement.

6. Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which any of the Companies provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

7. Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

8. A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all three of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

9. This Agreement shall remain in effect until the later of (i) January 1, 2007; (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2. Except as set forth in paragraph C.10 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.9.

10. Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.9 above:

(i) This Agreement shall survive as to the following provisions, which also individually survive: paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.I (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.8), two-thirds of the Participating Regulators and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.9 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

11. Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator, the DOL or the Participating Regulators as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the Companies or the Parent Company, or as a waiver by the Company, the Companies or the Parent Company of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

12. The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

13. Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy. Neither this Agreement nor any relief to be offered under this

Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 13 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

14. The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of the Agreement by appropriate documentation of no less than two-thirds of the Participating States unless a lesser number is agreed by the Company, (iii) approval and execution of substantially identical regulatory settlement agreements between each of the other two insurance companies that come within the definition of Companies and their respective domiciliary regulators, and (iv) the approval and execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators.

15. During the pendency of this Agreement, each of the Participating Regulators agrees that such Participating Regulator and his or her insurance department (i) will not conduct a market conduct examination of the Companies relating to the Model Act, and (ii) will not impose a fine, injunction or any other remedy on any of the Companies for any of the matters that are the subject matter of this Agreement and may only participate on terms set forth in this Agreement in any fine or remedy that may be imposed under this Agreement . Notwithstanding the foregoing, upon notice from any Participating Regulator to the Lead Regulators, the Participating Regulator and the Lead Regulators shall proceed to investigate an assertion of the Company's non-compliance herewith regarding residents of said Participating Regulator's state.

16. This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company without the consent of any Participating Regulator, provided that any such amendment does not materially alter this Agreement. Any amendment to the terms of the Agreement (or to its Exhibits and their Attachments) which would affect the regulatory authority of any Participating Regulators(s) shall not become effective without the consent of such Participating Regulator(s). All such amendments to this Agreement shall be in writing.

17. The DOL may enter into arrangements or

agreements with any of the Lead Regulators or Participating Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators or Participating Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

18. For the duration of this Agreement, if any Lead Regulator or Participating Regulator finds any information which it believes constitutes a violation of ERISA with respect to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

## D. Remedies

1. In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

2. In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

3. In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

4. In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

5. In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

6. Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions

were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

7. Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

8. The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

9. Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to this Agreement (unless the Company consents to a lower number) and the other conditions of effectiveness set forth in paragraph C.14 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

10. In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulators and Participating Regulators retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

11. The obligation, as among the individual Company members of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each Company to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such Company.

12. All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the Company's premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

13. The Lead Regulators, the DOL and the Participating Regulators reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14. The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY
PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY

BY:_____

THEIR:_____

November ___, 2004


TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE

BY:_____
    Paula A. Flowers, Commissioner

November ___, 2004


MAINE BUREAU OF INSURANCE

BY:_____
    Alessandro A. Iuppa, Superintendent



November ___, 2004


MASSACHUSETTS DIVISION OF INSURANCE

BY:_____
    Julianne M. Bowler, Commissioner

November ___, 2004


ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COOMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY
ADMINISTRATION

BY:_____
    James M. Benages
    Regional Director
    Employee Benefits Security Administration

    November ___, 2004


Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203
TEL:(617)565-9600
FAX:(617)565-9666


## PARTICIPATING REGULATOR ADOPTION

    On behalf of [Insert the State and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

BY:_____
    [Title of Regulator]

    November ___, 2004


Last Updated: **August 22, 2012**

Copyright © 2006 All rights reserved.

## VERIFICATION

I, Michael B. Sigal, verify that the foregoing Complaint in Civil Action is true and correct to the best of my personal knowledge, information and belief. This statement and verification is made subject to the penalties of *18 Pa. C.S. §4904* relating to unsworn falsification to authorities, which provides that if I make knowingly false averments, I may be subject to criminal penalties.

Date: December 15, 2012